Robert C. Niesley, Esq. (SBN 131373)
rniesley@watttieder.com
Kyle S. Case, Esq. (SBN 323653)
kcase@watttieder.com
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
4 Park Plaza, Suite 1000
Irvine, CA  92614
Telephone:  949-852-6700
Facsimile:   949-688-2139

Attorneys for Defendant
LIBERTY MUTUAL INSURANCE COMPANY,
THE OHIO CASUALTY INSURANCE
COMPANY, and LIVERMORE MULTIFAMILY
OWNER, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| SBI BUILDERS, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY; THE OHIO CASUALTY INSURANCE COMPANY; LIVERMORE MULTIFAMILY OWNER, LLC, a Delaware limited liability company,<br><br>    Defendant. | CASE NO.<br><br>**DEFENDANT LIBERTY MUTUAL INSURANCE COMPANY'S NOTICE OF REMOVAL**<br><br>Complaint Filed: 08/03/2023<br>Trial Date: 02/04/2025 |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant LIBERTY MUTUAL INSURANCE COMPANY ("Liberty") hereby removes to this Court the state action described below.

1.      On June 10, 2024, an action was commenced in the Superior Court of the State of California in and for the County of Alameda, entitled *SBI Builders, Inc. v. Liberty Mutual Insurance Company*, et al., as Case Number 24CV0709070. A copy of the complaint is attached hereto as Exhibit "A".

2.      The first date upon which Liberty received a copy of the said complaint was June 12, 2024, when Liberty had learned that the complaint was filed and purchased a copy of the complaint through the Superior Court, County of Alameda's website. To date, Liberty has not been served with the complaint.

## JURISDICTION

3.      This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this Court by Liberty pursuant to the provisions of 28 U.S.C. § 1441(b) in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs because Plaintiff SBI BUILDERS, INC. ("SBI") contends in its complaint that "there is presently due and owing in excess of $5 million to Plaintiff." (See, Exhibit "A" hereto, pg. 6:12-13).

4.      Complete diversity of citizenship exists in that: Plaintiff SBI was and is incorporated and has its principal place of business in the State of California; Liberty was and is incorporated and has its principal place of business in the State of Massachusetts; and Defendant THE OHIO CASUALTY INSURANCE COMPANY ("OCIC") was and is incorporated and has its principal place of business in the State of New Hampshire.

5.      The complaint herein (Exhibit "A") also names as defendant LIVERMORE MULTIFAMILY OWNER, LLC ("Livermore"). For purposes of diversity jurisdiction, a limited liability company is a citizen of each state of which its owner/members are citizens. *Johnson v. Columbia Properties Anchorage, LP* (9th Cir. 2006) 437 F.3d 894, 899. In this case, despite Livermore being formed in Delaware, Livermore has members/owners who are domiciled in the State of California. However, the citizenship of Livermore should be disregarded for purposes of determining jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1442(b) on the ground that there is no possibility that SBI will be able to establish liability against Livermore for the following reasons:

In its complaint, SBI alleges a singular cause of action against Livermore for Quantum Meruit (*See*, Ex. A, pg. 6). However, as explained below, there is no possibility that SBI will be able to establish liability against Livermore on a theory of quantum meruit.

### a.     Background Facts

This case stems from a construction project known as Legacy at Livermore ("Project"), located at 1934 First Street, Livermore, CA 94550 ("Property"). On or about October 29, 2019, Livermore entered into a written contract with Katerra Construction, LLC ("Katerra") to construct the Project. Pursuant to the request of Katerra, Liberty, as surety, issued performance and payment bonds on behalf of Katerra, in connection with the Project.

Subsequently, on June 1, 2021, Katerra disclosed its intent to abandon the Project and subsequently filed for bankruptcy protection in the Southern District of Texas. Livermore notified Liberty of Katerra's termination and demanded that Liberty take over the Project under the terms of the performance bond.

On October 21, 2021, Liberty executed a Takeover Agreement with Livermore to complete the construction of the Project. A true and correct copy of the Takeover Agreement is attached hereto as Exhibit "B". The Takeover Agreement required Liberty to find a contractor to complete the obligations of Katerra pursuant to the contract documents in the underlying bonded contract.

Upon execution of the Takeover Agreement, Liberty issued a Request for Proposal ("RFP") for contractors to submit proposals to complete the Project. In response to the RFP, SBI submitted a proposal.

On February 3, 2022, Liberty executed a Completion Agreement with SBI to complete the construction of the Project. A true and correct copy of the Completion Agreement is attached hereto as Exhibit "C".

Now, disputes have arisen between SBI and Liberty in connection with the Completion Agreement. On or about December 7, 2023, SBI recorded a mechanics

Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
Attorneys At Law

lien in connection with the Project. Thereafter, on December 19, 2023, at the request of Livermore, OCIC issued a mechanics lien release bond ("Release Bond") for the benefit of Livermore.

On June 10, 2024, SBI initiated an action in the Alameda County Superior Court alleging causes of action against Liberty, Livermore and OCIC. Specifically, as to Liberty, SBI asserts causes of action for Breach of Contract, Quantum Meruit, and Common Counts. As to OCIC, SBI seeks to recover against the Release Bond. Finally, as to Livermore, SBI only seeks to recover under the theory of Quantum Meruit.

> b.  <u>Analysis</u>

There is no possibility that SBI will be able to establish liability against Livermore for quantum meruit.

"The elements of quantum meruit are: (1) that the plaintiff performed certain services for the defendant, (2) their reasonable value, (3) that they were rendered at defendant's request, and (4) that they are unpaid." *Cedar Sinai Medical Center v. Mid-West National Lise Ins. Co.* (C.D. Cal. 2000) 118 F.Supp.2d 1002, 1013.

"To recover in quantum meruit, the plaintiff must establish *both* that he or she was acting pursuant to either an *express or implied request* for such services from the defendant *and* that the services rendered were *intended to and did benefit* the defendant; further, the defendant must have retained the benefit with full appreciation of the facts." *Pacific Bay Recovery, Inc. v. California Physicians' Services, Inc.* (2017) 12 Cal.App.5th 200, 214-15.

Moreover, case law demonstrates that absent a request by the defendant for the work performed, a quantum meruit claim will fail. *See*, *Stanford Health Care v. Blue Cross Blue Shield of North Carolina, Inc.* (2022) WL 195847 ("there must be circumstances indicating that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made"); *Cedars Sinai Medical Center v. Mid-West Nat. Life Ins. Co.* (C.D. Cal. 2000) 118

F.Supp.2d 1002 ("Cedars' claim for quantum meruit lacks merit because Cedars did not treat Bernheim at Mid-West's request.")

In this case, Livermore did not request SBI to perform any work. Rather, the work performed by SBI was at the request of Liberty pursuant to the Completion Agreement. Indeed, it was Liberty who issued the RFP and it was Liberty who contracted with SBI. Legacy was simply the owner of the Project. SBI was the completion contractor hired by Liberty as Takeover Surety. SBI's role vis-à-vis Owner was akin to a subcontractor.

California case law has held that a subcontractor/supplier lacks the ability to seek an unjust enrichment claim against an owner. *See*, *Truestone, Inc. v. Simi West Industrial Park II* (1984) 163 Cal.App.3d 715, 724, where summary judgment was granted in property owner's favor against a subcontractor's claim for unjust enrichment ("A subcontractor, who has no direct contractual relationship with the property owner, may generally not recover on an unjust enrichment theory for benefits conferred on the property.")

For these reasons, SBI's action against Livermore for quantum meruit will fail, and Livermore has been fraudulently joined in this action. As a result, Livermore's citizenship should not be considered for purposes of determining diversity jurisdiction, and this case should be properly removed to this Court.

## DIVISIONAL ASSIGNMENT

6.    Venue is proper in this Oakland Division as the SBI Superior Court action (Case No. 24CV0709070) was filed in the Superior Court of California in and for the County of Alameda. The County of Alameda falls within the jurisdiction of the Oakland Division. (*See*, L.R. 3-2(d)) Moreover, "[a] defendant or defendants desiring to remove any civil action from a State court shall file in the district court of the United States for the district and division within which such action is pending…" 28 U.S.C. § 1446(a).

/ / /

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
ATTORNEYS AT LAW

7.     Liberty is informed and believes that OCIC and Livermore have not been served with a copy of SBI's summons and complaint. Therefore, joinder of OCIC and Livermore with this Notice of Removal is not required. *See*, *Gossmeyer v. McDonald* (7th Cir. 1997) 128 F.3d 481, 489; *Destfino v. Reiswig* (9th Cir. 2011) 630 F.3d 952, 957. Nonetheless, both OCIC and Livermore join in this Notice of Removal.

Dated: July 12, 2024                    Watt, Tieder, Hoffar & Fitzgerald, L.L.P.

By: _____
       Robert C. Niesley
       Kyle S. Case
       Attorneys for Defendant
       LIBERTY MUTUAL INSURANCE
       COMPANY, THE OHIO
       CASUALTY INSURANCE
       COMPANY, and LIVERMORE
       MULTIFAMILY OWNER, LLC

20288425.1 103735.00109

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

LIBERTY MUTUAL INSURANCE COMPANY'S NOTICE OF REMOVAL

# EXHIBIT A

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
06/10/2024 at 02:17:15 PM
By: Damaree Franklin,
Deputy Clerk

CRAIG WALLACE (SBN 174043)
cwallace@smithcurrie.com
**SMITH, CURRIE & HANCOCK LLP**
1999 Harrison, Suite 1025
Oakland, CA 94612
Telephone: (415) 394-6688
Facsimile: (415) 394-6687

Attorneys for Plaintiff
SBI Builders, Inc.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA – UNLIMITED JURISDICTION

| | |
|---|---|
| SBI BUILDERS, INC. | Case No.: **24CV079070** |
| Plaintiff, | **SBI BUILDERS, INC.'S, COMPLAINT FOR:** |
| v. | **1) BREACH OF CONTRACT** |
| LIBERTY MUTUAL INSURANCE COMPANY; THE OHIO CASUALTY INSURANCE COMPANY; LIVERMORE MULTIFAMILY OWNER, LLC, a Delaware limited liability company, DOES 1 through 20 | **2) QUANTUM MERUIT**<br>**3) COMMON COUNT**<br>**4) FORECLOSURE OF MECHANIC'S LIEN RELEASE BOND** |
| Defendants. | |

Comes now Plaintiff SBI Builders, Inc. and alleges against Defendants Liberty Mutual

Insurance Company, The Ohio Insurance Company, Livermore Multifamily Owner, LLC, and DOES

1 through 20, as follows:

**GENERAL ALLEGATIONS**

1.    Plaintiff SBI Builders, Inc. ("SBI"), is a California corporation in good standing at all

times pertinent to the issues in this matter and is, and was at all times, licensed to do business as a

general construction contractor in the State of California, license B-860997.

2.    Plaintiff is informed and believes, and on that basis alleges, Defendant Liberty Mutual

Insurance Company ("Liberty") is an insurance company and a corporation authorized to do business

SMITH, CURRIE & HANCOCK LLP
1999 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

in California acting in the role of a construction surety bond related to the matters alleged in this action.

3.       Plaintiff is informed and believes, and on that basis alleges, Defendant Livermore Multifamily Owner, LLC, ("Livermore") is an entity of unknown form in the business of property development in California and which has an ownership interest in the real property and improvements at 1934 First Street, Livermore, California, 94550, and which is at issue in this matter.

4.       Plaintiff is informed and believes, and on that basis alleges, that Defendant The Ohio Insurance Company ("Ohio-Bond Surety"), a New Hampshire Corporation, in the business of providing surety bonds in California, and which issued Bond Number 906225878 on or about December 12, 2023, identifying Livermore Multifamily Owner, LLC, a Delaware limited liability company ("Owner"), as principal and SBI as Obligee, in the penal sum of $13,524,338.00, purporting to release the Property from Plaintiff's mechanic's lien ("Bond").

5.       The true names and capacities, whether individual, corporate, or otherwise, of the Defendants named herein as DOES 1-20, inclusive, are unknown to Plaintiff, and Defendants therefore are sued by such fictitious names pursuant to Code of Civil Procedure section 474.  When the true names and capacities of such fictitiously named Defendants have been ascertained, Plaintiff will seek leave of court to amend this complaint to show the true names and capacities of Defendants.

6.       Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the Defendants designated herein as DOES 1-10, inclusive, was, and/or now is, the agent, employee, officer, director, partner, joint venturer, stockholder or related corporation of one or more of the other Defendants and is responsible in some manner for the events and happenings referred to herein.

7.       Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the Defendants designated herein as DOES 11-20, inclusive, was, and/or now is,

SMITH, CURRIE & HANCOCK LLP
1999 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

**SBI BUILDERS, INC., COMPLAINT**

the agent, employee, officer, director, partner, joint venturer, stockholder or related corporation of one or more of the other Defendants and is an owner or reputed owner, or has some other legally cognizable interest in the real property and improvements at issue in this action and to which the mechanic's lien attaches.

8.    On or about February 3, 2022, Liberty and SBI entered into a construction contract, referred to as the Completion Agreement, in which SBI would act as the general contractor to complete the Project on which the original general contractor defaulted and failed to complete the project ("Agreement").  Liberty, in the role of a surety which issued a performance bond related to the original Project, contracted with SBI to complete the Project.  The Project is a multifamily project at 1934 First Street, Livermore, California, 94550 ("Project").  A partial true and correct copy of the Agreement is attached hereto as Exhibit A and incorporated herein – some limited confidential and proprietary information is redacted and the exhibits are not attached as these contain confidential and proprietary information.

9.    The Agreement was a lump sum agreement.  It included terms providing that change orders for both costs and time would issue to SBI to repair defective work performed by the original contractor.  It did not include any Project phasing meaning the whole Project would be delivered to Liberty at one time, rather than breaking it up into different parts of the Project being delivered at different times while other parts would be in use and occupied by tenants.

10.    As provided in the Agreement, SBI began its Project work and Liberty made the agreed upon monthly payments.  SBI would submit the contractually required Project schedule and schedule analysis narrative each month.  Liberty made no comments about the schedule or the narrative.

11.    As the work progressed, substantial defective work was discovered and, as authorized in the Agreement, SBI submitted change orders for the repairs totaling approximately $14 million.

SMITH, CURRIE & HANCOCK LLP
1990 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

Liberty refused to agree to even one day of additional time related to the $14 million of defective repair work.  In addition, Liberty then broke the Project delivery into phases requiring parts of the Project be delivered earlier than other parts of the Project.  This significantly increased the costs to complete the overall Project, but Liberty refused to grant any additional change orders to SBI related to this change of Project sequencing.

12.    For approximately 17 months of Project work, SBI submitted its monthly schedule updates and narrative with no comments from Liberty.  At month 18 of the Project Work, as the Project was nearing the final stages to reach substantial completion, Liberty, for the first time since the work began, asserted that SBI's schedule was wrong and hired a scheduling consultant to criticize the schedule.  After back and forth communication between the parties regarding Liberty's scheduling consultant's deliverables, Liberty directed SBI to hire a "time impact analysis" consultant to prepare a TIA analysis, which SBI did at substantial cost.  When this was delivered, Liberty rejected it outright by declaring it was in the wrong format, and as a result, refused to agree to provide additional time to SBI contrary to the terms of the Completion Agreement.

13.    A host of other issues were raised by Liberty and nothing SBI could do would appease Liberty.  Liberty eventually refused to approve any other change orders, directed SBI to keep working on the Project (including the changed work) and make claims for the changed work. Liberty refused to make payments to SBI on its final pay applications asserting host of reasons why payment was not due, including asserting that substantial liquidated damages were owed by SBI. Despite expressly agreeing in writing in April 2023 that the liquidated damages would end upon SBI obtaining the temporary certificates of occupancy ("TCO") for the Project, six months later at the end of October 2023 and after the TCOs were obtained by SBI, Liberty changed direction and said the liquidated damages kept running until Substantial Completion was achieved.  This appeared to be in an effort to justify Liberty's failure to pay SBI as the end of the Project was reached.

14. On December 7, 2023, Plaintiff recorded in the Alameda County Recorder's Office its mechanic's lien in the amount of $9,016,225.33, Document No. 2023143284, for its contracting services provided to Defendants, the Project, and the Property for which it has not been compensated. It paid a recording fee of $111.00. A copy of such lien was served on Liberty and the Property Owner, Livermore Multifamily Owner, LLC, prior to its recordation. A true and correct copy of such lien is attached hereto as Exhibit B and incorporated herein.

15. On December 19, 2023, the Bond issued by Ohio-Bond Surety was recorded in the Alameda County Recorder's Office, Document Number 2023147830. A true and correct copy of the Bond is attached hereto and incorporated herein as Exhibit C.

16. Subsequent to recordation of its lien, SBI is informed and believes that Liberty made payments to various Project entities other than SBI in unknown amounts. If those payments were properly made to and accepted by the proper recipients, with a concurrent proper waiver and release of the recipients' lien rights, these will have the effect of reducing SBI's lien claim in a concurrent amount, subject to proof at the time of trial.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (vs. Liberty and DOES 1-10)

17. Plaintiff incorporates the allegations in paragraphs 1 through 16 above as though fully set forth herein.

18. On or about February 3, 2022, Plaintiff, on the one hand, and Defendants, and DOES 1-10, inclusive and each of them, on the other hand, entered into an agreement in which Plaintiff agreed to provide general contracting services to Defendants in exchange for compensation. Defendants initially made the agreed upon payments, but thereafter did not pay for all services rendered in accordance with the terms of the Agreement.

SMITH, CURRIE & HANCOCK LLP
1999 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

19.     Despite acceptance of the work performed, Defendants thereafter failed and refused, and continue to fail and refuse, to pay Plaintiff for such work and otherwise comply with the terms of the Agreement.  Defendants also failed and refused, and continue to fail and refuse, to grant Plaintiff additional time as provided under the terms of the Agreement.

20.     Plaintiff performed all conditions, covenants, and promises it was required to perform under the agreement, except as excused, waived, or prevented by Defendants.

21.     Although demand for payment has been made, Defendants, and DOES 1-10, inclusive and each of them, have not paid, and continue to refuse to pay, Plaintiff for its services constituting a breach of the Agreement.  Although some payments were made to SBI's subcontractors by Liberty after the recordation of SBI's mechanic's lien, Plaintiff is informed and believes and thereon alleges there is presently due and owing in excess of $5 million to Plaintiff.

22.     As a direct and proximate result of the breach of contract by Defendants, and each of them, Plaintiff has been damaged in an amount to be determined according to proof at trial but in excess of the jurisdictional limits of this court.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as set forth below.

### SECOND CAUSE OF ACTION

**Quantum Meruit**

**(vs. Liberty, Livermore, and DOES 1-20)**

23.     Plaintiff incorporates the allegations set forth in Paragraphs 1 through 22 as though fully set forth herein.

24.     Plaintiff provided general contracting construction services for the Project at the specific request of Defendants, and DOES 1-20.  Defendants knew, agreed with, and acquiesced in Plaintiff's actions and the performance of such services, and agreed to pay for the reasonable value of such services, materials, and equipment.

SMITH, CURRIE & HANCOCK LLP
1999 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

25.    Plaintiff demanded payment for such services, however Defendants failed, and continue to fail and refuse, to fully and properly pay for such services.

26.    Plaintiff's services added significant value to the Project and the Property for which it has not been compensated in an amount subject to proof at trial but believed to be not less than $5 million.

27.    As a direct and proximate result of Defendants, and each of them, failure to pay Plaintiff, Plaintiff has been damaged in an amount to be determined according to proof at trial but in excess of the jurisdictional limits of this court.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as set forth below.

### THIRD CAUSE OF ACTION

### Common Counts

### (vs. Liberty and DOES 1-10)

28.    Plaintiff incorporates the allegations in paragraphs 1 through 27 above as though fully set forth herein.

29.    Plaintiff is informed and believes and bases thereon alleges that within the last four years Defendants and DOES 1-10, inclusive and each of them, became indebted to Plaintiff in an agreed sum for work, labor, and services performed by Plaintiff, for materials and equipment provided by Plaintiff, and/or for money expended by Plaintiff for and/or at the request of Defendants and with their knowledge and acquiescence.

30.    Plaintiff demanded payment from Defendants and DOES 1-10, and each of them, for these sums and it has not been paid.

31.    Plaintiff is informed and believes and bases thereon alleges that the labor, services, equipment, and materials furnished by Plaintiff, which Defendants and DOES 1-10, and each of

SMITH, CURRIE & HANCOCK LLP
1990 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

them, agreed to pay, has a reasonable and current value in an amount to be determined subject to proof at trial but not less than $5 million.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as set forth below.

## FOURTH CAUSE OF ACTION

### Foreclosure of Mechanic's Lien Release Bond

### (vs. Ohio-Bond Surety and DOES 1-10)

32.    Plaintiff incorporates the allegations in paragraphs 1 through 31 above as though fully set forth herein.

33.    On December 7, 2023, Plaintiff recorded in the Alameda County Recorder's Office its mechanic's lien in the amount of $9,016,225.33, Document No. 2023143284, for its contracting services provided to Defendants, the Project, and the Property for which it has not been compensated.  Alameda County is the county where the Project is located.  The lien contains a statement of Plaintiff's demand after deducting all just credits and offsets, the names of the owners or reputed owners of said property, the names of the entity to and for which Plaintiff contracted to furnish said drywall services, together with a general statement of the kind of services furnished by Plaintiff, and a description of the property sought to be charged with the lien sufficient for identification.  Plaintiff's mechanics lien was filed for record under and by virtue of the provisions of Division 4, Part 6 of the California Civil Code.

34.    At the time of recording the lien, the sum identified in the lien, together with interest thereon, was due and owing Plaintiff.  Said amount is still due and owing to Plaintiff, less unknown payments that may have been paid by Liberty to subcontractors as long as such payments were properly and correctly made.

SMITH, CURRIE & HANCOCK LLP
1990 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

35.     Plaintiff served its mechanics lien and attached notice of mechanics lien on Defendants on December 5, 2023, by certified mail return receipt, before recording the lien.

36.     Thereafter, on December 19, 2023, the Bond issued by Ohio-Bond Surety was recorded in the Alameda County Recorder's Office, Document Number 2023147830.  By operation of law, the recording of the bond resulted in Mechanic's Lien recorded against the Property being transferred to an action on the bond. Plaintiff is the intended beneficiary of this release bond, and therefore is entitled to recover against Owner, as principal, and the Ohio Insurance Company as surety, on the bond, to the same extent as Plaintiff would have been entitled to foreclose upon and recover on the Mechanic's Lien.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as set forth below.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.     For special and general damages according to proof;

2.     For pre-judgment interest;

3.     For costs of suit;

4.     That the lien release bond be adjudged responsible for payment to Plaintiff for Plaintiff's mechanic's lien claim in an amount according to proof at trial

5.     For prompt payment penalties as authorized by statute, including but not limited to, Business and Professions Code 7108.5; and

SMITH, CURRIE & HANCOCK LLP
1999 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

6.     For such other and further relief as the court deems proper.

Dated:  June 10, 2024                    **SMITH, CURRIE & HANCOCK LLP**

By: _____
     Craig Wallace
     Attorneys for Plaintiff
     SBI BUILDERS, INC.

SMITH, CURRIE & HANCOCK LLP
1999 Harrison Street, Suite 1025
Oakland, California 94612
Ph. (415) 394-6688

EXHIBIT A

## COMPLETION AGREEMENT (Livermore – Lump Sum)

THIS COMPLETION AGREEMENT ("this Agreement") is made and entered into as of February 3, 2022, by and between LIBERTY MUTUAL INSURANCE COMPANY ("Surety") and SBI BUILDERS, INC., a California corporation ("Completion Contractor"). Capitalized terms not otherwise defined herein will have the meaning set out in Section 1.

WHEREAS, Katerra Construction LLC ("Katerra") entered into a Standard Design-Build Agreement and General Condition between Owner and Design Builder (Lump Sum Price) dated October 29, 2019, with Livermore Multifamily Owner LLC, as amended by Amendment to Standard Design-Build Agreement and General Condition Between Owner and Design Builder (Lump Sum Price) dated as of October 29, 2019 (including all general, supplementary, and special conditions, drawings, specifications, forms, addenda, and documents forming a part of thereof "the Bonded Contract") with respect to the construction of Legacy at Livermore located in California ("the Project");

WHEREAS, Surety issued a Performance Bond A312-2010 and Payment Bond A312-2010 each No. 906223564, on behalf of Katerra, as the principal, and in favor of Livermore Multifamily Owner LLC., as the obligee ("Obligee"), each in the penal sum of                               in connection with the Bonded Contract and the Project ("the Bonds");

WHEREAS, on June 6, 2021, Katerra filed a Petition for Relief under Chapter 11 of the Bankruptcy Code and the United Stated Bankruptcy Court, Southern District of Texas, Houston Division ("the Bankruptcy Court"), styled *In Re: Katerra, Inc. et al.,* Case No. 21-31861 (DRJ) ("Bankruptcy Case");

WHEREAS, in conjunction with the bankruptcy filing, Katerra filed Debtor's Third Omnibus Motion for Entry of an Order authorizing (i) the Rejection of Certain Unexpired Leases, and (ii) the Rejection of Certain Executory Contracts, each effective as of the Petition Date, and (iii) granting related relief.

WHEREAS, on June 29, 2021, the Bankruptcy Court entered a Joint Stipulation and Agreed Order Between the Debtors, Liberty Mutual Insurance Company, and Certain Project Owners Rejecting Certain Executory Contracts and Unexpired Leases Effective As of the Petition Date and for Limited Relief from the Automatic Stay that includes the Bonded Contract and associated subcontracts in the list of contracts to be rejected. This Order included the Bonded Contract and associated subcontracts in the list of contracts to be rejected;

WHEREAS, by letter dated August 2, 2021, Obligee terminated the Bonded Contract with Katerra for default;

WHEREAS, subject to the consent of Obligee, which has been obtained, Surety wants Completion Contractor to perform and complete the work under the Bonded Contract; and

WHEREAS, Completion Contractor desires to perform the Work, upon the terms and conditions set out in this Agreement.

4847-9774-1039

NOW, THEREFORE, in consideration of the premises, other good and valuable considerations, and the mutual covenants set forth herein, the receipt and sufficiency of all are hereby acknowledged, the parties hereto agree as follows:

1. <u>Definitions</u>.    In addition to the terms defined elsewhere in this Agreement, unless the context otherwise requires, the following terms, when used in this Agreement, will have the meanings set forth below:

"Agreement" means this Completion Agreement, as it may be amended and modified from time-to-time.

"Completion of the Project" means the procurement of all materials and the performance of all services necessary for the completion of the Work in compliance with this Agreement, the Bonded Contract, and the plans and specifications listed in the Bonded Contract. The foregoing will not include the design and construction administration services provided by the Architect of Record that are included in the Bonded Contract.

"Contingency Amount" means
.

"Contract Documents" means: (i) this Agreement, (ii) the Bonded Contract, (iii) the plans and specifications listed in the Bonded Contract, (iv) approved and executed Change Orders, and (v) modifications issued after the execution of this Agreement.  In the event of a conflict or ambiguity between any of the Contract Documents and this Agreement, as between Surety and Completion Contractor, this Agreement will govern.

"Cost of the Work" means costs necessarily incurred by Completion Contractor in the proper performance of the Work. Such costs will be at rates not higher than the standard paid at the situs of the Project, except with prior written consent of Surety. The Cost of the Work will include only the following items:

(a)    Subcontract Costs: Payments made by Completion Contractor to any subcontractors required to progress the Work, subject to the limitations included in this Agreement, without any mark-up of any type for Completion Contractor's overhead and profit;

(b)    Costs of Materials and Equipment Incorporated in the Project: Costs, including transportation and storage, of materials (excluding consumables, expendables, and small tools) and equipment incorporated or to be incorporated in the Project,  without any mark-up of any type for Completion Contractor's overhead and profit;

(c)    Rental Equipment: any equipment needed but not owned by Completion Contractor for the performance of the work will be rented and invoiced at the actual invoice net rental rate (all rentals must be approved by Surety in advance and in writing).  Transportation and state and local taxes will be at actual cost to Completion Contractor without any mark-up. Fuel, oil, and gas reasonably necessary and actually consumed in the course of performing the work are reimbursable at Completion Contractor's actual cost without any mark-up of any type for Completion Contractor's overhead and profit; and

2

(d)     Owned Equipment: Compensation for all equipment that is owned by Completion Contractor, including, not limited to, maintenance, repairs, transportation, profit, and overhead, will be in accordance with rates set out on the attached Exhibit A or that are otherwise agreed to by Surety in advance of any use of same without exception. Commercial rates are not acceptable. Fuel, oil, and gas reasonably necessary and actually consumed in the course of performing the work are reimbursable at Completion Contractor's actual cost, without any mark-up of any type for Completion Contractor's overhead and profit. The quantities and type of equipment used will be subject to Surety's prior written approval.

The Cost of the Work will not include:

(aa)     General Conditions Cost, labor costs, salaries, and other compensation of Completion Contractor's personnel stationed at Completion Contractor's principal office or offices other than offices established at the site of the Project;

(bb)     expenses of Completion Contractor's principal office, temporary construction facilities, general conditions, consumables, expendables, overhead, and profit;

(cc)     overhead and general taxes and expenses, except as may be expressly included in the above paragraphs (a) - (c);

(dd)     Completion Contractor's capital expenses, including interest on Completion Contractor's capital employed for the Work;

(ee) rental costs of machinery and equipment, except as approved by Surety or Surety's Representative in advance and in writing;

(ff) subcontract costs, except as approved by Surety or Surety's Representative in advance and in writing;

(gg) costs due to the negligence or failure of Completion Contractor, its subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including, but not limited to, costs for the correction of damaged, defective, or nonconforming work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the work except where expressly allowed elsewhere in this Agreement; and

(hh) any cost not specifically and expressly described in the above paragraphs (a) – (d).

"Cost to Complete" means the anticipated cost of materials, labor, and other items, including, but not limited to, back charges, overhead of Completion Contractor, and penalties for termination or late completion required to complete the Work required by the Bonded Contract.

"Defective Work" means a defect in work, including design errors and omissions, performed by Katerra. Defective Work also includes any and all damages caused by the idling of the Project, including up to the date of the Notice to Proceed that was issued on October 26, 2021,

as a result of the June 29, 2021, rejection of the Bonded Contract and related work stoppage and resultant inactivity at the Project, where such damages are caused by the passage of time and are not readily observable through a reasonable inspection, such as, purely for the sake of example, warping and deformation of the uninstalled modular wall units stored at the Project site such that they will not properly fit together once put into place for installation.

"Defective Work and Storm Damage Costs" means cost necessarily incurred by Completion Contractor in the proper performance of any work to correct and address Defective Work and Storm Damage, plus                    overhead and profit.  Such costs will be at rates not higher than the standard paid at the situs of the Project, except with prior written consent of Surety.  Defective Work and Storm Damage Costs will include only the following items:

(a)    Subcontract Costs:    Payments made by Completion Contractor to any subcontractors required to address the Defective Work and/or Storm Damage, subject to the limitations included in this Agreement, including, but not limited to, Section 2;

(b)    Costs of Materials and Equipment Incorporated in the Project:  Costs, including transportation and storage, shipping, handling, taxes, and duties for materials (excluding consumables, expendables, and small tools) and equipment incorporated or to be incorporated in the Project required in the performance of Defective Work and/or Storm Damage related work;

(c)    Rental equipment: any equipment needed but not owned by Completion Contractor for the performance of the Defective Work and/or Storm Damage related work will be rented and invoiced at the actual invoice net rental rate (all rentals must be approved by Surety in advance and in writing).  Transportation and state and local taxes will be at actual cost to Completion Contractor without any mark-up.  Fuel, oil, and gas reasonably necessary and actually consumed in the course of performing the Defective Work and/or Storm Damage related work are reimbursable at Completion Contractor's actual cost without any mark-up of any type for Completion Contractor's overhead and profit; and

(d)    Owned Equipment: Compensation for all equipment that is owned by Completion Contractor, including, but not limited to, maintenance, repairs, transportation, profit, and overhead, will be in accordance with the rates that are agreed to by Surety in advance of any use of same without exception.  Commercial rates are not acceptable.  Fuel, oil, and gas reasonably necessary and actually consumed in the course of performing the Defective Work and/or Storm Damage related work are reimbursable at Completion Contractor's actual cost, without any mark-up of any type for Completion Contractor's overhead and profit.  The quantities and type of equipment used will be subject to Surety's prior written approval.

The Defective Work and Storm Damage Costs will not include:

(aa)    Salaries and other compensation of Completion Contractor's personnel stationed at Completion Contractor's principal office or offices other than offices established at the site of the Project;

(bb)    expenses of Completion Contractor's principal office, temporary construction facilities, general conditions, consumables, expendables, overhead, and profit (other

4

than the                    fee for overhead and profit set out in the first paragraph of this definition), except that in the event the time to complete the Work is extended solely as a result of the performance of Defective Work and/or Storm Damage work, Completion Contractor shall be entitled to a daily rate of                                                      for general conditions set out on the attached Exhibit B commensurate with the number of days that the Project's critical path is extended due to such Defective Work;

(cc)    overhead and general taxes and expenses, except as may be expressly included in the above paragraphs (a) - (e);

(dd)    Completion Contractor's capital expenses, including interest on Completion Contractor's capital employed for the Work;

(ee)    rental costs of machinery and equipment, except as approved by Surety or Surety's Representative in advance and in writing;

(ff)    subcontract costs, except as approved by Surety or Surety's Representative in advance and in writing;

(gg)    costs due to the negligence or failure of Completion Contractor, its subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including, but not limited to, costs for the correction of damaged, defective, or nonconforming Work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the Work except where expressly allowed elsewhere in this Agreement; and

(hh)    any cost not specifically and expressly described in the above paragraphs (a) – (d).

"General Conditions Cost" means the general conditions items listed on the attached Exhibit B for which Completion Contractor will be paid a lump sum amount equal to                                        per month. The General

"Interim Completion Letter" means that certain letter dated October 25, 2021, from Surety accepted and agreed to by Completion Contractor pursuant to which Completion Contractor performed certain work on the Project, commencing October 26, 2021, modified by that certain letter dated January 6, 2022.

"Lump Sum Amount" means

                                                        minus
                                                        paid to
                                                        inus the
bond premium amount of
                    .  Completion Contractor has represented to Surety that the foregoing Lump Sum
                    s been reduced by the aggregate dollar amount advanced by Surety or Surety

5

Representative to purchase HVAC and other materials during the Interim Period under the Interim Completion Letter.  Surety Representative and Completion Contractor will work together during the thirty (30) day period following the execution of this Agreement to verify and reconcile the amount of such purchased materials. Completion Contractor and Surety Representative will work together in good faith to adjust the Lump Sum Amount if there has been any error in its calculation with respect to the foregoing HVAC and other materials.  The Lump Sum Amount is "all-inclusive," consisting of all subcontractor and vendor costs, the costs of general conditions work, and services by Completion Contractor, including its site labor force, the costs for Completion Contractor's project staff, and all other direct and indirect costs of performance under this Agreement.  Without limiting the generality of the foregoing, the Lump Sum Amount includes all currently earned retainage for any assigned subcontractors and suppliers listed on Exhibit C.

"Storm Damage" means any and all damages caused by the October 24, 2021, rain storm that occurred in Livermore and throughout Northern California and prior to execution of this Agreement.

"Substantial Completion Date" has the meaning set out in Section 3.

"Surety Representative" means Nick Deeley with The Vertex Companies, Inc.

"Work" means all general construction, supervision, coordination, and related work and services required to be performed by Katerra in the Completion of the Project but which, as of the date hereof, has not been performed and satisfaction of all warranty claims made in accordance with the terms of the Bonded Contract, but subject to the terms of this Agreement, which controls over any conflicting provisions of the Bonded Contract.  The Work will not include the design and construction administration services provided by the Architect of Record that are included in the Bonded Contract.

Any collective defined term and any defined term used in the plural or singular will be taken to encompass all members of the relevant class.  Any defined term used in the singular proceeded by "any" will be taken to indicate any number of the members of the relevant class.

2.    <u>Completion of the Project</u>.  Completion Contractor agrees to complete the Work pursuant to the terms and conditions required by the Bonded Contract and the Bonds, including, but not limited to, obtaining the acceptance of Obligee of the Work under the Bonded Contract; provided however, as set out in this Agreement, the price and schedule applicable to the Completion Contractor's completion of the Work deviate from the price and schedule provided for in the Bonded Contract, as amended by this Agreement.  The terms in this Agreement that are different from or inconsistent with the terms of the Bonded Contract supersede the terms and obligations in the Bonded Contract.  Completion Contractor will not be required to provide ongoing design, architectural, engineering, and construction administration services for the Project, nor obtain approvals to the Construction Documents from any approving agencies.  These services will be contracted separately by Surety.  Completion Contractor will be required to coordinate with the Architect of Record as needed to fulfill the requirements of the Bonded Contract.

Item Number 2 in the October 29, 2019, Amendment to the Bonded Contract does not apply to this Agreement. Additional costs to construct or install the Work resulting from error, omission, deficiencies, ambiguities, or other issues with the design development documents or Contract Documents, for Work not yet performed by Katerra, shall entitle Completion Contractor to an equitable adjustment in the Lump Sum Amount and/or an extension of the Substantial Completion Date; provided, however, that an equitable adjustment to the Lump Sum Amount will only be made to the extent that (i) such additional costs are with respect to Defective Work or Storm Damage, or (ii) are included in a change order with such additional cost to be passed through and paid for one hundred percent (100%) by Obligee. Any extension by the Substantial Completion Date will only be made if the time to complete the Work on the Project is extended solely as a result of the performance of Defective Work and/or Storm Damage work in which case it will be extended commensurate with the number of days that the Project's critical path is extended due to such Defective Work and/or Storm Damage work and/or an extension of the Substantial Completion Date will be provided day for day for any extension of time provided by Obligee to Surety with respect to any change order work that is not with respect to Defective Work and/or Storm Damage work.

Completion Contractor assumes responsibility for all of the Work required to complete the Project and the Completion of the Project, including the assumption of responsibility and liability for all warranty obligations under the Bonded Contract including, but not limited to, warranty obligations relating to or arising from work performed by Katerra and its subcontractors and suppliers. Completion Contractor agrees to issue to Obligee any written warranty or other documentation required under the Bonded Contract to be issued to evidence any and all warranties required under the Bonded Contract. Except to the extent Surety chooses to award contracts to another contractor pursuant to the fourth paragraph of this Section 2 or exercises its right to terminate under Section 16, Completion Contractor assumes all responsibility and liability for defects resulting from work previously performed by Katerra subject to Surety's obligation to pay for such Work as provided in this Agreement. Except to the extent Surety chooses to award contracts to another contractor pursuant to the fourth paragraph of this Section 2 or exercises its right to terminate under Section 16, Completion Contractor assumes all responsibility and liability for all warranty obligations under the Bonded Contract, including, but not limited to, warranty obligations relating to or arising from work performed by Katerra and its subcontractors and suppliers subject to Surety's obligation to pay for such Work as provided in this Agreement.

Completion Contractor will notify Surety Representative within ten (10) days should it become aware of any defect in any of the Work performed by Completion Contractor or its subcontractors, or Katerra or its subcontractors. In the event that any Defective Work is discovered after the date of the Interim Completion Letter in work performed by Katerra or its subcontractors before the date of the Interim Completion Letter, Completion Contractor will, if directed by Surety to do so, correct, repair, and/or replace any such defects provided, that, Surety agrees to compensate Completion Contractor for the Defective Work and Storm Damage Costs, in excess of any retainage applicable to any such subcontractor, for such corrective work on the terms and at the rates provided for in this Agreement and provide Completion Contractor an extension of time and time to complete or repair such Defective Work. Completion Contractor will first use any retainage applicable to any such subcontractor to pay for any such corrective work to address any such Defective Work. Furthermore, if any such Defective Work was caused by a subcontractor of Katerra that has been assigned to Completion Contractor and is being utilized by Completion

7

Contractor for completion of the Project, then Completion Contractor will use best efforts to enforce the responsibility of that subcontractor to correct, replace, or repair said Defective Work. The Work will include satisfaction of all warranty claims made in accordance with the terms of the Bonded Contract. In the case of warranty claims arising from work performed by Completion Contractor's own forces, subcontractors and vendors assigned to Completion Contractor and/or selected by Completion Contractor, after the date of the Interim Completion Letter, Completion Contractor will be responsible for recovery of costs incurred responding to warranty claims.

In lieu of paying the Defective Work and Storm Damage Cost, as provided herein, Surety may elect to require a negotiated fixed price depending upon the magnitude of such Defective Work for which Katerra is responsible or the magnitude of the Storm Damage. In the alternative, Surety reserves the right to award contracts for the performance of specific corrective work to someone other than Completion Contractor; however, Completion Contractor will not be liable for any issues arising from the alternate contractor's work. In addition, Completion Contractor will not be liable for any liquidated damages that may be assessed by Obligee as a result of any delays in the completion of the Work caused by any substitute subcontractor or contractor that Surety decides to engage to perform any such corrective work – Surety will be solely responsible as between Surety and Completion Contractor for any such liquidated damages that may be assessed by Obligee. Surety will have a reasonable time in which to investigate the purported Defective Work and/or Storm Damage and to advise Completion Contractor with respect to it and to what method Surety elects to resolve such Defective Work and/or Storm Damage.

Surety may retain the services of Surety Representative to monitor the completion of the Project, and, if so retained, Completion Contractor agrees that Surety Representative will monitor progress of the Project. Completion Contractor will meet with Surety Representative or Surety on a periodic basis for the purposes of reporting to Surety regarding the status and progress of the remaining Work and Completion Contractor's performance of its obligations under this Agreement. Completion Contractor will prepare and provide to Surety Representative on a monthly basis a monthly status report that will include: (i) status of compliance and deviations from the established schedule; (ii) any Obligee requested or directed change orders; (iii) staffing needs; and (iv) any other issues related to the Completion of the Project. Completion Contractor will prepare and maintain on a daily basis signed reports showing, among other things, its employees on the Project site, the subcontractors at the Project site and number of employees of each, the general work (and location of same) performed by each trade, the names of any other persons not generally at the Project site on a daily basis in attendance at the site on that date, the temperature and weather conditions, and description in reasonable detail of any extraordinary or special occurrences. Means and methods of construction will be at the discretion of Completion Contractor. Completion Contractor further agrees that it will work with Surety Representative to complete the Work. Completion Contractor and Surety's Representative will work cooperatively and collaboratively to assure that the Work is completed as efficiently and as promptly as reasonably possible while maintaining safety and quality obligations required by the Bonded Contract. Completion Contractor will advise Surety at least monthly on staffing needs and will work cooperatively with Surety to manage staffing at levels appropriate to the needs of the Project.

Completion Contractor hereby assumes liability and responsibility for all performance bond claims on the Project that are the subject of the Bonded Contract and/or the Bonds, with respect to the Work performed by Completion Contractor or completion costs incurred in the

Completion of the Project.  Completion Contractor hereby assumes liability and responsibility for all Work performed by Completion Contractor, and subcontractors, suppliers, and others under its direction, to address Defective Work, provided, that, Surety compensates Completion Contractor for any Defective Work and Storm Damage Costs for any corrective work performed with respect to Defective Work performed by Principal as provided in Section 2.

Obligee has taken an assignment of agreements with subcontractors and/or suppliers previously utilized on the Project by Principal as listed on the attached Exhibit C.  Completion Contractor has evaluated the subcontractors and/or suppliers listed on the attached Exhibit C, and has decided to utilize all of said subcontractors and suppliers, and will accept an assignment from Obligee of all related agreements.  Subject to Surety's final review and approval and confirmation that bonds are required from each such subcontractor, Completion Contractor will require that all subcontractors with a subcontract value of                               or greater provide to Completion Contractor payment and performance bonds from a U.S. Treasury listed corporate surety licensed to do business in California and acceptable to Surety, in its sole and absolute discretion, with such bonds to be in a form acceptable to Surety.  Attached as Exhibit D is information regarding Completion Contractor's requests to date that subcontractors provide bonds.  Surety will be named as a dual obligee on any subcontractor bonds.

Subject to any conditions and limitations in the Bonded Contract, Completion Contractor has the right to replace any such subcontractors and/or vendors with substitute subcontractors and/or vendors, provided that Completion Contractor provides Surety Representative with all bids and proposals obtained by Completion Contractor with respect to the Work to be performed by any such substitute subcontractors and/or vendors and obtains Surety's express written consent prior to any such replacement.  Copies of all bids and proposals and Surety's express written consent is also required prior to Completion Contractor engaging a new subcontractor or vendor to perform any assigned subcontractor's work or vendor's obligations.  In addition, Completion Contractor will advise Surety Representative of the reason that it wants to make any such substitution and advise as to how it will mitigate any risks (i.e. warranty gaps) associated with any such substitution.  Surety will respond to a request for approval of a subcontractor and/or vendor within five (5) business days of receipt of a written request for approval from Completion Contractor with all required documentation.  Completion Contractor is not under any obligation to accept assignment of any such subcontractors or suppliers.  However, Completion Contractor will utilize all specialty ordered materials and equipment for which fabrication is commenced or being completed and such specialty ordered materials and equipment that are presently stored or are in route, for which cancellation or reorder would delay the Project.  Any increased cost of any new or substitute subcontractor or vendor will not increase the Lump Sum Amount.  If Completion Contractor elects to utilize some or all of the listed subcontractors and suppliers, then Completion Contractor will be responsible for the unearned amount of the applicable subcontracts or purchase orders, including, but not limited to, retainage.  Completion Contractor will not have any financial responsibility for any earned but not paid amounts to any such subcontractors or suppliers other than for all previously earned retainage.  Completion Contractor is responsible for both currently earned and unearned retainage for any of the assigned subcontractors or suppliers listed on the attached Exhibit C.  Completion Contractor will not have any financial responsibility for any previously earned retainage of any subcontractor engaged by Katerra that is not listed on the attached Exhibit C unless Completion Contractor takes an assignment of any such subcontractor.

9

Care, custody, and control of all stored materials (whether stored onsite or offsite under the control of Completion Contractor) became the responsibility of Completion Contractor on November 25, 2021.  Completion Contractor has inspected and accepted such stored materials.  Said stored materials have been itemized in an inventory that has been agreed to by Completion Contractor and Surety. The stored materials will only be used for the Completion of the Work.  The maintenance and care of these materials will become the responsibility of Completion Contractor in accordance with the Bonded Contract.  Completion Contractor will not be required to reimburse any party for these materials.  No representations are made, expressed or implied, by Surety regarding the quantity, quality, contract suitability, or any other aspect of these stored materials.  Unused excess stored materials, if any, will be retained by Completion Contractor and become Completion Contractor's property for which Completion Contractor has sole discretion as to the resolution of such materials.

Completion Contractor will provide full and complete access to the Project site to Surety, Obligee, and any of their third-party representatives for purposes of inspecting the status and quality of the Work.  Any such inspection will not relieve Completion Contractor of its obligations under the Contract Documents.

3.  <u>Schedule for Completion</u>.  Completion Contractor will commence performance under this Agreement on February 3, 2022. Completion Contractor commenced work under the Interim Completion Letter on October 26, 2021.  Completion Contractor  has provided to Surety Representative its schedule for completion of all of the Work to complete the Bonded Contract.  Said Schedule includes all milestone completion dates referred to in the Bonded Contract.  This Schedule will be supplemented as needed to ensure that it is sufficient in detail to allow Surety Representative to monitor the progress of completion of the Bonded Contract.  At a minimum, the level detail in such schedule will meet the requirements of the Bonded Contract.  Completion Contractor will adjust its schedule as necessary depending on conditions affecting the Work to ensure that a temporary certificate of occupancy is received no later than March 30, 2023, and ensure substantial completion by no later than May 11, 2023 ("Substantial Completion Date"), as the same may be extended by Obligee under the terms of the Bonded Contract.  As between Surety and Completion Contractor, this schedule controls over any schedule in the Bonded Contract.  Completion Contractor will provide scheduling data as required showing current conditions and revisions required by actual experience.  These time periods may be extended by time extensions granted by Obligee to Surety, which will be negotiated directly between Surety, or Surety Representative on behalf of Surety, and Obligee.  Completion Contractor will be entitled to the benefit of any extensions that may be granted by Obligee for actual delays to Completion Contractor's ability to prosecute the Work.

4.  <u>Change Orders; Contingency Amount</u>.  Completion Contractor will not have the authority to negotiate any change orders, modifications, and/or supplemental agreements directly with Obligee, all of which must be negotiated through and approved by Surety or Surety Representative prior to submittal to Obligee.  Completion Contractor will coordinate with Surety or Surety Representative in the preparation of such change orders, etc.  Attached as Exhibit E is the Fully Loaded Labor Rates Schedule that sets out the stipulated labor rates that will apply with respect to any additional labor that may be required to perform any change order work.  Surety has provided Completion Contractor all pending and/or enforceable change orders, modifications, and/or supplemental agreements between Obligee and Katerra of which Surety has knowledge

from Obligee or Katerra. Surety Representative will provide Completion Contractor with notice of any change order or request for extension of time submitted by Surety Representative on behalf of Surety; said notice to include documentation to support the change order and extension of time. With respect to additional costs of change orders, modifications, and/or supplemental agreements entered into by Surety with Obligee after the date of this Agreement and not due to a Defective Work, Surety is liable to Completion Contractor to the extent (and only to the extent) that the additional costs are recovered from and paid by Obligee to Surety and represent valid costs legally due from Obligee; Surety's obligation for such costs is expressly limited to said recovery, if any. Upon receipt of such a request for changed, modified, or supplemental work, Surety or Surety Representative shall promptly, but in no more than five (5) working days after the receipt by Surety or Surety Representative of a complete proposal for any such request with all supporting documentation and other relevant information, forward such request to Obligee to obtain Obligee's authorization. Completion Contractor shall not be required to perform any change order, modified, or supplemental work prior to receiving both Surety's and Obligee's written authorization to pay for such work. Any delays in obtaining such authorization shall entitle Completion Contractor to an equitable adjustment of the Substantial Completion Date to the extent and only to the extent that an equitable time adjustment is provided to Surety by Obligee under the Bonded Contract. Completion Contractor will not be entitled to receive any of the amounts for general conditions, profit, or fee intended to be paid to Surety and not Completion Contractor that may be included in any change order submitted and approved by Obligee with all of the foregoing payments to be retained by Surety.

Completion Contractor has included in the Lump Sum Amount certain subcontractor Change Orders as shown on the attached Exhibit G. Surety Representative will review and investigate the terms and amounts of these Change Orders during the thirty (30) day period following the execution of this Agreement to verify the amounts included in the Lump Sum Amount. Surety Representative and Completion Contractor will work together in good faith to adjust the Lump Sum Amount in the event any error in its calculation is discovered as a result of this investigation.

The requests for the application of the Contingency to items of Work will be at Completion Contractor's reasonable discretion as needed for the mutual benefit of Surety and Completion Contractor in the Completion of the Project. The Contingency Amount will be billed and released based on Change Orders submitted by Completion Contractor and if approved by Surety, which approval will not be unreasonably denied or delayed, on an as required/documented based. Any remaining unpaid Contingency Amount will be paid with the final payment to Completion Contractor pursuant to Section 6.

5. _Payment to Completion Contractor_. In consideration of Completion Contractor's performance pursuant to the terms of this Agreement, Surety will pay Completion Contractor the Lump Sum Amount and Defective Work and Storm Damage Costs (or any negotiated fixed price with respect to any Defective Work and/or Storm Damage), if any, in accordance with the procedures set forth in Section 6. The Lump Sum Amount will apply to all Work (other than Defective Work and Storm Damage Costs) done by Completion Contractor on or after issuance of the Notice to Proceed. The Lump Sum Amount includes all Work required by Completion Contractor in order to address any warranty claims under the Bonded Contract. Attached as Exhibit F is a summary sheet of the agreed to Lump Sum Amount and related qualifications.

11

Completion Contractor agrees that its compensation and the Lump Sum Amount and the Defective Work and Storm Damage Costs (or any negotiated fixed price with respect to any Defective Work and/or Storm Damage), if any, constitutes full and fair compensation to it for the full and timely performance of the Work, including all elements or direct and indirect costs, however described. Completion Contractor agrees that if the Cost to Complete the Work exceeds the Lump Sum Amount and the Defective Work and Storm Damage Costs, if any, Completion Contractor will promptly pay all such other or excess costs required to timely and fully complete the Work without further payment from Surety and Obligee and, further, Completion Contractor will indemnify, hold harmless (and if request, defend) Surety, for and against any and all such other or excess costs outside of, or in excess of the Lump Sum Amount, and the Defective Work and Strom Damage Costs, if any, required to timely and fully complete the Work.

Completion Contractor acknowledges that the costs or services, labor, equipment, materials, taxes, and compliance with governmental regulations in effect as of the date of this Agreement, may increase during the Project. Completion Contractor represents that it has considered these risks in agreeing to the compensation under this Section 5. Thus, except as expressly provided in this Agreement, Completion Contractor agrees not to make any claim against Surety for an increase in the compensation beyond that provided in this Agreement based upon the escalation of these costs. The Lump Sum Amount and the Defective Work and Storm Damage Costs are all of the compensation to which Completion Contractor is entitled. The Lump Sum Amount expressly includes any and all increased costs related to returning subcontractors, including, but not limited to, remobilization, labor, material escalation, and re-procurement costs. Notwithstanding the foregoing, Completion Contractor shall be entitled to an equitable adjustment in the contract price or time in the event of any increased costs or services, labor, equipment, materials, tax)es, and/or compliance with the governmental regulations which are related to or arise out of more burdensome or increased COVID-19 requirements imposed after the Project start to the extent, and only to the extent that, such additional costs are with respect to Defective Work or are included in a change order with such additional cost to be passed through and paid for one hundred percent (100%) by Obligee.

6.    <u>Payment Procedures</u>. Prior to the submission of any pay request by Completion Contractor to Surety, Surety and Completion Contractor will agree upon a schedule of values. This schedule of values will be for informational purposes and, once Completion Contractor has delivered to Surety the completion bonds pursuant to Section 8, to aid in determining the amount of payments to be made to Completion Contractor for performance of the Work. Until such time as the Completion Contractor has delivered to Surety the completion bonds pursuant to Section 8, the amount of payments to be made to Completion Contractor will not be determined by reference to the schedule of values, but will be determined by reference to the Cost of the Work plus the monthly General Conditions Costs, plus the monthly                fee for overhead and profit described in this Section 6, subject to the Lump Sum Amount, as further provided in this Section 6. Said schedule of values will not modify Completion Contractor's obligations under this Agreement, nor will Completion Contractor be allowed any adjustment to the Lump Sum Amount as a result of said schedule of values. The bond premium required to be paid by Completion Contractor to obtain the completion bonds pursuant to Section 8 will be added to the Lump Sum Amount in the event such completion bonds are obtained. In addition, the Lump

12

Sum Amount will be increased by any bond premiums that are paid to obtain the subcontractor bonds required pursuant to Section 2 in the event such bonds are required by Surety.

In the name of Surety, Surety Representative will prepare for Surety's benefit, review, and approval, the monthly or periodic progress pay estimates and the final pay estimate, as required by the Bonded Contract, in the same form and at the same time, and with the same breakdown by items as provided for in the Bonded Contract ("the Contract Pay Estimate(s)").  Completion Contractor will cooperate and assist Surety Representative with the preparation of each such Contract Pay Estimate.  Each Contract Pay Estimate will include retainage at the rates provided in the Retention Schedule of the Bonded Contract.  Upon completion of a Contract Pay Estimate, whether for a progress or final payment, Surety Representative will forward that pay estimate to Obligee, with a copy of that transmittal furnished to Completion Contractor.  Notwithstanding the foregoing, Surety may, at its sole option, submit a pay estimate to Obligee, in whatever amount or form Surety deems appropriate.  In the event this Agreement is tendered to Obligee, then the Contract Pay Estimates will be prepared in the name of Completion Contractor and will not be submitted to Surety Representative for review or approval but will be submitted directly to Obligee and paid by Obligee directly to Completion Contractor.

Completion Contractor will prepare and present to Surety pay estimates for progress payments, in form and with such detail as required by Surety ("the Completion Pay Estimate(s)").  Completion Contractor will submit all Completion Pay Estimates to Surety on the same billing cycle as the Contract Pay Estimates prepared on Surety's behalf for submission to Obligee, e.g., on or about the 25th of the month.  Provided, that, Completion Contractor has delivered the completion bonds pursuant to Section 8, the progress payment for each billing period will be based on the percentages of completion for that billing period utilizing the agreed to schedule of values.  If Completion Contractor has not delivered to Surety the completion bonds pursuant to Section 8, then the progress payment for each billing period will be based on the Cost of the Work plus the monthly General Conditions Cost, plus the Defective Work and Storm Damage Costs, if any, plus                             per month for overhead and profit plus any approved Change Orders for any of the Contingency Amount.  Fifty percent (50%) of any unbilled overhead and profit that is included in the Lump Sum Amount may be billed by Completion Contractor at such time as the Project has reached fifty percent (50%) completion.  Each Completion Pay Estimate will include retainage at the percentage rates set out on the Retention Schedule attached as Exhibit D to the Bonded Contract.  Notwithstanding any provision of the Bonded Contract to the contrary, until such time as Completion Contractor has delivered to Surety the completion bonds pursuant to Section 8, Completion Contractor will not be entitled to bill for any retainage until final completion, provided, that, retainage will be released by Surety prior to final completion pursuant to the terms of the Bonded Contract as needed to pay any retainage that it is required to be paid to any subcontractor under the terms of any applicable subcontract.  In the event of a tender of the Agreement to Obligee, the Completion Pay Estimates will only include the separate accounting and invoices for Defective Work and Storm Damage Costs for which Completion Contractor is to be paid, subject to Section 2, directly by Surety and not by Obligee.  With each Completion Pay Estimate, Completion Contractor will provide to Surety, if not previously provided, a list of all of its subcontractors, remote subcontractors, and suppliers whose contract or purchase order is for a contract value in excess of Ten Thousand Dollars ($10,000), and will provide conditional releases, in a form acceptable to Surety or Surety Representative, executed by each of Completion

13

Contractor and each of such subcontractors, remote subcontractor, and supplier which provided a preliminary notice.

Surety will remit progress payments to Completion Contractor within ten (10) days after the last to occur of the following: (i) after receipt of Completion Pay Estimate, if any, with all required executed conditional releases of Completion Contractor and its subcontractors, remote subcontractors, and vendors; and (ii) Completion Contractor's work for the current billing period is approved and paid for by Obligee, to the extent any payment is to be made by Obligee, said approval established by Obligee's approval of the corresponding Contract Pay Estimate submitted to Obligee, if applicable. If Obligee has not approved the Work performed by Completion Contractor within no later than forty five (45) days after the submission of a Contract Pay Application, with all required executed conditional releases of Completion Contractor and its subcontractors, remote subcontractors, and vendors, or has not advised of any work that is not approved, then Surety Representative will immediately advise Completion Contractor as to whether it has approved the Work that is the subject of the Completion Pay Application. Surety will then remit payment to Completion Contractor for any Work that is approved by Surety Representative no later than forty five (45) days of receipt by Surety of the Completion Pay Application. In lieu of remitting the entire progress payment to Completion Contractor, at Surety's discretion, Surety may make payments owed to subcontractors by joint check, after five (5) days written notice to Completion Contractor of such election. In addition, if a subcontractor has not delivered any bond required pursuant to Section 2, then Surety, in its discretion, may choose to make any payments owed to remote subcontractors and lower tier suppliers by joint check, after five (5) days written notice to Completion Contractor of such election. Completion Contractor agrees that Surety and Surety Representative may communicate directly with subcontractors, suppliers, and other vendors to confirm payment status. Any amounts withheld by Surety for remediation of such Work not in conformance with the Bonded Contract will be determined by Surety Representative and Completion Contractor, and no other sums otherwise due Completion Contractor under its Completion Pay Application will be withheld. In the event of any payment dispute that dispute will not delay performance of the Work on the Project by Completion Contractor provided that Surety will make payment of all amounts not in dispute.

Notwithstanding the above paragraph regarding the remittance of progress payments and the paragraph below regarding final payment, at Surety's discretion, progress and other payments to be made to Completion Contractor may be required to be disbursed through a funds control account at the cost of Completion Contractor          of funds deposited into the account). In furtherance of the foregoing, Surety, Completion Contractor, and Surety Representative will enter into a Funds Control Agreement.

Completion Contractor represents and warrants to Surety that it will use any payments received from Surety under this Agreement to pay its obligations owing to its laborers, subcontractors and suppliers of equipment and materials on or to the Project. Completion Contractor covenants with Surety that all payments received hereunder will be treated as trust moneys, except for the portion of the payment paid to Completion Contractor for its fee, and will be used to pay all persons or companies who have furnished labor and/or materials at Completion Contractor's request on the Project. The trust moneys, unless otherwise restricted or regulated by state or local laws, can be commingled with other funds, but the trust fund nature and purpose as stated in this paragraph will not be modified nor waived by this commingling provision. If

14

requested by Surety, Surety Representative, or Obligee it will become a further condition precedent to payment that Completion Contractor furnish to Surety Representative proper waivers of liens, releases, affidavits, sworn statements listing all contracts let and to be let and obligations due or to become due for equipment (and rentals thereof), materials, labor, and services under subcontracts entered into by Completion Contractor, and other evidence establishing that all accounts for services, labor, materials, equipment (and rentals thereof) furnished by or for Completion Contractor in the performance of this Agreement and the prosecution of the Work have been fully paid.  All costs reasonably incurred by Surety because of failure of Completion Contractor to deliver such waiver and release of all claims within thirty (30) days of notice of demand, or arising from any breach of these covenants in the paragraph, including any reasonable attorney's fees will be paid by Completion Contractor.

Final payment will be made to Completion Contractor as provided under the Bonded Contract, provided that Obligee has accepted the Project as complete and Completion Contractor has furnished evidence reasonably satisfactory to Surety that there are no claims, obligations, or liens outstanding or unsatisfied for reasonable labor, services, equipment, taxes, or other items performed, furnished, or incurred for or in connection with the Work, and Completion Contractor will have fully performed its obligations under this Agreement.  Any remaining Contingency Amount that has not been paid with the submission of Change Orders as contemplated by Section 4, any remaining unbilled overhead and profit that is included in the Lump Sum Amount, and any remaining unbilled line item amounts shown on Exhibit F that fall within the Lump Sum Amount, will be paid by Surety to Completion Agreement as a part of the final payment.

Notwithstanding anything to the contrary herein, Surety may withhold payment, whether progress or final, to Completion Contractor due to Completion Contractor's failure to comply with the Contract Documents after written notice is received by Completion Contractor and a reasonable opportunity to cure has been given.  Surety may not hold more funds than it deems reasonably necessary to cure.  Surety may, at its sole option, issue joint checks to Completion Contractor and to any of its subcontractors, suppliers or vendors.

7.    <u>Time for Completion</u>.  Completion Contractor hereby assumes full responsibility for the completion of Work that is required to be performed by it under this Agreement in a timely manner to ensure completion within the time period provided in Section 3.  This time period may be extended by time extensions granted by Obligee to Surety, which will be negotiated directly between Surety Representative on behalf of Surety and Obligee.

Following thirty (30) days' written notice to cure, Completion Contractor will pay to Surety liquidated damages at the rate of                         per day as set out in the Bonded Contract for any failure to meet any milestone completion dates and failure to complete the Work by the Substantial Completion Date provided in Section 3 (and associated Schedule) of this Agreement in accordance with the Contract Documents.  Completion Contractor is only liable for liquidated damages, if any, due to its own performance and the Substantial Completion Date of its schedule to be provided as part of this Agreement, and not the performance of Katerra and Katerra's schedule related to the original Bonded Contract.  Completion Contractor is only liable to Surety for liquidated damages if and to the extent Surety is required to pay Obligee for such liquidated damages.  Nothing herein is intended to preclude Surety from recovering re-procurement costs or other such damages (including damages for the failure to pay Completion Contractor's

15

subcontractors and suppliers) arising directly from the termination for default of Completion Contractor by Surety or Obligee, such damages not being considered delay damages within the meaning of this paragraph.  The time period for completion set out in Section 3 will be extended by time extension granted by Obligee in accordance with the Bonded Contract to Surety and/or Completion Contractor for delays caused by events that may occur after the date of execution of this Agreement.  Claims for extensions of time will be jointly negotiated by Completion Contractor and Surety Representative with Obligee.

8.    <u>Completion Bonds</u>.  Contemporaneous with the execution of this Agreement, Completion Contractor will provide to Surety its

. Completion Contractor further agrees that as part of this Agreement, it will use its best good faith efforts to provide to Surety performance and payment bonds from a U.S. Treasury listed corporate surety licensed to do business in California and acceptable to Surety, in its sole and absolute discretion, in the same form as the Bonds, each in the penal sum equal to

and naming Surety as the obligee.  At the request of Completion Contractor, Surety will consider accepting payment and performance bonds from Completion Contractor in a reduced penal amount taking into consideration the status of the Completion of the Project and the bonds that have been provided by subcontractors, with any decision whether to accept any such reduction to be made in the sole reasonable discretion of Surety.  Any such surety must be approved by the U.S. Treasury to issue a bond to the Federal Government in an amount at least equal to the foregoing penal sum amount and must possess an A.M. Best Financial Strength rating of A- or better and a financial size category of VI or larger.  Said completion bonds will cover all of the Work performed by Completion Contractor.  Obligee will be named as a dual obligee on any such completion bonds, or as the sole named obligee in the event of tender.

9.    <u>Insurance Coverage and Licensure</u>.    Completion Contractor represents and warrants that it maintains all necessary licenses, permits, and qualifications to perform the Work. Completion Contractor shall be a Named Insured on the existing CCIP Policy provided for the Project and this shall fully satisfy Completion Contractor's Commercial General Liability and Excess Liability insurance obligations to Surety and Obligee.  Completion Contractor will obtain all necessary other policies of insurance, such as  workers' compensation, and other insurance coverages, in the amounts as required by the Bonded Contract, which coverages to the extent permitted by law, will name Obligee, Obligee's lender (if required in writing by Obligee), Surety Representative, and Surety as additional insureds.  All such policies will provide that the insurers will notify Surety and Obligee not less than thirty (30) days before any material change, reduction in coverage, cancellation, including cancellation for nonpayment of premium, or other termination thereof or change therein and will include a clause or endorsement denying the insurer any rights of subrogation against Surety and Obligee.  Within five (5) calendar days of the execution of this Agreement, Completion Contractor's agent will deliver directly to Obligee and Surety copies of certificates of insurance evidencing such coverages.

10.    <u>Examination of Work</u>.  Completion Contractor has:  (i) examined the Bonded Contract together with all amendments or addenda; (ii) fully investigated the status of and the conditions affecting the Work (including, but not limited to, the locality and Project site); and (iii) fully informed itself with respect to those items required to complete the Work and perform all of

16

the obligations required hereunder independent of any representations or warranties, either expressed or implied, of Surety, Obligee, or any of their respective employees, agents, consultants, or representatives.

11.    <u>Representations and Warranties of Completion Contractor</u>.  To induce Surety to enter into this Agreement, Completion Contractor represents and warrants to Surety that: (i) it  has all required licenses, if any, and is in good standing under the laws of the State of California; (ii) it has all required licenses, if any, and is in good standing under the laws of any state, commonwealth, or territory where all or a portion of the Work is to be performed; (iii) it is solvent and does not intend to file any proceeding in bankruptcy, or for reorganization; and (iv) it has paid all taxes and filed all tax returns and other corporate filings required in its state of incorporation and in any state where all or a portion of the Work is to be performed.

12.    <u>Indemnification by Completion Contractor</u>.  Completion Contractor assumes all responsibility for any and all liabilities, claims, damages, losses, suites, and demands against Surety, with respect to the Work and the Completion of the Project arising out of Completion Contractor's breach of this Agreement or its failure to perform as required under this Agreement or that of its subcontractors, employees, materialmen, or any other party performing work for Completion Contractor, all occurring after Completion Contractor commences work on the Project.  Completion Contractor hereby assumes liability and responsibility for all performance bond claims on the Project that are the subject of the Bonded Contract and/or the Bonds, with respect to the work performed by Completion Contractor or completion costs incurred in the Completion of the Project.  Completion Contractor hereby assumes liability and responsibility for all warranty obligations in the Bonded Contract, including, but not limited to, any warranty obligations arising from or relating to work previously performed by Katerra or its subcontractors. Completion Contractor will indemnify and hold Surety, its officers, directors, and employees free and harmless from any against any and all actions, causes of action, suites, for limitation, counsel fees and disbursements incurred by Surety as a result of, or arising out of, or relating to Completion Contractor's completion of its work scope or payment obligations with respect to the Bonded Contract, the Project, and/or the breach of this Agreement by Completion Contractor, including, but not limited to, all payment claims for labor and material costs incurred by the Completion Contractor.

13.    <u>Legal Fees; Litigation</u>.  Surety agrees to indemnify, defend, and hold Completion Contractor harmless from any and all third party claims that arise directly from any Defective Work  (each a "Defective Work  Related Third Party Claim"), including all liabilities, professional fees, expenses, costs, and arising therefrom, except to the extent such Defective Work  Related Third Party Claim is caused by the negligent acts or omissions of Completion Contractor from and after the date thereof, including, but not limited to, (i) any direction of Completion Contractor regarding performance of any work to address any Defective Work  that is contrary to the requirements of the Bonded Contract or commonly accepted industry good practice and standards, (ii) a failure to provide notice to Surety's Representative of any Defective Work  known to Completion Contractor, (iii) the failure of Completion Contractor to address any Defective Work in a timely manner after it has knowledge of any such Defective Work , (iv) the failure of Completion Contractor to take safety or other measures to protect against or prevent the Defective Work  Related Third Party Claim after it has knowledge of the Defective Work , or (v) any breach of Completion Contractor's express obligations pursuant to this Agreement.  Notwithstanding

4847-9774-1039

anything to the contrary in this letter, in no event will Surety be obligated to indemnify Completion Contractor for any claims, liabilities, expenses, costs, demands, and obligations to the extent caused by Completion Contractor's breach of its express obligations pursuant to this Agreement or its negligent acts or omissions.  In no event will the amounts paid by Surety under this paragraph be in excess of the lesser of (i)                                                                in the aggregate ("the Indemnity Cap"); and (ii) the remaining available penal limit of Liberty's Performance Bond.

If a Defective Work Related Third Party Claim is asserted against Completion Contractor that may give rise to a claim by Completion Contractor for indemnification from Surety, then Completion Contractor will give written notice of such Defective Work Related Third Party Claim to Surety promptly upon obtaining knowledge thereof.  Completion Contractor may elect to contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Defective Work  Related Third Party Claim in any manner that Completion Contractor reasonably deems appropriate and Surety will reimburse Completion Contractor promptly and periodically for all costs and expenses (including attorneys' fees and expenses) of such contest, defense, or settlement and will remain responsible for any losses, subject to the Indemnity Cap and the limitations in the above paragraph, that Completion Contractor suffers resulting from or relating to the Defective Work  Related Third Party Claim; provided, however, that Completion Contractor shall have the independent right to demand that Surety provide Completion Contractor's defense and indemnity, subject to the Indemnity Cap and the limitations in the above paragraph, for the Defective Work  Related Thirty Party Claim which Surety shall thereafter perform pursuant to this paragraph, or Surety may voluntarily assume such defense and indemnity and thereafter contest, defend against, consent to the entry of any judgment on (but only with SBI's prior written consent), or enter into any settlement with respect to the Defective Work Related Third Party Claim at Surety's sole cost and expense and with legal counsel of its choice (and reasonably satisfactory to Completion Contractor), if (i) Surety notifies Completion Contractor, in writing within ten (10) days after receiving notice of the Third Party Claim, that Surety will contest and defend against the Defective Work  Related Third party Claim, and (ii) Surety conducts the defense of the Defective Work  Related Third Party Claim actively and diligently.  If any such condition ceases to be satisfied, then Completion Contractor may again elect to contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Defective Work Related Third Party Claim, and Surety will reimburse Completion Contractor and be responsible as above provided.  If Surety so elects to contest or defend against a Defective Work  Related Third Party Claim in accordance with this paragraph, then Completion Contractor may, at its sole cost and expense, retain separate co-counsel of its choice and otherwise participate in such contest or defense of the Defective Work  Related Third Party Claim, and Surety will not consent to the entry of any judgment on or enter into any settlement with respect to the Defective Work  Related Third Party Claim without Completion Contractor's prior written consent (not to be unreasonably withheld or delayed).

Surety will have the right to assume and control the prosecution or defense of any claim, proceeding, or litigation:  (i)  instituted by or against Obligee;  (ii) instituted by or against any municipality or other governmental authority with respect any taxes;  and (iii) with respect to which Completion Contractor seeks to pass on any cost or award to Surety  ("any Third Party Claim") with counsel of its choosing if Surety provides written notice of its election to assume such defense within twenty (20) days after Completion Contractor has received a Claims Notice, if applicable,  with respect to such Third Party Claim; provided, however, Surety must conduct the

18

defense or prosecution of any Third Party Claim reasonably, actively, and diligently in order to preserve Completion Contractor's rights. Completion Contractor may participate, at Completion Contractor's own expense, in the defense or prosecution of any Claim assumed by Surety.

Completion Contractor will give Surety prompt notice should it become aware of any Third Party Claim. If, within twenty (20) days of Surety's receipt of such notice, Surety does not elect to defend or prosecute the Third Party Claim, or if Surety fails to adequately defend or prosecute the Third Party Claim, Completion Contractor will have the right to assume control of the defense, prosecution, and/or compromise of such Third Party Claim.

The party assuming the defense or prosecution of any Third Party Claim will keep the other party reasonably informed at all times of the progress and development of its or their defense or prosecution of and compromise and settlement efforts with respect to such Third Party Claim and will furnish the other party with copies of all relevant pleadings, correspondence, and other papers. In addition, the parties to this Agreement will cooperate with each other and make available to each other and their representatives all available relevant records or other materials required by them for their use in prosecuting, compromising, or contesting any Third Party Claim.

Neither party will consent to the entry of any judgment or enter into any settlement with respect to any Third Party Claim without the prior consent of the other party (which consent will not be unreasonably withheld or delayed) unless the judgment or proposed settlement (i) includes an unconditional release of all liability of each of Surety and Completion Contractor that is a party with respect to such Third Party Claim, and (ii) involves only the payment of money damages by the party consenting to the entry of the judgment and does not impose an injunction or other equitable relief upon Surety or Completion Contractor without its consent or impose any restrictions on the operation of the business of Surety or Completion Contractor without its consent.

In the event both Surety and Completion Contractor are named as defendants in an action or proceeding initiated by a third party with respect to a Third Party Claim, they will both be represented by the same counsel (as chosen by Surety but subject to Completion Contractor's reasonable objection), unless such counsel, Surety, or Completion Contractor determines that such counsel has a conflict of interest in representing both Surety and Completion Contractor in the same action or proceeding and Surety and Completion Contractor do not waive such conflict to the satisfaction of such counsel.

In the event of any claim or litigation that does not fall within the definition of a Third Party Claim then Surety and Completion Contractor will reasonably negotiate how the claim or litigation will be handled and an equitable allocation of any associated legal fees and expenses. Completion Contractor will give Surety an estimate of any such cost, expenses, and attorneys fees that it anticipates it will incur prior to incurring them and allow Surety to assume the prosecution or defense of any such claim, demand, litigation, or dispute in each case with counsel chosen by Surety, but subject to Completion Contractor's reasonable objection, so long as Surety gives written notice to Completion Contractor within ten (10) days after receipt of the estimate that Surety will assume such prosecution or defense. Completion Contractor may retain separate co-counsel at its sole cost and expense and participate in any such prosecution or defense.

In any dispute between Completion Contractor, Obligee, and /or Surety, the prevailing party will recover from the non-prevailing party its reasonable and necessary attorney's fees and costs, including, but not limited to, expert witness fees.

14.     Reservation of Surety Rights and Remedies.  Notwithstanding anything contained herein to the contrary, nothing herein will waive, impair, or limit any right, power, or remedy of Surety against Katerra (or any guarantor or indemnitor of Katerra's obligations to Surety) under any agreement for indemnity or other agreement, or at law or in equity, including without limitation, Surety's right of equitable subrogation.  Notwithstanding anything contained herein to the contrary, nothing herein will waive, impair, or limit any right, power, claim, remedy, or defense of Obligee, Completion Contractor, or Surety against Katerra (and its subcontractors, agents, employees, and assigns) under any contract or agreement between or among Katerra and any of Obligee, Completion Contractor, or Surety, or at law or in equity.

15.     Events of Default.  The occurrence of any one or more of the following events may constitute an "Event of Default" hereunder:

(a)     If Completion Contractor fails to perform any material obligation under this Agreement, the Contract Documents, or otherwise owed to Obligee or Surety;

(b)     if Completion Contractor fails to pay amounts due pursuant to the terms of an agreement with any subcontractor, laborer, materialman, or supplier for work or materials supplied to Completion Contractor or its subcontractors;

(c)     if proceedings in bankruptcy, or for reorganization of Completion Contractor, or for the readjustment of the debts of Completion Contractor, under Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute, or any part thereof, or under any other laws, whether state or federal, for the relief of debtors, now or hereafter existing, are commenced by or against Completion Contractor and such proceedings are not dismissed within thirty (30) days of filing;

(d)     if a receiver or trustee is appointed for Completion Contractor or for any substantial part of Completion Contractor's assets, or any proceedings are instituted for the dissolution or the full or partial liquidation of Completion Contractor and such proceedings are not dismissed within thirty (30) days of filing, or if Completion Contractor discontinues its business or materially changes the nature of its business;

(e)     if Completion Contractor fails, refuses, or neglects to supply a sufficient number of skilled workers or other employees (either in quantity or quality) to complete the Work in accordance with this Agreement;

(f)     if Completion Contractor fails to comply with the directions, instructions, and requirements of Surety or Obligee given pursuant to the terms of the Bonded Contract or this Agreement;

(g)     if Completion Contractor fails to comply with any laws, ordinances, rules, regulations, or orders of governmental departments or agencies having jurisdiction over the

performance of the Work and fails to cure related breaches within any cure period, if any, allowed under the Bonded Contract; and

(h)    any material failure of Surety or Obligee to perform as agreed herein, including, but not limited to, the obligation to pay Completion Contractor timely and in full.

Upon the occurrence of any Event of Default, the non-defaulting party will have, in addition to the rights and remedies given in this Agreement, all those allowed by all applicable laws.

16.    <u>Termination for Convenience</u>.  Upon five (5) days written notice to Completion Contractor, Surety will have the right to terminate this Agreement for convenience.  In the event of a termination for convenience, Completion Contractor will be entitled to a payment for Work property performed under the Contract Documents, demobilization costs, and reasonable restocking charges.  Notwithstanding anything to the contrary herein, Completion Contractor will not be entitled to recovery of profit and/or overhead on unperformed work.  Following the effective date of such termination, Completion Contractor shall have no further liability under this Agreement other than with respect to matters which occurred prior to such effective date.

17.    <u>Authority</u>.  Each of the undersigned persons executing this Agreement on behalf of the Surety and Completion Contractor, respectively, represents and warrants that:  (i) he or she is fully empowered and duly authorized by all necessary action of Surety and Completion Contractor, respectively, to execute and deliver this Agreement; (ii) he or she has full capacity, power, and authority to enter into and carry out this Agreement; and (iii) this Agreement is the legal, valid, and binding obligation of Surety and Completion Contractor, respectively.

18.    <u>Notices</u>.  Any notice, request, demand, or other communications required by this Agreement will be in writing and either delivered personally, sent by regularly scheduled overnight air courier service, or postage prepaid certified United States mail, return receipt requested, to the following addresses:

Surety:                    Liberty Mutual Surety
                           1001 4th Ave., Suite 3700
                           Seattle, WA  98155
                           Attn:  Emily Wilson, Surety Claims Counsel Global Risk Claims

                           and

                           HOSCL@libertymutual.com

with a copy to:            Manier & Herod
                           1201 Demonbreun St., Ste. 900
                           Nashville, TN  37203
                           Attn.:  Sam H. Poteet, Jr.
                                   Mary Paty Lynn LeVan
                                   Jeffrey S. Price

and

The Vertex Companies, Inc.
16150 Scientific Way
Irvine, CA  92618
Attn:   Nick Deeley

As to Obligee:          Livermore Multifamily Owner LLC
2710 Gateway Oaks Dr., Ste. 150 N
Sacramento, CA  95833
Attn:  David J. Eichler

with a copy to:         Baker Botts L.L.P.
910 Louisiana Street
Houston, TX  77002-4995
Attn:  Joseph Colagiovanni

Completion Contractor:  SBI Builders, Inc.
710 West Julian Street
San Jose, CA  96126
Attn:   Paul Nuytten
        Renato O'Neal

with a copy to:         Smith, Currie & Hancock
275 Battery Street, Ste. 1300
San Francisco, CA  94111
Attn:   Craig Wallace

Any such communication will be deemed received at the earliest to occur of: (i) personal receipt; or (ii) the date of promised delivery of a regularly scheduled overnight air courier service. Any of the foregoing addresses may be changed by means of a notice furnished in the manner provided herein.

19.    <u>Entire Agreement</u>.  This is an integrated agreement.  This Agreement and any referenced Exhibit(s) represents the entire agreement between the parties concerning the subject matter hereof, and all oral discussions and prior agreements are merged herein.  This Agreement replaces and supersedes any statements or representations Surety, its consultants, agents, and/or attorneys have made to Completion Contractor or Obligee.

20.    <u>Governing Law, Jurisdiction and Venue</u>.  This Agreement will be deemed to be a contract under the laws of the State of California and for all purposes will be governed by and construed and enforced in accordance with the laws of the California.  The parties to this Agreement consent to the jurisdiction of the State of California.  Venue for any legal proceeding, whether litigation, mediation or arbitration, will be in California.  Unless all parties agree to mediation or arbitration, all disputes will be decided by a court of competent jurisdiction.  The foregoing consent will not be construed as any waiver by the parties of any right under applicable law to remove any lawsuit or proceeding brought in state court to federal court.  In the event any

22

such dispute involves Obligee or it is deemed necessary by either party to make Obligee a party with respect to the dispute and none of the forgoing courts have jurisdiction over Obligee, then any suit under this Agreement may be brought in such alternative court that has jurisdiction over Obligee.

21.   Counterparts.  This Agreement may be executed simultaneously in counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.  This Agreement, to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including .pdf files, digital signatures), will be treated in all manner and respects and for all purposes as an original agreement or instrument and will be considered to have the same binding legal effect as if it were to the original signed version thereof delivered in person.

22.   Nonwaiver of Rights.  No waiver of any right, power, or remedy of any party will be effective unless said waiver is in writing and signed by said party.

23.   Binding Effect, Assignment, and Amendment.  This Agreement will inure to the benefit of, and will be binding upon, the respective successors and permitted assigns of the parties hereto.  Completion Contractor has no right to assign any of its rights or obligations hereunder without the prior written consent of Obligee and Surety.  Completion Contractor expressly agrees that Surety has the right to assign this Agreement and all of its rights, remedies, benefits and obligations to Obligee, or to any designee of Obligees, on the condition that Obligee expressly accepts such assignment in writing.

24.   Severability.  The provisions of this Agreement are intended to be severable.  If any provision of this Agreement is held invalid or unenforceable in whole or in part in any jurisdiction such provision will, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

25.   Section Headings.  The section headings in this Agreement are for convenience only and do not limit, define, or construe the contents of the sections.

26.   Cooperation.  Surety acknowledges that Completion Contractor does not have any contract with Obligee, and Surety does have a contract with Obligee.  This Agreement requires Completion Contractor's performance based on certain actions, conduct, and agreements from Obligee.  Surety will reasonably cooperate with Completion Contractor's interest to undertake to obtain Obligee's actions and agreements in order to facilitate and not delay the performance of the Work or Completion Contractor's timely and diligent performance under this Agreement.

27.   Dispute Resolution.  Any claim between the parties to the Agreement for time or money, controversy, or other disputes arising out of this Agreement or the Work ("Claim") shall be resolved in accordance with this Section 27, and in a prompt, efficient, and cost-effective framework.  Claims shall first be attempted to be resolved through a face-to-face meeting of a principal from each party where, to the extent practicable, such principal was not the primary person involved with such party's work at the Project.  Such meeting shall occur within fifteen (15) calendar days following a written demand to the other party.  Subject to the provisions and

23

limitations in the next following paragraph, if negotiations fail to resolve the dispute, the parties agree to mediate the matter with an agreed-upon mediator. If the result of mediation is unsatisfactory to either party, subject to the provisions and limitations in the next following paragraph, the dispute shall be subject to litigation or arbitration.

If the parties are unable to resolve the Claim, mediation shall occur and is a condition precedent to arbitration or other legal action, provided, that, in the event any Claim involves Obligee or it is deemed necessary by either Completion Contractor or Surety to make Obligee a party to any proceeding to resolve any Claim and Obligee does not agree to mediate, then any dispute or Claim under this Agreement may be brought in such an alternative dispute resolution or court that has jurisdiction over Obligee without the necessity of mediation. A written request for mediation shall be made within twenty (20) calendar days following inability to resolve the Claim through the principal meeting. The parties shall agree on one mediator. If the parties are unable to agree on a mediator within thirty (30) days of the demand for mediation, the parties shall mediate the dispute using AAA's or JAMS's rules, but not under the purview of the AAA or JAMS. Any claim for the cost of mediation, including the mediator's fee, may be discussed and resolved in the mediation.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

COMPLETION CONTRACTOR:

SBI BUILDERS, INC.

By: **Paul Nuytten** _Digitally signed by Paul Nuytten DN: C=US, E=paul@sbibuilders.com, O="SBI Builders, Inc.", CN=Paul Nuytten Date: 2022.02.03 16:11:50-08'00'_ _____

Its: Paul Nuytten _____

SURETY:

LIBERTY MUTUAL INSURANCE COMPANY

By: _____
John A. McDevitt, Regional Vice
President – Global Risk Claims

24

limitations in the next following paragraph, if negotiations fail to resolve the dispute, the parties agree to mediate the matter with an agreed-upon mediator. If the result of mediation is unsatisfactory to either party, subject to the provisions and limitations in the next following paragraph, the dispute shall be subject to litigation or arbitration.

If the parties are unable to resolve the Claim, mediation shall occur and is a condition precedent to arbitration or other legal action, provided, that, in the event any Claim involves Obligee or it is deemed necessary by either Completion Contractor or Surety to make Obligee a party to any proceeding to resolve any Claim and Obligee does not agree to mediate, then any dispute or Claim under this Agreement may be brought in such an alternative dispute resolution or court that has jurisdiction over Obligee without the necessity of mediation. A written request for mediation shall be made within twenty (20) calendar days following inability to resolve the Claim through the principal meeting. The parties shall agree on one mediator. If the parties are unable to agree on a mediator within thirty (30) days of the demand for mediation, the parties shall mediate the dispute using AAA's or JAMS's rules, but not under the purview of the AAA or JAMS. Any claim for the cost of mediation, including the mediator's fee, may be discussed and resolved in the mediation.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

COMPLETION CONTRACTOR:

SBI BUILDERS, INC.

By: _____

Its: _____

SURETY:

LIBERTY MUTUAL INSURANCE COMPANY

By: _____
    John A. McDevitt, Regional Vice
      President – Global Risk Claims

24

**Exhibit List**

Exhibit A     Owned Equipment Rates
Exhibit B     General Conditions Cost
Exhibit C     Assigned Subcontractors and Suppliers
Exhibit D     Subcontract Bond Information
Exhibit E     Fully Loaded Labor Rate Schedule
Exhibit F     Estimate Summary by System and General Qualification to Lump Sum Amount
Exhibit G     Subcontractor and Change Order Accounting

EXHIBIT B

ACCOMMODATION
First American Title Insurance Company
Escrow No: 923205MH1

Recording Requested By:
SBI Builders, Inc.
710 West Julian Street
San Jose, CA 95126

2023143284   12/07/2023 11:06 AM   5 PGS

OFFICIAL RECORDS OF ALAMEDA COUNTY
MELISSA WILK, CLERK-RECORDER
RECORDING FEES: $111.00



When Recorded Mail To:
Craig Wallace
492 Ninth Street, Suite 220
Oakland, CA 94607

**ELECTRONICALLY RECORDED**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# MECHANICS LIEN
## (CLAIM OF LIEN)
(Civil Code Section 8416)

NOTICE IS HEREBY GIVEN: That **SBI Builders, Inc.** as claimant claims a lien for labor, service, equipment, or materials under Section 8416 et seq. of the Civil Code of the State of California, upon the premises hereinafter described, and upon every estate or interest in such structures, improvements and premises held by any party holding any estate therein.

The labor, service, equipment or materials, were furnished for the construction of those certain buildings, improvements, or structures, now upon that certain parcel of land situated in the County of <u>Alameda</u>, State of California, said land described as follows:

Street Address:   **1934 First Street, Livermore, CA 94550**

Legal Description:   **APN:**
A general description of labor, services, equipment, or materials furnished is as follows: General contracting services for construction of the apartment building project known as **Legacy at Livermore**.

The amount due, excluding interest and penalties, after deducting all just credits and offsets is:
**$9,016,225.33**
The name of the person or company to whom claimant furnished labor, services, equipment, or materials is:
**Liberty Mutual Insurance Company and Livermore Multifamily Owner, LLC.**

The owner(s) or reputed owner (s) of said premises is/are:
Name:   **Livermore Multifamily Owner, LLC**
Address:   2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833

The claimant is:
Name:   **SBI Builders, Inc.**
Address:   710 West Julian Street, San Jose, CA 95126

Dated: December 5, 2023

For Claimant, By: _____
Name (print):   Paul Nuytten
Title:   President

SEE CA NOTARIAL ACT

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of Santa Clara )

On Dec. 5, 2023 before me, Marisol M. Moreno, Notary Public
_Date_ _Here Insert Name and Title of the Officer_
personally appeared Paul Nuytten
_Name(s) of Signer(s)_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

MARISOL M. MORENO
Notary Public - California
Santa Clara County
Commission # 2446938
My Comm. Expires May 14, 2027

Signature _____
_Signature of Notary Public_

_Place Notary Seal Above_

---
**OPTIONAL**

_Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document._

**Description of Attached Document**
Title or Type of Document: Mechanics Lien   Document Date: Dec. 5, 2023
Number of Pages: 1   Signer(s) Other Than Named Above: —

**Capacity(ies) Claimed by Signer(s)**
Signer's Name: Paul Nuytten
☑ Corporate Officer — Title(s): President
☐ Partner — ☐ Limited ☐ General
☐ Individual   ☐ Attorney in Fact
☐ Trustee   ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual   ☐ Attorney in Fact
☐ Trustee   ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

## VERIFICATION

I, the undersigned, state:  I am the _____President of SBI Builders, Inc.___,
                                    ("Agent of", "President of", "A Partner of", "Owner of", etc.)
the Claimant identified in the foregoing Mechanics Lien.  I have read said document and know the contents thereof, and I certify that the same is true of my own knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: December **5**, 2023           By: _____

                                       Name (print)  Paul Nuytten

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of Santa Clara  } ss.   On December 5, 2023 (date), before me,

Marisol M. Moreno, notary public (name and title of officer)

MARISOL M. MORENO
Notary Public - California
Santa Clara County
Commission # 2446938
My Comm. Expires May 14, 2027

*(seal)*

personally appeared Paul Nuytten, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal. _____

Signature of Notary

NOTICE OF MECHANICS LIEN

ATTENTION!

Upon the recording of the enclosed MECHANICS LIEN with the county recorder's office of the county where the property is located, your property is subject to the filing of a legal action seeking a court-ordered foreclosure sale of the real property on which the lien has been recorded. That legal action must be filed with the court no later than 90 days after the date the mechanics lien is recorded.

The party identified in the enclosed mechanics lien may have provided labor or materials for improvements to your property and may not have been paid for these items. You are receiving this notice because it is a required step in filing a mechanics lien foreclosure action against your property. The foreclosure action will seek a sale of your property in order to pay for unpaid labor, materials, or improvements provided your property. This may affect your ability to borrow against, refinance, or sell the property until the mechanics lien is released.

BECAUSE THE LIEN AFFECTS YOUR PROPERTY, YOU MAY WISH TO SPEAK WITH YOUR CONTRACTOR IMMEDIATELY, OR CONTACT AN ATTORNEY, OR FOR MORE INFORMATION ON MECHANICS LIENS GO TO THE CONTRACTORS' STATE LICENSE BOARD WEB SITE AT www.cslb.ca.gov.

**PROOF OF MAILING AFFIDAVIT**
(Civil Code Section 8416(a)(8) and (c))

I, the undersigned, declare that:

I am a citizen of the United States and am over the age of 18 years.  On this date, I caused to be served the following Mechanics Lien prepaid, via [check all that apply]:

___X___     Certified Mail, Return Receipt Requested

_____     Registered Mail

_____     First Class Mail

_____     Express Service Carrier for Overnight Delivery

_____     Delivery in Person

On the following person or persons [list all persons served]:

| | |
|---|---|
| Name: | Livermore Multifamily Owner, LLC |
| Title (if known): | Attn: David J. Eichler |
| Address: | 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833 |
| Second Address | 950 Tower Lane, Suite 900, Foster City, CA  94404 |

| | |
|---|---|
| Name: | Liberty Mutual Surety |
| Title (if known): | Attn: Michelle Killebrew, Regional Vice President |
| Address: | 1001 4th Avenue, Suite 3700, Seattle, WA  98155 |
| Second Address | |

| | |
|---|---|
| Name: | The Vertex Companies, Inc. |
| Title (if known): | Attn: Nick Deeley |
| Address: | 16150 Scientific Way, Irvine, CA  92618 |

| | |
|---|---|
| Name: | PNC Bank, National Association |
| Title (if known): | |
| Address: | One PNC Plaza, P1-POPP-19-2, Pittsburg, PA 15222-2707 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:  December 5, 2023          By: _____

                                    Print Name: _____

EXHIBIT C

Record ng Requested By:
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.

And When Recorded Mail To:

Name
Robert C. Niesley, Esq.
Ma'ling Address
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
4 Park Plaza, Suite 1000
Irvine, CA  92614

2023147830        12/19/2023 11:54 AM        5 PGS
OFFICIAL RECORDS OF ALAMEDA COUNTY
MELISSA WILK, CLERK-RECORDER
RECORDING FEES: $111.00



**ELECTRONICALLY RECORDED**

(SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE)

# BOND FOR RELEASE OF MECHANIC'S LIEN
# PURSUANT TO SECTION 8424 OF THE CALIFORNIA CIVIL CODE
### *Title of Document*

**Recording Requested By**
**And When Recorded Mail To:**

Name
Robert C. Niesley, Esq.
Mailing Address
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
4 Park Plaza, Suite 1000
Irvine, CA  92614

(SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE)

Bond No.: ___906225878___

## BOND FOR RELEASE OF MECHANIC'S LIEN
## PURSUANT TO SECTION 8424 OF THE CALIFORNIA CIVIL CODE

KNOW ALL MEN BY THESE PRESENTS:

That we, **Livermore Multifamily Owner LLC (a Delaware limited liability company)**, as Principal, and **The Ohio Casualty Insurance Company**, a corporation organized and existing under and by virtue of the laws of the State of **New Hampshire**, as Surety, are held and firmly bound unto **SBI Builders, Inc.**, as Obligee in the penal sum of **Thirteen Million Five Hundred Twenty Four Thousand Three Hundred Thirty Eight and Zero Cents ($13,524,338.00)** lawful money of the United States of America, for the payment of which, well and truly to be made, we bind ourselves, our heirs, executors, successors and assigns, jointly and severally, firmly by these presents.

THE CONDITION OF THE ABOVE OBLIGATION IS SUCH, That,

WHEREAS, that certain real property situated in the County of **Alameda**, commonly known as **Legacy at Livermore Project, 1934 First Street, Livermore, CA  94550, APN 097-0003-007-01**, is subject to a claim of Mechanic's Lien filed for record in the Office of the County Recorder of **Alameda**, State of California on **December 7, 2023**, in Document No. **2023143284** of County Records, whereby **SBI Builders Inc.** claims a lien on said real property in the amount of **Nine Million Sixteen Thousand Two Hundred Twenty Five and Thirty Three Cents ($9,016,225.33)**.

WHEREAS, said Principal disputes the correctness of validity of such claim of Mechanic's Lien and desires to execute and record a bond pursuant to the provisions of Section 8424 of the Civil Code of the State of California, to enable the real property above described to be freed from the effect of said claim of Mechanic's Lien and any action brought to foreclose said lien.

NOW, THEREFORE, if the Principal shall pay, or cause to be paid, all sums which said claimant may recover on said claim together with his costs of suit in this action, then this obligation shall be void; otherwise to remain in full force and effect.

Signed and dated at ___Denver___, ___CO___ on ___December 12___, ___2023___.

Livermore Multifamily Owner LLC
(a Delaware limited liability company)

By: _____
Name: ___Ron J. Hoyl___
Its: ___Vice President___

The Ohio Casualty Insurance Company

By: _____

___Kimberly A. Rike___, Attorney-in-Fact

STATE OF TEXAS      §
           §
COUNTY OF DALLAS     §

   On this 15th day of December, 2023, before me M. K. Beavans, a Notary Public of said State, personally appeared Ron J. Hoyl, personally known to me to be the person whose name is subscribed to the within Bond for Release of Mechanic's Lien, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument.

   Witness my hand and official seal.



[S E A L]

Notary Public in and for the State of Texas

Notary's Printed Name:  M. K. Beavans

This Power of Attorney limits the acts of those named herein, and they have no authority to
bind the Company except in the manner and to the extent herein stated.

**Liberty Mutual.**
**SURETY**

Liberty Mutual Insurance Company
The Ohio Casualty Insurance Company
West American Insurance Company

Certificate No: **8205919-975436**

# POWER OF ATTORNEY

**KNOWN ALL PERSONS BY THESE PRESENTS:** That The Ohio Casualty Insurance Company is a corporation duly organized under the laws of the State of New Hampshire, that Liberty Mutual Insurance Company is a corporation duly organized under the laws of the State of Massachusetts, and West American Insurance Company is a corporation duly organized under the laws of the State of Indiana (herein collectively called the "Companies"), pursuant to and by authority herein set forth, does hereby name, constitute and appoint, __Andrew Musarra, Austin Bulecza, Brendan Smith, Brian A. O'Neal, Carmen Andrade, Craig Dunbar, Dilynn Guern, Erick Jones, Esmeralda Ureno, Hanna Munson, James Bell, Kimberly A. Rike, Martha G. Ross, Monica Avelar, Noe Guerrero, Rey Villa, Ryan King, Ryan Knowle, Tammy Sack, Terry Moore, Timothy J. Maffiore, Todd Buechter__

all of the city of _____ Englewood _____ state of _____ CO _____ each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents and shall be as binding upon the Companies as if they have been duly signed by the president and attested by the secretary of the Companies in their own proper persons

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the Companies and the corporate seals of the Companies have been affixed thereto this ___8th___ day of ___July___ , ___2021___ .

 

Liberty Mutual Insurance Company
The Ohio Casualty Insurance Company
West American Insurance Company

By: _David M. Carey_
David M. Carey, Assistant Secretary

State of PENNSYLVANIA
County of MONTGOMERY  ss

On this ___8th___ day of ___July___ , ___2021___ before me personally appeared David M. Carey, who acknowledged himself to be the Assistant Secretary of Liberty Mutual Insurance Company, The Ohio Casualty Company, and West American Insurance Company, and that he, as such, being authorized so to do, execute the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my notarial seal at King of Prussia, Pennsylvania, on the day and year first above written.



Commonwealth of Pennsylvania - Notary Seal
Teresa Pastella, Notary Public
Montgomery County
My commission expires March 28, 2025
Commission number 1126044
Member Pennsylvania Association of Notaries

By: _Teresa Pastella_
Teresa Pastella, Notary Public

Not valid for mortgage, note, loan, letter of credit, currency rate, interest rate or residual value guarantees.

For bond and/or Power of Attorney (POA) verification inquiries, please call 610-832-8240 or email HOSUR@libertymutual.com.

This Power of Attorney is made and executed pursuant to and by authority of the following By-laws and Authorizations The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company which resolutions are now in full force and effect reading as follows:

**ARTICLE IV – OFFICERS:** Section 12. Power of Attorney.
Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitation as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act on behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and execution of any such instruments and to attach thereto the seal of the Corporation. When so executed, such instruments shall be as binding as if signed by the President and attested to by the secretary. Any power or authority granted to any representative or attorney-in-fact under the provisions of this article may be revoked at any time by the Board, the Chairman, the President or by the officer or officers granting such power or authority.

**ARTICLE XIII – Execution of Contracts:** Section 5. Surety Bonds and Undertakings.
Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

**Certificate of Designation** – The President of the Company, acting pursuant to the Bylaws of the Company, authorizes David M. Carey, Assistant Secretary to appoint such attorneys-in-fact as may be necessary to act on behalf of the Company to make, execute, seal acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

**Authorization** – By unanimous consent of the Company's Board of Directors, the Company consents that facsimile or mechanically reproduced signature of any assistant secretary of the Company, wherever appearing upon a certified copy of any power of attorney issued by the Company in connection with surety bonds, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

I, Renee C. Llewellyn, the undersigned, Assistant Secretary, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy of the Power of Attorney executed by said Companies, is in full force and effect and has not been revoked.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seals of said Companies this _12th_ day of _December, 2023_

  

By: _Renee Llewellyn_
Renee C. Llewellyn, Assistant Secretary

LMS-12873 LMIC OCIC WAIC Multi Co 02/21



**Liberty Mutual.**
SURETY

## SURETY NOTARY ACKNOWLEDGMENT

State of   Colorado                )

County of   Jefferson              )

On        12/12/2023        before me,   DiLynn Guern                , personally appeared
Kimberly A. Rike                        , who proved to me on the basis of satisfactory evidence to be the
person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/
her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the
person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of   Colorado        that the foregoing paragraph
is true and correct.

WITNESS my hand and official seal.

Signature

Notary Public residing at:   Jefferson                    Colorado

My commission expires:  2-26-27

DiLynn Frances Guern
Notary Public
State of Colorado
Notary ID 19954003039
My Commission Expires February 26, 2027

# EXHIBIT B

## TAKEOVER AGREEMENT (Livermore)

THIS TAKEOVER AGREEMENT ("this Agreement") is made and entered into as of the 22nd day of October, 2021, by and between LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts company (including subsidiaries and affiliates and their respective co-sureties and reinsurers, and their respective successors and assigns, "Surety"), and LIVERMORE MULTIFAMILY OWNER LLC ("Obligee"). Except as otherwise provided herein, all capitalized terms have the meanings set out in this Agreement, including Section 1.

WHEREAS, Obligee and Katerra Construction LLC ("Katerra") entered into a Standard Design-Build Agreement and General Conditions dated October 29, 2019 (including all amendments and addenda thereto and all other documents which are or have become part thereof, "the Bonded Contract"), with respect to the design and construction of the Legacy at Livermore project, located in Livermore, California ("the Project"), which Bonded Contract is attached hereto as Exhibit A and is expressly incorporated herein by reference;

WHEREAS, Surety issued that certain Performance Bond A312-2010 and Payment Bond A312-2010 each No. 906223564, each in the penal sum of Sixty Eight Million Six Hundred Twenty-Five Thousand Twenty-Five Dollars ($68,625,025), and Design Services Exclusion Rider dated February 3, 2020, with respect to the Bonded Contract, wherein Katerra is named as the principal, Surety is named as the surety, and Obligee is named as the obligee (collectively "the Bonds"), which Bonds, and the Design Services Exclusion Rider, are collectively attached hereto as Exhibit B and are expressly incorporated herein by reference;

WHEREAS, by letter dated June 1, 2021, Katerra disclosed its intent to abandon the Work and the Project;

WHEREAS, in response to Katerra's June 1 letter and by its own letter dated June 7, 2021, Obligee issued to Katerra a notice of intent to declare default of Katerra under the Bonded Contract;

WHEREAS, on June 7, 2021, Obligee notified Surety of Katerra's default under the Bonded Contract;

WHEREAS, by letter dated June 11, 2021, Surety responded to Obligee's June 7, 2021, letter;

WHEREAS, on June 6, 2021, Katerra filed a Petition for Relief under Chapter 11 of the Bankruptcy Code and the United States Bankruptcy Court, Southern District of Texas, Houston Division ("the Bankruptcy Court"), styled In Re: Katerra, Inc. et al., Case No. 21-31861 (DRJ) ("Bankruptcy Case");

WHEREAS, in conjunction with the bankruptcy filing, Katerra filed Debtor's Third Omnibus Motion for Entry of an Order authorizing (i) the Rejection of Certain Unexpired

Leases, and (ii) the Rejection of Certain Executory Contracts, each effective as of the Petition Date, and (iii) granting related relief;

WHEREAS, on June 29, 2021, the Bankruptcy Court entered a Joint Stipulation and Agreed Order Between the Debtors, Liberty Mutual Insurance Company, and Certain Project Owners Rejecting Certain Executory Contracts and Unexpired Leases Effective ("the Joint Stipulation") As of the Petition Date and for Limited Relief from the Automatic Stay that includes the Bonded Contract and associated subcontracts in the list of contracts to be rejected. This Order included the Bonded Contract and associated subcontracts in the list of contracts to be rejected;

WHEREAS, it is stated in Section 11.3.2 of the Bonded Contract that "[i]f [Katerra] files a petition under the bankruptcy code, [the Bonded Contract] shall terminate if [Katerra] or [Katerra's] trustee rejects [the Bonded Contract];

WHEREAS, by letter dated August 2, 2021, Obligee advised Surety that "[t]o the extent that [the Bonded Contract] was not terminated as a result of the rejection alone, [the Bonded Contract] has been terminated for cause pursuant to Section 11.3 of the [Bonded Contract] upon rejection";

WHEREAS, Surety asserts that the August 2, 2021, letter was the first time that Surety had been notified by Obligee that the Bonded Contract was terminated, which notice, pursuant to Section 3.2 of the Performance Bond, is a condition precedent to Surety's obligations under the Performance Bond, and Obligee denies Surety's assertion and Obligee claims that (a) Surety was actively involved and participated in drafting, negotiating and filing the Joint Stipulation, which Obligee asserts evidences the Surety's actual knowledge of Katerra's material breach and the termination of the Bonded Contract, (b) Section 4 of the Performance Bond states that a "failure by the Owner [the Obligee] to comply with the notice requirement in Section 3.1 [of the Bonded Contract] shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice," and (c) the Surety's obligations under the Performance Bond arose immediately upon Katerra's filing of the Bankruptcy Case notwithstanding the Surety's assertion that the August 2, 2021, letter was the first time that Surety had been notified by Obligee that the Bonded Contract was terminated;

WHEREAS, by letter dated August 6, 2021, Surety confirmed "[s]ubject to [Obligee's] satisfaction of Section 3.3 of the Performance Bond, and the other terms and provisions of the Performance Bond, including, without limitation, the penal limit thereof, pursuant to Section 5 of the Performance Bond" its intent to arrange for the completion of the Project;

WHEREAS, pursuant to Section 3.3 of the Performance Bond, it is a condition precedent to Surety's obligation under the Performance Bond that "[Obligee] has agreed to pay the [Bonded Contract Balance] in accordance with the terms of the [Bonded Contract] to the Surety or to a contractor selected to perform the [Bonded Contract] and Obligee desires to satisfy this condition precedent as set forth in Sections 3 and 5 of this Agreement;

2

WHEREAS, in order to further Surety's completion of the Project, pursuant to Section 5.3.3 of the Bonded Contract Obligee will direct that the Subcontracts listed on Exhibit C ("the Subcontracts") be assigned to Completion Contractor;

WHEREAS, Obligee and Surety have certain rights, interests, and defenses in connection with the completion of the Work under the Bonds, the Bonded Contract and applicable law; and

WHEREAS, Obligee desires for Surety to effect the completion of the Work covered by the Bonded Contract and Surety desires to effect the completion of the Takeover Work covered by the Bonded Contract, subject to the terms of the Performance Bond and the Design Exclusion Rider, in order to fulfill certain of Surety's obligations under the Performance Bond.

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Obligee and Surety agree as follows:

1.     <u>Definitions</u>. Unless the context otherwise requires, the following terms when used in this Agreement will have the meanings set forth in this Section 1.

"Agreement" means this Takeover Agreement, as it may be amended, restated, renewed, or extended from time to time.

"Authorized Individual" means the individual designated under Section 7.

"Bonded Contract" means that certain Standard Design-Build Agreement and General Conditions dated September 26, 2018, attached hereto as Exhibit A and any and all amendments and addenda thereto and all other documents which have become part thereof.

"Bonded Contract Balance" means the remaining balance of the Bonded Contract Price, as further defined in Section 4 of this Agreement.

"Bonded Contract Price" means, inclusive of all the design services under the Interim Design Agreement dated December 19, 2018, between Katerra and Obligee, the total amount of Seventy One Million Six Hundred Fifty Six Thousand One Hundred Sixty Five Dollars ($71,656,165) subject to adjustment as provided in Article 8 and other applicable provisions of the Bonded Contract.

"Completion Contractor" means SBI Construction Inc.

"Design Exclusion Rider" means the Design Services Exclusion Rider dated February 3, 2020, attached hereto as part of Exhibit B.

"Design Rider Reservations" has the meaning set out in footnote 1.

"Design Work" means the design services that are included in the Bonded Contract.

3

"Excused Delay" means a delay beyond the control of Surety or its Completion Contractor as further defined in Section 6.3.1 of the Bonded Contract.

"Final Completion" means the date when Katerra's obligations under the Bonded Contract are complete and accepted by Obligee and final payment becomes due and payable pursuant to and in accordance with Section 2.4.13 of the Bonded Contract, including, but not limited to, a certificate of occupancy and release from public works.[1]

"Owner's Program" means the objectives, budgetary and time criteria, space requirements and relationships, flexibility and expandability requirements, special equipment and systems, site requirements, features, items, systems, finishes, and elements set forth in Exhibit B to the Bonded Contract, together with the design documents, drawings, outline specifications, and other conceptual documents illustrating the Project's basic elements, scale, and their relationship to the geographical area of the Project location where the Work is to be performed, as finally established pursuant to the applicable provisions of the Bonded Contract.

"Performance Bond" means that certain Performance Bond A312-2010 as modified by the Design Exclusion Rider.

"Substantial Completion" has the meaning set out in Section 2.4.32 of the Bonded Contract.

"Takeover Work" means the Work required by the Bonded Contract exclusive of any Work that is not required to be performed by the Surety based on the terms of the Design Exclusion Rider.[2]

"Work" means the Work as defined in the Bonded Contract, including the design services required by Section 3.1 of the Bonded Contract, the construction services provided in accordance with Section 3.2 of the Bonded Contract, any additional services required by Section 3.11 of the Bonded Contract, and other services which are necessary to complete the Project in accordance with and reasonably inferable from the Owner's Program or required to provide the Obligee with fully connected, complete, functional and operational work in conformance with the requirements set forth in the Owner's Program.[3]

---

[1] **Note**: Obligee acknowledges that Surety asserts that, in light of the Design Exclusion Rider, Surety is not responsible for any Design Work, and Surety acknowledges that Obligee disputes the Surety's interpretation and application of the Design Exclusion Rider (as further described in Section 2(a) of this Agreement). The Obligee and Surety each respectively reserve their rights and remedies in this regard, including but not limited to (a) Surety's assertion that it has a right to refuse to perform any Work that Surety contends is excluded from the Surety's obligations under the Bonds and/or Bonded Contract based on the Design Exclusion Rider, and (b) Obligee's assertion that it has a right to make claims against Surety to compel the performance of any Work that Surety refuses to perform and/or to seek costs, damages and expenses incurred by Obligee as a result of such refusal. The foregoing reservation of rights are referred to herein as the "Design Rider Reservations." Surety asserts that final payment is due and payable to Surety upon completion of the Takeover Work. Obligee reserves all rights and defenses with respect to such assertion by Surety.

[2] **Note**: This definition is subject to the Design Rider Reservations.

[3] **Note**: *See* footnote 1 above.

4

2.      <u>Completion of Bonded Contract</u>.

a.      Surety expressly acknowledges and agrees that Obligee has advised Surety that the Bonded Contract was terminated for cause as a result of Katerra's material breach and abandonment of the Project.  Pursuant to the terms of this Agreement, Surety hereby agrees to satisfy its obligations under the Performance Bond and to arrange for the completion of the Takeover Work, subject to the Performance Bond and Design Exclusion Rider and subject to the Design Rider Reservations. In this regard, Surety hereby agrees to effect or cause the completion of the Takeover Work in accordance with the terms of the Bonded Contract and the Bonds and subject to the Design Rider Reservations, and agrees that, subject to the Design Exclusion Rider and Design Rider Reservations, performance of all Work up through the date of this Agreement and all Takeover Work performed after the date of Agreement shall be governed in all respects by, and shall be in compliance with, the terms of the Bonded Contract provided, that, Surety does not make any agreement or representation with respect to any Design Work.  Surety reserves its right to stop Takeover Work subject to and in accordance with Section 9.1.6 of the Bonded Contract if Obligee fails to pay Surety any undisputed amount due pursuant to the Bonded Contract (including if Obligee fails to pay to Surety the earned and unpaid Bonded Contract Balance pursuant to Sections 3 and 5 of this Agreement).  Obligee acknowledges that the Surety asserts that it is not responsible for any Design Work, the adequacy of the design or any defect in the design and that Surety further asserts that it will not be liable for any personal injury, property damages, fines, or other loss cost or expense resulting from defects arising from or relating to the design and/or engineering of the work performed or to be performed under the Bonded Contract, including as an example and not as a limitation, any inadequacy of such design and/or engineering or any efficiency guarantee.  Surety in turn acknowledges that the Obligee asserts that the Surety is responsible pursuant to the Performance Bond and the Bonded Contract for the full and complete performance of the Work in accordance with the Owner's Program and Obligee asserts that such responsibility is not limited or otherwise modified by the Design Exclusion Rider.  The Obligee and Surety each respectively reserve their rights and remedies in this regard, including as set forth in the Design Rider Reservations.

b.      Obligee acknowledges the designation by Surety of SBI Builders, Inc. as the "Completion Contractor." Notwithstanding the Obligee's acknowledgment in this regard, the Surety acknowledges and agrees that the Obligee asserts that Surety is and shall be responsible for the full, proper and integrated performance of all Takeover Work as required by the Bonded Contract and subject to the Design Rider Reservations, regardless of whether the performance of such Takeover Work is allocated to the Completion Contractor (i.e., subject to the terms and conditions of the Bonded Contract and the Performance Bond, as applicable, the Surety is responsible for the completion of the Takeover Work in accordance with the Owner's Program and the terms of the Bonded Contract and subject to the Design Rider Reservations).  In this regard, the Surety shall fully perform and complete (or cause to be fully performed and completed by the Completion Contractor) all of the obligations and Takeover Work required of Katerra under the Bonded Contract and subject to the Design Rider Reservations, including but not limited to:

(i)      furnishing the full and proper performance of the Takeover Work in accordance with the Bonded Contract, including by completing all incomplete Work that is

5

required to be completed under the Bonded Contract and subject to the Design Rider Reservations;

(ii)    achieving Substantial Completion and Final Completion of the Takeover Work, each as required and defined by the Bonded Contract.  Surety and Obligee each acknowledge that the Completion Contractor will not be able to meet the Substantial Completion, Final Completion, and other dates established in the Bonded Contract, as such dates may have been required to be adjusted under the terms of the Bonded Contract as of the date when Katerra defaulted.  The Surety and Obligee each respectively reserve their rights and remedies with respect to (a) any failure of Surety and Completion Contractor to achieve Substantial and Final Completion by the Substantial Completion date, the Final Completion date, and any other dates established by the Bonded Contract (as such dates may have been required to be adjusted pursuant to the applicable provisions of the Bonded Contract), and/or (b) any asserted adjustments to such dates (including as a result of alleged Excused Delays), which may have been or are hereafter required under the Bonded Contract (Surety asserts that it is entitled to the full benefit of whatever extensions of time and other associated relief for Excused Delay to the extent provided for or permitted under the terms of the Bonded Contract, and Obligee reserves all rights and defenses to contest the assertion of any such Excused Delay).  Obligee and Surety agree to meet, subsequent to the execution of this Agreement, in order to establish the schedule for the completion of the Takeover Work from and after the date of this Agreement.  In this regard, the parties acknowledge and agree that it is the parties' intent that the establishment of the schedule for the Takeover Work and the completion of the Takeover Work will proceed as expeditiously as practicable; and

(iii)    fulfilling any and all guarantee and/or warranty obligations and/or correction of defective Work responsibilities in accordance with the Bonded Contract and subject to the Design Rider Reservations, for all Work, including all Work performed by Katerra, subject to the Design Rider Exclusion and Design Rider Reservations, and all Takeover Work to be performed by the Completion Contractor.  In this regard, Obligee and Surety each respectively reserve all rights, remedies, and defenses that may be available to them under the Bonded Contract, at law, and in equity with respect to such obligations and/or any defective Work.

c.    The Surety acknowledges and agrees that Katerra failed to achieve Substantial Completion on the Project (as that term is defined in the Bonded Contract) prior to its default and material breach and that as a result of such failure, Surety elected pursuant to Section 5.2 of the Performance Bond to arrange for completion of the Bonded Contract (subject to the Design Exclusion Rider and Design Rider Reservations) and the Surety's obligations under this Agreement and the Bonds include taking over and completing Work (subject to the Design Rider Reservations) that is only partially completed. In this regard, (1) Surety acknowledges that the Obligee has not made and makes no representations or warranties concerning any Work completed with respect to the Project to date, (2) Surety acknowledges that Obligee alleges that the Surety and/or the Surety's consultants have maintained possession and control of the site of the Project since Katerra's abandonment of the Project on June 6, 2021, and Obligee asserts that Surety would maintain risk of loss for the Project (including with respect to any deterioration), and Surety reserves all right and defenses with respect to the foregoing allegations and assertions of Obligee, (3) Surety reserves the right to assert any breach by and claims against Obligee with

respect to the Project, including, but not limited to, any claims with respect to the completed Work and the condition or deterioration of the Project, and (4) Surety acknowledges that Obligee reserves all rights to contest any such assertions by the Surety. Surety does not have any actual knowledge of any claims against Obligee with respect to the deterioration of the Project, if any, that occurred during the period of June 6, 2021, through the date of this Agreement. The Surety further acknowledges and agrees that, as described in Section 2(b)(iii) above, the Surety shall be responsible for any and all obligations with respect to the entire Takeover Work required by the Bonded Contract whether such Work is or was performed by Katerra or by the Completion Contractor (without regard to any contrary or conflicting provisions in any of the Surety's separate agreements with its Completion Contractor), subject to the Design Exclusion Rider and the Design Rider Reservations.

        d.      Surety acknowledges and agrees that Katerra's responsibilities under the Bonded Contract, and, as a result, the Surety's responsibilities under the Bonds, extend to the completion of the Work and for the correction of any defective or deficient Work, in accordance with the applicable provisions and requirements of the Bonded Contract and subject to the Design Exclusion Rider and the Design Rider Reservations. Surety specifically acknowledges that Obligee asserts that the items and components of the Work described in Exhibit E hereto have been deficiently performed by Katerra in a manner that is inconsistent with the Owner's Program. Obligee further asserts that the Surety is obligated under the Bonds to correct and/or otherwise remedy such defects pursuant to the Bonded Contract prior to achievement of Substantial Completion. Obligee agrees to reasonably cooperate with Surety in its investigation of the foregoing alleged deficiencies. The Obligee and Surety hereby reserve and retain all of their respective rights, positions, defenses, and causes of action under the Bonds, the Bonded Contract and applicable law with respect to such items, including their respective rights under the Design Services Reservations.

        e.      Obligee represents that attached hereto as Exhibit A is a true and correct copy of the Bonded Contract and all Exhibits thereto as of the date of execution of the Bonded Contract. The Surety agrees that: (i) it has reviewed and is familiar with Exhibit A hereto and all of the documents related to the Bonded Contract provided to it by Katerra; and (ii) it has begun its review of and is generally familiar with the nature and status of the Work previously performed on the Project by Katerra and its subcontractors.

        f.      The Surety hereby accepts responsibility for the final completion of the Bonded Contract subject to the terms and conditions of the Performance Bond and the Design Services Exclusion Rider and subject to the Design Rider Reservations. The Surety acknowledges that Obligee has not made and makes no representations or warranties concerning the work completed under the Bonded Contract to date.

        g.      In furtherance of the foregoing, Surety or its Completion Contractor will approach the subcontractors under the Subcontracts to effect the assignment of such Subcontracts to Surety or Completion Contractor. Obligee will reasonably cooperate with Surety to effect such assignment, including confirming to any subcontractors that Obligee agrees, pursuant to Section 5.3.3 of the Bonded Contract, that the Subcontracts are so assigned. Obligee will not seek any compensation from Surety for such direction. In this regard, Obligee consents to the

Subcontracts being assigned and transferred to Surety or Completion Contractor, as requested by Surety, at no cost or expense to Obligee. The Surety or Completion Contractor, as applicable, will assume all obligations under such Subcontracts from and after such assignment to the Surety or Completion Contractor.

   h. In the event a dispute arises between Obligee and Completion Contractor Obligee will give Surety notice thereof as quickly as reasonably possible.

   i. Surety may satisfy the required insurance obligations under the Bonded Contract by providing evidence of the required insurance coverage carried by Completion Contractor (i.e., by demonstrating via appropriate documentation that the Completion Contractor has purchased and is maintaining the insurance coverages required by Katerra under the Bonded Contract), with Surety and Obligee being named as an additional insured under the policy or policies. In this regard, the Surety acknowledges that Katerra had procured a contractor controlled insurance project as relates to the Project (the "CCIP") and that, to the extent the Surety intends to maintain such CCIP in order to satisfy the required insurance obligations under the Bonded Contract, the Surety shall be responsible for paying all premiums relating to such CCIP (without any reimbursement from Obligee), either extending or replacing the CCIP procured by Katerra and ensuring that all applicable subcontractors and related entities are appropriately enrolled in the CCIP. In addition, Surety agrees that it is responsible for, and shall provide Obligee with evidence of, the payment of all premiums required with respect to the CCIP in order to effectuate and maintain full coverage thereunder for the full period required under the Bonded Contract as relates to any Work performed by or through Katerra as of the date hereof, without any break or gap in the coverages or limits required by the Bonded Contract. Obligee acknowledges that Surety asserts that it is not responsible to procure insurance coverages related to the Design Work, and Surety in turn acknowledges that Obligee asserts that Surety is responsible to procure such insurance coverages. Each of the Obligee and Surety reserve their respective rights and remedies in this regard.

   j. Moreover, the Surety acknowledges and agrees that, although it is the Obligee's obligation to procure and pay for builder's risk insurance pursuant to the terms of the Bonded Contract, the Obligee asserts that it has incurred, and may hereafter incur, increased costs in order to obtain and maintain such insurance as a direct result of Katerra's repeated delays and ultimate material breach and abandonment of the Work on the Project. The Surety acknowledges that the Obligee has advised Surety that it intends to make a claim against the Surety for any such additional costs associated with the extension, maintenance or procurement of the builder's risk insurance, and the Obligee and Surety hereby reserve and retain all of their respective rights, positions, defenses and causes of action under the Bonds, the Bonded Contract and applicable law with respect thereto. In this regard, Surety asserts that Obligee is not entitled to recover any of the foregoing builders risk insurance related costs under the Bonded Contract or the Bonds, based on, without limiting the generality of the foregoing, Section 6.4.1.2 of the Bonded Contract which states: "The liquidated damages provided herein shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties, and any other damages of whatsoever nature incurred by [Obligee] which are occasioned by any delay in achieving Substantial Completion."

k.      Any contract entered into between the Surety and the Completion Contractor shall permit the Completion Contractor to be joined if necessary in any proceeding against the Surety.

l.      Obligee agrees to pay to Surety the earned and unpaid Bonded Contract Balances pursuant to Section 5 of this Agreement.

m.      Except and only to the extent expressly stated otherwise herein, and in addition to the rights otherwise reserved herein, Obligee and Surety each hereby reserve and retain all of their respective claims, rights, positions, defenses, and causes of action arising from conduct, actions, or inaction by Obligee, Surety, and/or Katerra prior to the date of this Agreement and Surety's and Obligee's execution of this Agreement does not waive such claims or defenses under the Bonds, the Bonded Contract and applicable law, including with respect to (i) any dispute or disagreement as to extensions of time and other associated relief under the Bonded Contract (including for any Excused Delays and/or COVID delays and accrued and future liquidated damages), and (ii) Surety's right to seek reimbursement for costs expended in the completion of the Project if it is determined that Surety was not obligated under the Bonded Contract or Bonds to incur such costs.

n.      The Obligee acknowledges the Surety's assertion that the Design Exclusion Rider affects the nature and extent of the Surety's obligations under the Bonds, and that the Surety is obliged only to perform the completion of the Takeover Work as defined herein.  The Obligee reserves all rights available to it to contest the effect, if any, of the Design Exclusion Rider on the Surety's obligations pursuant to the Bonds and the Bonded Contract. Without in any way limiting the foregoing, and subject to the all reservation of rights set forth herein, Obligee has agreed that it will retain an architect to perform any Design Work required to complete the Work under the Bonded Contract, which retention by the Obligee is made in accordance with and pursuant to the Design Rider Reservations.

3.      <u>Status of Completion</u>. Obligee will pay Surety the Bonded Contract Balance set forth in Section 4 of this Agreement below for Work performed by Katerra, Surety, and/or the Completion Contractor in accordance with the requirements of and at such times and in such amounts as required by the Bonded Contract. In this regard, all such payments shall be processed and made in accordance with the applicable provisions of the Bonded Contract (including Article 9 thereof). All payments to Surety shall be processed and transferred using Textura, using the applicable file previously used by the Obligee and Katerra, provided, that, Obligee facilitates, and Surety is actually provided sufficient access to and authority to utilize the Project Textura platform in order to process the payment requisitions and perform all functions required or permitted by the Bonded Contract (including Article 9 thereof).

4.      <u>Bonded Contract Balance Retainage, Pending Payment Applications and Change Order Claims</u>. As of the date of this Agreement, the Pay Applications submitted by Katerra reflect that the Bonded Contract Balance is as set forth in this Section 4:

| a. | Original Contract Amount | $71,656,165 |
|---|---|---|
| b. | Approved Change Orders | $1,617,787.51 |
| c. | Accrued liquidated damages offset against the original Contract Amount as set forth and acknowledged by Katerra in its Applications for Payment[4] | n/a |
| **d.** | **Adjusted Contract Amount (row a +/- row b – row c)** | **$73,273,952.59** |
| e. | Amount Paid to Date | $32,419,874.50 |
| **f.** | **Retainage (to be paid as set forth in Section 9.2 of the Bonded Contract) (through Pay Application No. 17)** | **$2,026,108.61** |
| **g.** | **Bonded Contract Balance (including above retainage) remaining to be paid as of the date of this Agreement (row d – row e)** | **$40,854,078.01** |

Obligee acknowledges that Surety has the right to verify and dispute the accuracy of the Bonded Contract Balance; provided that Surety will notify Obligee of any dispute within thirty (30) days of the signing of this Agreement; provided further that the Obligee shall use reasonable efforts to assist the Surety in reviewing past payment applications and related documentation to confirm the accuracy of the Bonded Contract Balance. Obligee and Surety each reserve all of their rights and defenses with respect to the foregoing.

a. *Bonded Contract Balance*. The above stated Bonded Contract Balance is Forty Million Eight Hundred Fifty Four Thousand Seventy Eight 01/100 Dollars ($40,854,078.01), which Bonded Contract Balance excludes the Retainage previously accrued under the Bonded Contact as of the date of this Agreement, and is inclusive of the Pending Payment Application Amount (as further described in paragraphs (b) and (c) of this Section 4).

b. *Retainage*. The retainage accrued through Pay Application No. 17 relating to Work performed by Katerra and its laborers, materialmen, subcontractors and suppliers (the "Katerra Parties") is Two Million Twenty Six Thousand One Hundred Eight 61/100 Dollars ($2,026,108.61) (the "Katerra Retainage"). The Katerra Retainage is not included in the Bonded Contract Balance required to be paid under Section 5 of this Agreement, but will be paid and released at Substantial Completion of the entire Work, in accordance with and subject to the applicable requirements and provisions of the Bonded Contract. Surety asserts that it is entitled to be paid the Katerra Retainage at Substantial Completion of the Takeover Work.

c. *Pending Payment Applications*. The Bonded Contract Balance includes the amounts that have been approved but not yet paid with respect to Katerra's payment applications numbered 18 and 19 (the "Pending Payment Application Amount"). In this regard,

---

[4] **Note**: Obligee asserts that any failure to achieve the original Scheduled Completion date for Substantial Completion under the Bonded Contract will result in liquidated damages in the amount of Seven Thousand Dollars ($7,000) per day pursuant to Section 6.4.1 of the Bonded Contract (as further described in Section 6 of this Agreement below). Surety acknowledges and agrees that the Obligee reserves its rights, if any, pursuant to the Bonded Contract to assert any applicable future liquidated damage. Surety and Obligee each reserve all rights and defenses with respect to time extensions and liquidated damages asserted by Obligee against the Contract Price and the Bonded Contract Balance.

Katerra's payment application number 17 for the period ending March 2021 is the last payment application that has been fully paid by Obligee to or on behalf of Katerra.

        d.    *Payment of Retainage and Pending Payment Applications*. Obligee agrees to make payment of Bonded Contract Balance (including the Pending Payment Application Amount) to the Surety directly, and Obligee agrees similarly to make payment of the Katerra Retainage (together with all future retainage accrued under the Bonded Contract) to the Surety directly. The Surety hereby agrees: (i) that in doing so, the Obligee will not be deemed to have committed any default under the Bonds or otherwise be deemed to have failed to satisfy any payment obligations under the Bonded Contract, and (ii) that the Surety shall be responsible for the resolution of any claims or liens for payment of any of the Bonded Contract Balance paid to Surety asserted by the Katerra Parties or any other person or entity that has provided work, labor, services, materials or equipment through or under the Katerra Parties and any claims to any of the Bonded Contract Balance paid to Surety asserted by any banks or lenders to Katerra alleging that they are entitled to payment of any portion of the Bonded Contract Balance, provided only that Obligee has satisfied its payment obligations under the terms of the Bonded Contract and this Agreement with respect to the Bonded Contract Balance. In this regard, and as further described in Section 5 of this Agreement below, the Surety shall provide final waivers and releases, to the extent required by and in the form stipulated in the Bonded Contract, for all labor and/or material supplied to the Project through the date of this Agreement. It is hereby further confirmed and acknowledged by Surety that its Payment Bond remains in full force and effect with respect to claims for labor and/or materials supplied to the Project by any such subcontractors or suppliers. The Pending Pay Application Amount of Five Million Five Hundred Eighty Six Thousand Five Hundred Ninety Six 23/100 Dollars ($5,586,596.23) will be paid to Surety within forty-five (45) days of (a) Surety providing the Obligee with a title report showing that all liens on the Project arising from or relating to the Work performed by Katerra and/or its subcontractors and suppliers of any tier have been removed (either by direct payment or having been released by the filing of a discharge bond), and (b) Obligee's receipt from Surety of a complete payment application executed by Surety in accordance with requirements of the Bonded Contract requesting the Pending Pay Application Amount.

        e.    *Current Change Order Claims*. The Surety and Obligee each acknowledge and agree that, as of the date of Katerra's material breach and abandonment of the Project, Katerra had submitted a number of proposed change order requests that have each been rejected by the Obligee (the "Pending PCOs"). Surety acknowledges and agrees that the Bonded Contract Balance does not include any amounts for the Pending PCOs. The Obligee and Surety agree to meet, subsequent to the execution of this Agreement, in order to negotiate in good faith the resolution of the Pending PCOs consistent with Section 8 and the other applicable provisions of the Bonded Contract. With regard to Pending PCOs, the Obligee and Surety each hereby reserve and retain all of their respective claims, rights, positions, defenses and causes of action under the Bonds, the Bonded Contract and applicable law.

        5.    <u>Bonded Contract Balances Payable to Surety; Required Documentation</u>. The Obligee shall make payment of the Bonded Contract Balance as progress payments and a final payment, and will make payment of the retainage (including the Katerra Retainage) in accordance with and subject to the provisions of, the Bonded Contract as such sums are earned

by the Completion Contractor in accordance with, and subject to all requirements, conditions and Obligee's rights under the Bonded Contract. Such payments will be made directly to Surety in accordance with Section 3. With respect to each such payment, the Surety shall provide full and final waivers and releases, in such form and substance as is required by the Bonded Contract, and shall provide all other related documentation that Katerra is required to provide under the Bonded Contract to Obligee or its lender. Specifically, in this regard, the Surety acknowledges that the Obligee has advised Surety that its ability to make payment to the Surety for the performance of the Work (including the Bonded Contract Balance) is contingent upon the Obligee's ability to satisfy such lender requirements and other financing arrangements, and the Surety acknowledges that Obligee asserts that it will not be a breach of this Agreement for the Obligee to fail to make payments of any amounts owed hereunder to the extent Obligee is unable to receive funds from its lenders as a result of the Surety's failure to provide the documentation required by this Section 5 and the Bonded Contract. Surety reserves all rights, remedies, and defenses for any failure of Obligee to make any payment to Surety as required under the terms of the Bonds, the Bonded Contract, and this Agreement, subject to the Design Rider Reservations. Subject to the terms and conditions of the Bonds, the Surety shall be responsible for any and all claims made by any laborers, subcontractors, or material suppliers for labor provided and/or material supplied in connection with the completion of the Work from and after the date of this Agreement, and, subject to the terms and conditions of the Bonds the Surety shall indemnify and hold harmless Obligee against any claims or liability with respect to any such claims.

6.      <u>Liquidated Damages</u>. The Surety acknowledges that it remains obligated under the Bonds, including under Section 7 of the Performance Bond, for (i) the responsibilities of Katerra for correction of defective work and completion of the Bonded Contract; (ii) "additional legal, design professional and delay costs resulting from the Contractor's [Katerra's] [de]fault, and resulting from the actions or failure to act of Surety under Section 5" of the Performance Bond (per Section 7.2 of the Performance bond); and (iii) liquidated damages. Surety asserts that any obligation of Surety and any recovery by Obligee under the foregoing items (i) – (iii) is to be "without duplication." Obligee does not agree that Surety's obligations and Obligee's rights to recovery is to be "without duplication." Moreover, the Surety acknowledges that, per Section 11.2 of the Bonded Contract, the Obligee is entitled to assert that it is entitled to recover attorneys' fees resulting from Katerra's failure to cure a default under the Bonded Contract. The Surety reserves its rights with respect to the Design Exclusion Rider and its effect, if any, on the foregoing. As of the date hereof, the applicable dates for the completion of the Work set forth in the Bonded Contract (including the Scheduled Completion Date, as defined in the Bonded Contract) remain unchanged. In this regard, the Surety acknowledges that Obligee asserts that any failure to achieve Substantial Completion of the Work by the Scheduled Completion Date (as those terms are defined in the Bonded Contract) will result in liquidated damages being accrued pursuant to Section 6.4 of the Bonded Contract, which liquidated damages will be recoverable from the Surety pursuant to the applicable terms of the Bonds. The Obligee hereby reserves the right to make claim against the Surety subsequent to the completion of the Work for such liquidated damages pursuant and subject to the terms and conditions of the Bonded Contract, the Bonds and applicable law. Obligee and Surety each hereby reserve and retain all of their claims, rights, positions, defenses and causes of action under the Bonds, the Bonded Contract and applicable law with respect to such matters.

7.      <u>Administrative Costs</u>. Obligee asserts that it has incurred and will hereafter incur certain costs, including legal and administrative costs, related to Katerra's default under the Bonded Contract that are recoverable under the Bonded Contract and the Bonds (including pursuant to Section 7 of the Performance Bond) (the "Administrative Cost Claims"). Obligee hereby makes claim against the Surety for the Administrative Cost Claims. Surety reserves the right to contest Obligee's assertion of Administrative Cost Claims, including, without limitation, the right to contest the amount of Administrative Cost Claims and to contend that any costs or damages allegedly incurred by Obligee were not caused by Katerra's default. Without limiting the generality of the foregoing, Surety asserts Obligee is not entitled to recover any of the foregoing Administrative Cost Claims under the Bonded Contract or the Bonds, and without limiting the generality of the foregoing, the Surety references Section 6.4.1.2 of the Bonded Contract which states: "The liquidated damages provided herein shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties, and any other damages of whatsoever nature incurred by [Obligee] which are occasioned by any delay in achieving Substantial Completion." Obligee hereby reserves the right to make claim against the Surety for Administrative Cost Claims subsequent to the completion of the Work, pursuant and subject to the terms and conditions of the Bonds and applicable law. With respect to the matters addressed by this Section 7, Obligee and the Surety each hereby reserve and retain all of their claims, rights, positions, defenses and causes of action under the Bonds, the Bonded Contract and applicable law.

8.      <u>Surety's Representative</u>.

a.      In order to facilitate communication between Surety, Obligee, and Completion Contractor, and Completion Architect, Surety has designated Nick Deeley of The Vertex Companies, Inc., to be its limited representative for this Project. Nick Deeley will have the authority to sign, submit, and negotiate, for and on behalf of Surety, any and all Applications and Certificates for Payment. Any additive change orders, modifications, and/or supplemental agreements with a dollar value of less than Twenty Five Thousand Dollars ($25,000) may be negotiated between Obligee and the foregoing named representative of Surety. Any additive or deductive change orders, modifications, and/or supplemental agreements with a dollar value in excess of Twenty Five Thousand Dollars ($25,000), any that include deductions or credits, and any that include or resolve any time extensions must be negotiated directly between Obligee and Surety. In this regard, the Surety's representatives and agents authorized to negotiate any such additive or deductive change orders, modifications, and/or supplemental agreements with a dollar value in excess of Twenty Five Thousand Dollars ($25,000) will be each, of Gary Shevik and Paul Schraf, individually.  All change orders and modifications shall be subject to the provisions of the Bonded Contract.  Nick Deeley's actual authority to represent Surety is limited to the express terms of this paragraph.  No additional authority, express or implied, is allowed.

b.      Surety will, within five (5) days of the date hereof, specifically authorize in writing an individual the Completion Contractor to be its representative (each an "Authorized Individual") solely for the purposes set forth in this paragraph. The Authorized Individual with Completion Contractor will represent Surety in dealing with Obligee on day to day construction issues with respect to the Project. Surety hereby designates the Authorized Individual with Completion Contractor to work with Obligee or Obligee's designated representative to enable

13

Obligee or its representative to prepare and process pay estimates on the Bonded Contract. The Authorized Individual will not have any authority to negotiate and sign change orders for extra work (i.e. work that is different from, in excess of, or beyond the scope of the Work required by the original Bonded Contract), deductive change orders, credits, back charges, or net deductions from the Bonded Contract or the Bonded Contract Balance of any nature whatsoever without Surety's prior written approval. Any agreements with respect to the correction of Work performed by Katerra will require the written approval of Surety.  Authorized Individual's actual authority is limited to the express terms of this paragraph.  No additional authority, express or implied, is allowed.

      9.    <u>Continuing Effect of the Bonds</u>. The Bonds remain in full force and effect pursuant to their terms and conditions (including the penal limit thereof) and neither party, by the execution of this Agreement, waives any rights that it may pursuant to the Bonds, other than as set forth in this Agreement. The parties acknowledge that nothing herein will limit, alter, amend, or waive either party's rights, defenses, or obligations as provided for under the Bonded Contract or the Bonds, except as expressly otherwise provided for in this Agreement. Obligee acknowledges that Surety's covenants, obligations, and performance under this Agreement are pursuant to its obligations under the Bonds, and all payments by Surety for labor and material or for performance of the Bonded Contract or pursuant to this Agreement are in discharge of Surety's obligations under the Bonds, and are to be credited (dollar for dollar and without offset) against the penal limit of the Bonds, less credits for receipt by Surety of Contract Balances. Surety's satisfaction of its obligations under the Bonds will occur either upon (a) the Surety's complete fulfillment of its obligations under the Bonds and the Bonded Contract and satisfaction of the obligations under this Agreement, or (b) the Surety's expenditure in the performance and completion of the Surety's obligations under the Bonds and the Bonded Contract of the complete penal amount of the Performance Bond, whichever comes first.

      10.    <u>Notices</u>. Any notice, request, demand, or other communications required, permitted or otherwise contemplated by this Agreement will be in writing and either delivered personally or sent by regularly scheduled overnight air courier service to the following addresses:

Surety:                        Liberty Mutual Surety
                                  1001 4th Ave., Ste. 3700
                                  Seattle, WA 98155
                                  Attn:   Emily Wilson, Surety Claims Counsel
                                              Global Risk Claims
                                  and

                                  HOSCL@Libertymutual.com

With a copy to:                     Manier & Herod, P.C.
                                    1201 Demonbreun St., Ste. 900
                                    Nashville, TN 37203
                                    Attn:   Sam H. Poteet, Jr.
                                            Mary Paty Lynn LeVan
                                            Jeffrey S. Price

                                    and

                                    The Vertex Companies, Inc.
                                    16150 Scientific Way
                                    Irvin, CA 92618
                                    Attn:   Nick Deeley

Obligee:                            Livermore Multifamily Owner LLC
                                    950 Tower Lane, Suite 900
                                    Foster City, CA 94404
                                    Attn:   David J. Eichler

                                    and

                                    DEichler@legacypartners.com

With a copy to:                     Baker Botts LLP
                                    910 Louisiana Street
                                    Houston, TX 77002
                                    Attn:   Danny David
                                            Munir Saadi

Any such communication will be deemed received at the earliest to occur of: (i) personal receipt; or (ii) the date of promised delivery of a regularly scheduled overnight air courier service. Any of the foregoing addresses may be changed by means of a notice furnished in the manner provided herein.

11.    <u>Mutual Cooperation</u>. Surety and Obligee agree to cooperate fully with each other to effect the completion of the Bonded Contract as efficiently and expeditiously as reasonably possible under the circumstances. Obligee further agrees to not perform Work on behalf of Surety, or any Completion Contractor or subcontractor to the Completion Contractor, without prior written notice as required by the Bonded Contract with any notices that are required to be sent to Katerra being sent to Surety.

12.    <u>Entire Agreement</u>. This Agreement represents the entire agreement between the parties concerning the subject matter hereof, and all oral discussions and prior agreements are merged herein.

13.    <u>Governing Law, Jurisdiction and Venue</u>. This Agreement will be deemed to be a contract under the laws of the State of California and for all purposes will be governed by and construed and enforced in accordance with the laws of the State of California. The parties to this Agreement consent to the jurisdiction of the State of California. Unless the jurisdictional prerequisites are not met, the parties hereto irrevocably consent to the exclusive jurisdiction of the United States District Courts of California for the purpose of any litigation concerning this Agreement. No party hereto will object to or contest California the proper venue for any action or proceeding to enforce the terms hereof. The foregoing consent will not be construed as any waiver by the parties of any right under applicable law to remove any lawsuit or proceeding brought in state court to federal court. Unless all parties agree to mediation or arbitration, all disputes will be decided by a court of competent jurisdiction.

14.    <u>Nonwaiver of Rights</u>. No waiver of any right, power, or remedy of either Party will be effective unless said waiver is in writing and signed by said Party. Every power and remedy given by this Agreement to Surety and Obligee may be exercised from time to time as often as may be deemed expedient by Surety and Obligee, as applicable.

15.    <u>Binding Effect, Assignment, and Amendment</u>. This Agreement will inure to the benefit of, and will be binding upon, the respective successors and permitted assigns of the parties hereto, including without limitation affiliates of Surety. Neither Party has any right to assign any of its rights or obligations hereunder without the prior written consent of the other Party. This Agreement may be amended only by a writing signed on behalf of each party.

16.    <u>Severability</u>. The provisions of this Agreement are intended to be severable. If any provision of this Agreement is held invalid or unenforceable in whole or in part in any jurisdiction such provision will, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

17.    <u>Counterparts</u>. This Agreement may be executed simultaneously in counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. This Agreement, to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including .pdf files, digital signatures), will be treated in all manner and respects and for all purposes as an original agreement or instrument and will be considered to have the same binding legal effect as if it were to the original signed version thereof delivered in person.

18.    <u>Section Headings</u>. The section headings in this Agreement are for convenience only and do not limit, define, or construe the contents of the sections.

19.    <u>Costs of Dispute Resolution</u>. The costs of any binding dispute resolution procedures (including arbitration and litigation) and reasonable attorneys' fees shall be borne by the non-prevailing party, as determined by the adjudicator of the dispute.

4816-8846-1048

20.    <u>Assignment by Owner</u>.  Owner may (without Surety's consent) assign or delegate this Agreement to a successor to Owner's interest capable of performing Owner's remaining obligations under this Agreement, and to any lender(s) or equity partners providing financing for the Work, and to any partnership, limited liability company or corporation in which Owner has a managing interest.

*(Signature pages follow)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SURETY:

LIBERTY MUTUAL INSURANCE COMPANY

By: _____

      John A. McDevitt, Regional Vice President,
      Global Risk Claims


OBLIGEE:

LIVERMORE MULTIFAMILY OWNER LLC,
 a Delaware limited liability company

By:    Livermore Multifamily Venture LLC,
      a Delaware limited liability company,
      its Sole Member

      By:    LP/CE Livermore, LLC, a Delaware
            limited liability company, its
            Administrative Member

            By: Legacy/Collier Holdings LLC, a
                Delaware limited liability
                company, its Manager

            By: _____

              David J. Eichler, Senior
              Managing Director

# EXHIBIT C

## COMPLETION AGREEMENT (Livermore – Lump Sum)

THIS COMPLETION AGREEMENT ("this Agreement") is made and entered into as of February 3, 2022, by and between LIBERTY MUTUAL INSURANCE COMPANY ("Surety") and SBI BUILDERS, INC., a California corporation ("Completion Contractor").  Capitalized terms not otherwise defined herein will have the meaning set out in Section 1.

WHEREAS, Katerra Construction LLC ("Katerra") entered into a Standard Design-Build Agreement and General Condition between Owner and Design Builder (Lump Sum Price) dated October 29, 2019, with Livermore Multifamily Owner LLC, as amended by Amendment to Standard Design-Build Agreement and General Condition Between Owner and Design Builder (Lump Sum Price) dated as of October 29, 2019 (including all general, supplementary, and special conditions, drawings, specifications, forms, addenda, and documents forming a part of thereof "the Bonded Contract") with respect to the construction of Legacy at Livermore located in California ("the Project");

WHEREAS, Surety issued a Performance Bond A312-2010 and Payment Bond A312-2010 each No.  906223564, on behalf of Katerra, as the principal, and in favor of Livermore Multifamily Owner LLC., as the obligee ("Obligee"), each in the penal sum of Sixty Eight Million Six Hundred Twenty Five Thousand Twenty Five Dollars ($68,625,025) in connection with the Bonded Contract and the Project ("the Bonds");

WHEREAS, on June 6, 2021, Katerra filed a Petition for Relief under Chapter 11 of the Bankruptcy Code and the United Stated Bankruptcy Court, Southern District of Texas, Houston Division ("the Bankruptcy Court"), styled *In Re:  Katerra, Inc. et al.,* Case No. 21-31861 (DRJ) ("Bankruptcy Case");

WHEREAS, in conjunction with the bankruptcy filing, Katerra filed Debtor's Third Omnibus Motion for Entry of an Order authorizing (i) the Rejection of Certain Unexpired Leases, and (ii) the Rejection of Certain Executory Contracts, each effective as of the Petition Date, and (iii) granting related relief.

WHEREAS, on June 29, 2021, the Bankruptcy Court entered a Joint Stipulation and Agreed Order Between the Debtors, Liberty Mutual Insurance Company, and Certain Project Owners Rejecting Certain Executory Contracts and Unexpired Leases Effective As of the Petition Date and for Limited Relief from the Automatic Stay that includes the Bonded Contract and associated subcontracts in the list of contracts to be rejected.  This Order included the Bonded Contract and associated subcontracts in the list of contracts to be rejected;

WHEREAS, by letter dated August 2, 2021, Obligee terminated the Bonded Contract with Katerra for default;

WHEREAS, subject to the consent of Obligee, which has been obtained, Surety wants Completion Contractor to perform and complete the work under the Bonded Contract; and

WHEREAS, Completion Contractor desires to perform the Work, upon the terms and conditions set out in this Agreement.

NOW, THEREFORE, in consideration of the premises, other good and valuable considerations, and the mutual covenants set forth herein, the receipt and sufficiency of all are hereby acknowledged, the parties hereto agree as follows:

1.    Definitions.    In addition to the terms defined elsewhere in this Agreement, unless the context otherwise requires, the following terms, when used in this Agreement, will have the meanings set forth below:

"Agreement" means this Completion Agreement, as it may be amended and modified from time-to-time.

"Completion of the Project" means the procurement of all materials and the performance of all services necessary for the completion of the Work in compliance with this Agreement, the Bonded Contract, and the plans and specifications listed in the Bonded Contract. The foregoing will not include the design and construction administration services provided by the Architect of Record that are included in the Bonded Contract.

"Contingency Amount" means Two Million Five Hundred Thirty Thousand Seven Hundred Sixty Nine Dollars ($2,530,769).

"Contract Documents" means: (i) this Agreement, (ii) the Bonded Contract, (iii) the plans and specifications listed in the Bonded Contract, (iv) approved and executed Change Orders, and (v) modifications issued after the execution of this Agreement.  In the event of a conflict or ambiguity between any of the Contract Documents and this Agreement, as between Surety and Completion Contractor, this Agreement will govern.

"Cost of the Work" means costs necessarily incurred by Completion Contractor in the proper performance of the Work. Such costs will be at rates not higher than the standard paid at the situs of the Project, except with prior written consent of Surety. The Cost of the Work will include only the following items:

(a)    Subcontract Costs: Payments made by Completion Contractor to any subcontractors required to progress the Work, subject to the limitations included in this Agreement, without any mark-up of any type for Completion Contractor's overhead and profit;

(b)    Costs of Materials and Equipment Incorporated in the Project: Costs, including transportation and storage, of materials (excluding consumables, expendables, and small tools) and equipment incorporated or to be incorporated in the Project,  without any mark-up of any type for Completion Contractor's overhead and profit;

(c)    Rental Equipment: any equipment needed but not owned by Completion Contractor for the performance of the work will be rented and invoiced at the actual invoice net rental rate (all rentals must be approved by Surety in advance and in writing).  Transportation and state and local taxes will be at actual cost to Completion Contractor without any mark- up. Fuel, oil, and gas reasonably necessary and actually consumed in the course of performing the work are reimbursable at Completion Contractor's actual cost without any mark-up of any type for Completion Contractor's overhead and profit; and

(d)    Owned Equipment: Compensation for all equipment that is owned by Completion Contractor, including, not limited to, maintenance, repairs, transportation, profit, and overhead, will be in accordance with rates set out on the attached Exhibit A or that are otherwise agreed to by Surety in advance of any use of same without exception. Commercial rates are not acceptable. Fuel, oil, and gas reasonably necessary and actually consumed in the course of performing the work are reimbursable at Completion Contractor's actual cost, without any mark-up of any type for Completion Contractor's overhead and profit. The quantities and type of equipment used will be subject to Surety's prior written approval.

The Cost of the Work will not include:

(aa)    General Conditions Cost, labor costs, salaries, and other compensation of Completion Contractor's personnel stationed at Completion Contractor's principal office or offices other than offices established at the site of the Project;

(bb)    expenses of Completion Contractor's principal office, temporary construction facilities, general conditions, consumables, expendables, overhead, and profit;

(cc)    overhead and general taxes and expenses, except as may be expressly included in the above paragraphs (a) - (c);

(dd)    Completion Contractor's capital expenses, including interest on Completion Contractor's capital employed for the Work;

(ee) rental costs of machinery and equipment, except as approved by Surety or Surety's Representative in advance and in writing;

(ff) subcontract costs, except as approved by Surety or Surety's Representative in advance and in writing;

(gg) costs due to the negligence or failure of Completion Contractor, its subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including, but not limited to, costs for the correction of damaged, defective, or nonconforming work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the work except where expressly allowed elsewhere in this Agreement; and

(hh) any cost not specifically and expressly described in the above paragraphs (a) – (d).

"Cost to Complete" means the anticipated cost of materials, labor, and other items, including, but not limited to, back charges, overhead of Completion Contractor, and penalties for termination or late completion required to complete the Work required by the Bonded Contract.

"Defective Work" means a defect in work, including design errors and omissions, performed by Katerra. Defective Work also includes any and all damages caused by the idling of the Project, including up to the date of the Notice to Proceed that was issued on October 26, 2021,

3

as a result of the June 29, 2021, rejection of the Bonded Contract and related work stoppage and resultant inactivity at the Project, where such damages are caused by the passage of time and are not readily observable through a reasonable inspection, such as, purely for the sake of example, warping and deformation of the uninstalled modular wall units stored at the Project site such that they will not properly fit together once put into place for installation.

"Defective Work and Storm Damage Costs" means cost necessarily incurred by Completion Contractor in the proper performance of any work to correct and address Defective Work and Storm Damage, plus five percent (5%) for all overhead and profit.  Such costs will be at rates not higher than the standard paid at the situs of the Project, except with prior written consent of Surety.  Defective Work and Storm Damage Costs will include only the following items:

(a)      Subcontract Costs:    Payments made by Completion Contractor to any subcontractors required to address the Defective Work and/or Storm Damage, subject to the limitations included in this Agreement, including, but not limited to, Section 2;

(b)      Costs of Materials and Equipment Incorporated in the Project:  Costs, including transportation and storage, shipping, handling, taxes, and duties for materials (excluding consumables, expendables, and small tools) and equipment incorporated or to be incorporated in the Project required in the performance of Defective Work and/or Storm Damage related work;

(c)      Rental equipment: any equipment needed but not owned by Completion Contractor for the performance of the Defective Work and/or Storm Damage related work will be rented and invoiced at the actual invoice net rental rate (all rentals must be approved by Surety in advance and in writing).  Transportation and state and local taxes will be at actual cost to Completion Contractor without any mark-up.  Fuel, oil, and gas reasonably necessary and actually consumed in the course of performing the Defective Work and/or Storm Damage related work are reimbursable at Completion Contractor's actual cost without any mark-up of any type for Completion Contractor's overhead and profit; and

(d)      Owned Equipment: Compensation for all equipment that is owned by Completion Contractor, including, but not limited to, maintenance, repairs, transportation, profit, and overhead, will be in accordance with the rates that are agreed to by Surety in advance of any use of same without exception.  Commercial rates are not acceptable.  Fuel, oil, and gas reasonably necessary and actually consumed in the course of performing the Defective Work and/or Storm Damage related work are reimbursable at Completion Contractor's actual cost, without any mark-up of any type for Completion Contractor's overhead and profit.  The quantities and type of equipment used will be subject to Surety's prior written approval.

The Defective Work and Storm Damage Costs will not include:

(aa)      Salaries and other compensation of Completion Contractor's personnel stationed at Completion Contractor's principal office or offices other than offices established at the site of the Project;

(bb)      expenses of Completion Contractor's principal office, temporary construction facilities, general conditions, consumables, expendables, overhead, and profit (other

4

than the five percent (5%) fee for overhead and profit set out in the first paragraph of this definition), except that in the event the time to complete the Work is extended solely as a result of the performance of Defective Work and/or Storm Damage work, Completion Contractor shall be entitled to a daily rate of Six Thousand Two Hundred Ninety Six 58/100 Dollars ($6,296.58) for general conditions set out on the attached Exhibit B commensurate with the number of days that the Project's critical path is extended due to such Defective Work;

   (cc) overhead and general taxes and expenses, except as may be expressly included in the above paragraphs (a) - (e);

   (dd) Completion Contractor's capital expenses, including interest on Completion Contractor's capital employed for the Work;

   (ee) rental costs of machinery and equipment, except as approved by Surety or Surety's Representative in advance and in writing;

   (ff) subcontract costs, except as approved by Surety or Surety's Representative in advance and in writing;

   (gg) costs due to the negligence or failure of Completion Contractor, its subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including, but not limited to, costs for the correction of damaged, defective, or nonconforming Work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the Work except where expressly allowed elsewhere in this Agreement; and

   (hh) any cost not specifically and expressly described in the above paragraphs (a) – (d).

"General Conditions Cost" means the general conditions items listed on the attached Exhibit B for which Completion Contractor will be paid a lump sum amount equal to One Hundred Eighty Nine Thousand Four Hundred Nineteen Dollars ($189,419) per month. The General Condition Cost is inclusive of all burden associated with labor.

"Interim Completion Letter" means that certain letter dated October 25, 2021, from Surety accepted and agreed to by Completion Contractor pursuant to which Completion Contractor performed certain work on the Project, commencing October 26, 2021, modified by that certain letter dated January 6, 2022.

"Lump Sum Amount" means Sixty One Million Five Hundred Fifty Seven Thousand Two Hundred Twenty Two 22/100 Dollars ($61,557,222.22) (Sixty Three Million Three Hundred Twenty Two Thousand Seven Hundred Forty 96/100 Dollars ($63,322,740.96) minus Nine Hundred Eighty Three Thousand Seven Hundred Fifty Six Dollars ($983,756.74) paid to Completion Contractor for Work performed under the Interim Completion Letter and minus the bond premium amount of Seven Hundred Eighty One Thousand Seven Hundred Sixty Two Dollars ($781,762)). Completion Contractor has represented to Surety that the foregoing Lump Sum Amount has been reduced by the aggregate dollar amount advanced by Surety or Surety

Representative to purchase HVAC and other materials during the Interim Period under the Interim Completion Letter. Surety Representative and Completion Contractor will work together during the thirty (30) day period following the execution of this Agreement to verify and reconcile the amount of such purchased materials. Completion Contractor and Surety Representative will work together in good faith to adjust the Lump Sum Amount if there has been any error in its calculation with respect to the foregoing HVAC and other materials. The Lump Sum Amount is "all-inclusive," consisting of all subcontractor and vendor costs, the costs of general conditions work, and services by Completion Contractor, including its site labor force, the costs for Completion Contractor's project staff, and all other direct and indirect costs of performance under this Agreement. Without limiting the generality of the foregoing, the Lump Sum Amount includes all currently earned retainage for any assigned subcontractors and suppliers listed on Exhibit C.

"Storm Damage" means any and all damages caused by the October 24, 2021, rain storm that occurred in Livermore and throughout Northern California and prior to execution of this Agreement.

"Substantial Completion Date" has the meaning set out in Section 3.

"Surety Representative" means Nick Deeley with The Vertex Companies, Inc.

"Work" means all general construction, supervision, coordination, and related work and services required to be performed by Katerra in the Completion of the Project but which, as of the date hereof, has not been performed and satisfaction of all warranty claims made in accordance with the terms of the Bonded Contract, but subject to the terms of this Agreement, which controls over any conflicting provisions of the Bonded Contract. The Work will not include the design and construction administration services provided by the Architect of Record that are included in the Bonded Contract.

Any collective defined term and any defined term used in the plural or singular will be taken to encompass all members of the relevant class. Any defined term used in the singular proceeded by "any" will be taken to indicate any number of the members of the relevant class.

2.    Completion of the Project. Completion Contractor agrees to complete the Work pursuant to the terms and conditions required by the Bonded Contract and the Bonds, including, but not limited to, obtaining the acceptance of Obligee of the Work under the Bonded Contract; provided however, as set out in this Agreement, the price and schedule applicable to the Completion Contractor's completion of the Work deviate from the price and schedule provided for in the Bonded Contract, as amended by this Agreement. The terms in this Agreement that are different from or inconsistent with the terms of the Bonded Contract supersede the terms and obligations in the Bonded Contract. Completion Contractor will not be required to provide ongoing design, architectural, engineering, and construction administration services for the Project, nor obtain approvals to the Construction Documents from any approving agencies. These services will be contracted separately by Surety. Completion Contractor will be required to coordinate with the Architect of Record as needed to fulfill the requirements of the Bonded Contract.

Item Number 2 in the October 29, 2019, Amendment to the Bonded Contract does not apply to this Agreement.  Additional costs to construct or install the Work resulting from error, omission, deficiencies, ambiguities, or other issues with the design development documents or Contract Documents, for Work not yet performed by Katerra, shall entitle Completion Contractor to an equitable adjustment in the Lump Sum Amount and/or an extension of the Substantial Completion Date; provided, however, that an equitable adjustment to the Lump Sum Amount will only be made to the extent that (i) such additional costs are with respect to Defective Work  or Storm Damage, or (ii) are included in a change order with such additional cost to be passed through and paid for one hundred percent (100%) by Obligee.  Any extension by the Substantial Completion Date will only be made if the time to complete the Work on the Project is extended solely as a result of the performance of Defective Work  and/or Storm Damage work in which case it will be extended commensurate with the number of days that the Project's critical path is extended due to such Defective Work  and/or Storm Damage work and/or an extension of the Substantial Completion Date will be provided day for day for any extension of time provided by Obligee to Surety with respect to any change order work that is not with respect to Defective Work and/or Storm Damage work.

Completion Contractor assumes responsibility for all of the Work required to complete the Project and the Completion of the Project, including the assumption of responsibility and liability for all warranty obligations under the Bonded Contract including, but not limited to, warranty obligations relating to or arising from work performed by Katerra and its subcontractors and suppliers.  Completion Contractor agrees to issue to Obligee any written warranty or other documentation required under the Bonded Contract to be issued to evidence any and all warranties required under the Bonded Contract.  Except to the extent Surety chooses to award contracts to another contractor pursuant to the fourth paragraph of this Section 2 or exercises its right to terminate under Section 16, Completion Contractor assumes all responsibility and liability for defects resulting from work previously performed by Katerra subject to Surety's obligation to pay for such Work as provided in this Agreement. Except to the extent Surety chooses to award contracts to another contractor pursuant to the fourth paragraph of this Section 2 or exercises its right to terminate under Section 16, Completion Contractor assumes all responsibility and liability for all warranty obligations under the Bonded Contract, including, but not limited to, warranty obligations relating to or arising from work performed by Katerra and its subcontractors and suppliers subject to Surety's obligation to pay for such Work as provided in this Agreement.

Completion Contractor will notify Surety Representative within ten (10) days should it become aware of any defect in any of the Work performed by Completion Contractor or its subcontractors, or Katerra or its subcontractors.  In the event that any Defective Work  is discovered after the date of the Interim Completion Letter in work performed by Katerra or its subcontractors before the date of the Interim Completion Letter, Completion Contractor will, if directed by Surety to do so, correct, repair, and/or replace any such defects provided, that, Surety agrees to compensate Completion Contractor for the Defective Work and Storm Damage Costs, in excess of any retainage applicable to any such subcontractor, for such corrective work on the terms and at the rates provided for in this Agreement and provide Completion Contractor an extension of time and time to complete or repair such Defective Work.  Completion Contractor will first use any retainage applicable to any such subcontractor to pay for any such corrective work to address any such Defective Work.  Furthermore, if any such Defective Work was caused by a subcontractor of Katerra that has been assigned to Completion Contractor and is being utilized by Completion

7

Contractor for completion of the Project, then Completion Contractor will use best efforts to enforce the responsibility of that subcontractor to correct, replace, or repair said Defective Work. The Work will include satisfaction of all warranty claims made in accordance with the terms of the Bonded Contract. In the case of warranty claims arising from work performed by Completion Contractor's own forces, subcontractors and vendors assigned to Completion Contractor and/or selected by Completion Contractor, after the date of the Interim Completion Letter, Completion Contractor will be responsible for recovery of costs incurred responding to warranty claims.

In lieu of paying the Defective Work and Storm Damage Cost, as provided herein, Surety may elect to require a negotiated fixed price depending upon the magnitude of such Defective Work for which Katerra is responsible or the magnitude of the Storm Damage. In the alternative, Surety reserves the right to award contracts for the performance of specific corrective work to someone other than Completion Contractor; however, Completion Contractor will not be liable for any issues arising from the alternate contractor's work. In addition, Completion Contractor will not be liable for any liquidated damages that may be assessed by Obligee as a result of any delays in the completion of the Work caused by any substitute subcontractor or contractor that Surety decides to engage to perform any such corrective work – Surety will be solely responsible as between Surety and Completion Contractor for any such liquidated damages that may be assessed by Obligee. Surety will have a reasonable time in which to investigate the purported Defective Work and/or Storm Damage and to advise Completion Contractor with respect to it and to what method Surety elects to resolve such Defective Work and/or Storm Damage.

Surety may retain the services of Surety Representative to monitor the completion of the Project, and, if so retained, Completion Contractor agrees that Surety Representative will monitor progress of the Project. Completion Contractor will meet with Surety Representative or Surety on a periodic basis for the purposes of reporting to Surety regarding the status and progress of the remaining Work and Completion Contractor's performance of its obligations under this Agreement. Completion Contractor will prepare and provide to Surety Representative on a monthly basis a monthly status report that will include: (i) status of compliance and deviations from the established schedule; (ii) any Obligee requested or directed change orders; (iii) staffing needs; and (iv) any other issues related to the Completion of the Project. Completion Contractor will prepare and maintain on a daily basis signed reports showing, among other things, its employees on the Project site, the subcontractors at the Project site and number of employees of each, the general work (and location of same) performed by each trade, the names of any other persons not generally at the Project site on a daily basis in attendance at the site on that date, the temperature and weather conditions, and description in reasonable detail of any extraordinary or special occurrences. Means and methods of construction will be at the discretion of Completion Contractor. Completion Contractor further agrees that it will work with Surety Representative to complete the Work. Completion Contractor and Surety's Representative will work cooperatively and collaboratively to assure that the Work is completed as efficiently and as promptly as reasonably possible while maintaining safety and quality obligations required by the Bonded Contract. Completion Contractor will advise Surety at least monthly on staffing needs and will work cooperatively with Surety to manage staffing at levels appropriate to the needs of the Project.

Completion Contractor hereby assumes liability and responsibility for all performance bond claims on the Project that are the subject of the Bonded Contract and/or the Bonds, with respect to the Work performed by Completion Contractor or completion costs incurred in the

Completion of the Project. Completion Contractor hereby assumes liability and responsibility for all Work performed by Completion Contractor, and subcontractors, suppliers, and others under its direction, to address Defective Work, provided, that, Surety compensates Completion Contractor for any Defective Work and Storm Damage Costs for any corrective work performed with respect to Defective Work performed by Principal as provided in Section 2.

Obligee has taken an assignment of agreements with subcontractors and/or suppliers previously utilized on the Project by Principal as listed on the attached Exhibit C. Completion Contractor has evaluated the subcontractors and/or suppliers listed on the attached Exhibit C, and has decided to utilize all of said subcontractors and suppliers, and will accept an assignment from Obligee of all related agreements. Subject to Surety's final review and approval and confirmation that bonds are required from each such subcontractor, Completion Contractor will require that all subcontractors with a subcontract value of Five Hundred Thousand Dollars ($500,000) or greater provide to Completion Contractor payment and performance bonds from a U.S. Treasury listed corporate surety licensed to do business in California and acceptable to Surety, in its sole and absolute discretion, with such bonds to be in a form acceptable to Surety. Attached as Exhibit D is information regarding Completion Contractor's requests to date that subcontractors provide bonds. Surety will be named as a dual obligee on any subcontractor bonds.

Subject to any conditions and limitations in the Bonded Contract, Completion Contractor has the right to replace any such subcontractors and/or vendors with substitute subcontractors and/or vendors, provided that Completion Contractor provides Surety Representative with all bids and proposals obtained by Completion Contractor with respect to the Work to be performed by any such substitute subcontractors and/or vendors and obtains Surety's express written consent prior to any such replacement. Copies of all bids and proposals and Surety's express written consent is also required prior to Completion Contractor engaging a new subcontractor or vendor to perform any assigned subcontractor's work or vendor's obligations. In addition, Completion Contractor will advise Surety Representative of the reason that it wants to make any such substitution and advise as to how it will mitigate any risks (i.e. warranty gaps) associated with any such substitution. Surety will respond to a request for approval of a subcontractor and/or vendor within five (5) business days of receipt of a written request for approval from Completion Contractor with all required documentation. Completion Contractor is not under any obligation to accept assignment of any such subcontractors or suppliers. However, Completion Contractor will utilize all specialty ordered materials and equipment for which fabrication is commenced or being completed and such specialty ordered materials and equipment that are presently stored or are in route, for which cancellation or reorder would delay the Project. Any increased cost of any new or substitute subcontractor or vendor will not increase the Lump Sum Amount. If Completion Contractor elects to utilize some or all of the listed subcontractors and suppliers, then Completion Contractor will be responsible for the unearned amount of the applicable subcontracts or purchase orders, including, but not limited to, retainage. Completion Contractor will not have any financial responsibility for any earned but not paid amounts to any such subcontractors or suppliers other than for all previously earned retainage. Completion Contractor is responsible for both currently earned and unearned retainage for any of the assigned subcontractors or suppliers listed on the attached Exhibit C. Completion Contractor will not have any financial responsibility for any previously earned retainage of any subcontractor engaged by Katerra that is not listed on the attached Exhibit C unless Completion Contractor takes an assignment of any such subcontractor.

Care, custody, and control of all stored materials (whether stored onsite or offsite under the control of Completion Contractor) became the responsibility of Completion Contractor on November 25, 2021. Completion Contractor has inspected and accepted such stored materials. Said stored materials have been itemized in an inventory that has been agreed to by Completion Contractor and Surety. The stored materials will only be used for the Completion of the Work. The maintenance and care of these materials will become the responsibility of Completion Contractor in accordance with the Bonded Contract. Completion Contractor will not be required to reimburse any party for these materials. No representations are made, expressed or implied, by Surety regarding the quantity, quality, contract suitability, or any other aspect of these stored materials. Unused excess stored materials, if any, will be retained by Completion Contractor and become Completion Contractor's property for which Completion Contractor has sole discretion as to the resolution of such materials.

Completion Contractor will provide full and complete access to the Project site to Surety, Obligee, and any of their third-party representatives for purposes of inspecting the status and quality of the Work. Any such inspection will not relieve Completion Contractor of its obligations under the Contract Documents.

3.  <u>Schedule for Completion</u>.  Completion Contractor will commence performance under this Agreement on February 3, 2022. Completion Contractor commenced work under the Interim Completion Letter on October 26, 2021. Completion Contractor has provided to Surety Representative its schedule for completion of all of the Work to complete the Bonded Contract. Said Schedule includes all milestone completion dates referred to in the Bonded Contract. This Schedule will be supplemented as needed to ensure that it is sufficient in detail to allow Surety Representative to monitor the progress of completion of the Bonded Contract. At a minimum, the level detail in such schedule will meet the requirements of the Bonded Contract. Completion Contractor will adjust its schedule as necessary depending on conditions affecting the Work to ensure that a temporary certificate of occupancy is received no later than March 30, 2023, and ensure substantial completion by no later than May 11, 2023 ("Substantial Completion Date"), as the same may be extended by Obligee under the terms of the Bonded Contract. As between Surety and Completion Contractor, this schedule controls over any schedule in the Bonded Contract. Completion Contractor will provide scheduling data as required showing current conditions and revisions required by actual experience. These time periods may be extended by time extensions granted by Obligee to Surety, which will be negotiated directly between Surety, or Surety Representative on behalf of Surety, and Obligee. Completion Contractor will be entitled to the benefit of any extensions that may be granted by Obligee for actual delays to Completion Contractor's ability to prosecute the Work.

4.  <u>Change Orders; Contingency Amount</u>.  Completion Contractor will not have the authority to negotiate any change orders, modifications, and/or supplemental agreements directly with Obligee, all of which must be negotiated through and approved by Surety or Surety Representative prior to submittal to Obligee. Completion Contractor will coordinate with Surety or Surety Representative in the preparation of such change orders, etc. Attached as Exhibit E is the Fully Loaded Labor Rates Schedule that sets out the stipulated labor rates that will apply with respect to any additional labor that may be required to perform any change order work. Surety has provided Completion Contractor all pending and/or enforceable change orders, modifications, and/or supplemental agreements between Obligee and Katerra of which Surety has knowledge

10

from Obligee or Katerra. Surety Representative will provide Completion Contractor with notice of any change order or request for extension of time submitted by Surety Representative on behalf of Surety; said notice to include documentation to support the change order and extension of time. With respect to additional costs of change orders, modifications, and/or supplemental agreements entered into by Surety with Obligee after the date of this Agreement and not due to a Defective Work, Surety is liable to Completion Contractor to the extent (and only to the extent) that the additional costs are recovered from and paid by Obligee to Surety and represent valid costs legally due from Obligee; Surety's obligation for such costs is expressly limited to said recovery, if any. Upon receipt of such a request for changed, modified, or supplemental work, Surety or Surety Representative shall promptly, but in no more than five (5) working days after the receipt by Surety or Surety Representative of a complete proposal for any such request with all supporting documentation and other relevant information, forward such request to Obligee to obtain Obligee's authorization. Completion Contractor shall not be required to perform any change order, modified, or supplemental work prior to receiving both Surety's and Obligee's written authorization to pay for such work. Any delays in obtaining such authorization shall entitle Completion Contractor to an equitable adjustment of the Substantial Completion Date to the extent and only to the extent that an equitable time adjustment is provided to Surety by Obligee under the Bonded Contract. Completion Contractor will not be entitled to receive any of the amounts for general conditions, profit, or fee intended to be paid to Surety and not Completion Contractor that may be included in any change order submitted and approved by Obligee with all of the foregoing payments to be retained by Surety.

Completion Contractor has included in the Lump Sum Amount certain subcontractor Change Orders as shown on the attached Exhibit G. Surety Representative will review and investigate the terms and amounts of these Change Orders during the thirty (30) day period following the execution of this Agreement to verify the amounts included in the Lump Sum Amount. Surety Representative and Completion Contractor will work together in good faith to adjust the Lump Sum Amount in the event any error in its calculation is discovered as a result of this investigation.

The requests for the application of the Contingency to items of Work will be at Completion Contractor's reasonable discretion as needed for the mutual benefit of Surety and Completion Contractor in the Completion of the Project. The Contingency Amount will be billed and released based on Change Orders submitted by Completion Contractor and if approved by Surety, which approval will not be unreasonably denied or delayed, on an as required/documented based. Any remaining unpaid Contingency Amount will be paid with the final payment to Completion Contractor pursuant to Section 6.

5. _Payment to Completion Contractor_. In consideration of Completion Contractor's performance pursuant to the terms of this Agreement, Surety will pay Completion Contractor the Lump Sum Amount and Defective Work and Storm Damage Costs (or any negotiated fixed price with respect to any Defective Work and/or Storm Damage), if any, in accordance with the procedures set forth in Section 6. The Lump Sum Amount will apply to all Work (other than Defective Work and Storm Damage Costs) done by Completion Contractor on or after issuance of the Notice to Proceed. The Lump Sum Amount includes all Work required by Completion Contractor in order to address any warranty claims under the Bonded Contract. Attached as Exhibit F is a summary sheet of the agreed to Lump Sum Amount and related qualifications.

11

Completion Contractor agrees that its compensation and the Lump Sum Amount and the Defective Work and Storm Damage Costs (or any negotiated fixed price with respect to any Defective Work and/or Storm Damage), if any, constitutes full and fair compensation to it for the full and timely performance of the Work, including all elements or direct and indirect costs, however described. Completion Contractor agrees that if the Cost to Complete the Work exceeds the Lump Sum Amount and the Defective Work and Storm Damage Costs, if any, Completion Contractor will promptly pay all such other or excess costs required to timely and fully complete the Work without further payment from Surety and Obligee and, further, Completion Contractor will indemnify, hold harmless (and if request, defend) Surety, for and against any and all such other or excess costs outside of, or in excess of the Lump Sum Amount, and the Defective Work and Strom Damage Costs, if any, required to timely and fully complete the Work.

Completion Contractor acknowledges that the costs or services, labor, equipment, materials, taxes, and compliance with governmental regulations in effect as of the date of this Agreement, may increase during the Project. Completion Contractor represents that it has considered these risks in agreeing to the compensation under this Section 5. Thus, except as expressly provided in this Agreement, Completion Contractor agrees not to make any claim against Surety for an increase in the compensation beyond that provided in this Agreement based upon the escalation of these costs. The Lump Sum Amount and the Defective Work and Storm Damage Costs are all of the compensation to which Completion Contractor is entitled. The Lump Sum Amount expressly includes any and all increased costs related to returning subcontractors, including, but not limited to, remobilization, labor, material escalation, and re-procurement costs. Notwithstanding the foregoing, Completion Contractor shall be entitled to an equitable adjustment in the contract price or time in the event of any increased costs or services, labor, equipment, materials, tax)es, and/or compliance with the governmental regulations which are related to or arise out of more burdensome or increased COVID-19 requirements imposed after the Project start to the extent, and only to the extent that, such additional costs are with respect to Defective Work or are included in a change order with such additional cost to be passed through and paid for one hundred percent (100%) by Obligee.

6.    <u>Payment Procedures</u>. Prior to the submission of any pay request by Completion Contractor to Surety, Surety and Completion Contractor will agree upon a schedule of values. This schedule of values will be for informational purposes and, once Completion Contractor has delivered to Surety the completion bonds pursuant to Section 8, to aid in determining the amount of payments to be made to Completion Contractor for performance of the Work. Until such time as the Completion Contractor has delivered to Surety the completion bonds pursuant to Section 8, the amount of payments to be made to Completion Contractor will not be determined by reference to the schedule of values, but will be determined by reference to the Cost of the Work plus the monthly General Conditions Costs, plus the monthly Fifty Thousand Dollars ($50,000) fee for overhead and profit described in this Section 6, subject to the Lump Sum Amount, as further provided in this Section 6. Said schedule of values will not modify Completion Contractor's obligations under this Agreement, nor will Completion Contractor be allowed any adjustment to the Lump Sum Amount as a result of said schedule of values. The bond premium required to be paid by Completion Contractor to obtain the completion bonds pursuant to Section 8 will be added to the Lump Sum Amount in the event such completion bonds are obtained. In addition, the Lump

12

Sum Amount will be increased by any bond premiums that are paid to obtain the subcontractor bonds required pursuant to Section 2 in the event such bonds are required by Surety.

In the name of Surety, Surety Representative will prepare for Surety's benefit, review, and approval, the monthly or periodic progress pay estimates and the final pay estimate, as required by the Bonded Contract, in the same form and at the same time, and with the same breakdown by items as provided for in the Bonded Contract ("the Contract Pay Estimate(s)"). Completion Contractor will cooperate and assist Surety Representative with the preparation of each such Contract Pay Estimate. Each Contract Pay Estimate will include retainage at the rates provided in the Retention Schedule of the Bonded Contract. Upon completion of a Contract Pay Estimate, whether for a progress or final payment, Surety Representative will forward that pay estimate to Obligee, with a copy of that transmittal furnished to Completion Contractor. Notwithstanding the foregoing, Surety may, at its sole option, submit a pay estimate to Obligee, in whatever amount or form Surety deems appropriate. In the event this Agreement is tendered to Obligee, then the Contract Pay Estimates will be prepared in the name of Completion Contractor and will not be submitted to Surety Representative for review or approval but will be submitted directly to Obligee and paid by Obligee directly to Completion Contractor.

Completion Contractor will prepare and present to Surety pay estimates for progress payments, in form and with such detail as required by Surety ("the Completion Pay Estimate(s)"). Completion Contractor will submit all Completion Pay Estimates to Surety on the same billing cycle as the Contract Pay Estimates prepared on Surety's behalf for submission to Obligee, e.g., on or about the 25th of the month. Provided, that, Completion Contractor has delivered the completion bonds pursuant to Section 8, the progress payment for each billing period will be based on the percentages of completion for that billing period utilizing the agreed to schedule of values. If Completion Contractor has not delivered to Surety the completion bonds pursuant to Section 8, then the progress payment for each billing period will be based on the Cost of the Work plus the monthly General Conditions Cost, plus the Defective Work and Storm Damage Costs, if any, plus Fifty Thousand Dollars ($50,000) per month for overhead and profit plus any approved Change Orders for any of the Contingency Amount. Fifty percent (50%) of any unbilled overhead and profit that is included in the Lump Sum Amount may be billed by Completion Contractor at such time as the Project has reached fifty percent (50%) completion. Each Completion Pay Estimate will include retainage at the percentage rates set out on the Retention Schedule attached as Exhibit D to the Bonded Contract. Notwithstanding any provision of the Bonded Contract to the contrary, until such time as Completion Contractor has delivered to Surety the completion bonds pursuant to Section 8, Completion Contractor will not be entitled to bill for any retainage until final completion, provided, that, retainage will be released by Surety prior to final completion pursuant to the terms of the Bonded Contract as needed to pay any retainage that it is required to be paid to any subcontractor under the terms of any applicable subcontract. In the event of a tender of the Agreement to Obligee, the Completion Pay Estimates will only include the separate accounting and invoices for Defective Work and Storm Damage Costs for which Completion Contractor is to be paid, subject to Section 2, directly by Surety and not by Obligee. With each Completion Pay Estimate, Completion Contractor will provide to Surety, if not previously provided, a list of all of its subcontractors, remote subcontractors, and suppliers whose contract or purchase order is for a contract value in excess of Ten Thousand Dollars ($10,000), and will provide conditional releases, in a form acceptable to Surety or Surety Representative, executed by each of Completion

13

Contractor and each of such subcontractors, remote subcontractor, and supplier which provided a preliminary notice.

Surety will remit progress payments to Completion Contractor within ten (10) days after the last to occur of the following: (i) after receipt of Completion Pay Estimate, if any, with all required executed conditional releases of Completion Contractor and its subcontractors, remote subcontractors, and vendors; and (ii) Completion Contractor's work for the current billing period is approved and paid for by Obligee, to the extent any payment is to be made by Obligee, said approval established by Obligee's approval of the corresponding Contract Pay Estimate submitted to Obligee, if applicable. If Obligee has not approved the Work performed by Completion Contractor within no later than forty five (45) days after the submission of a Contract Pay Application, with all required executed conditional releases of Completion Contractor and its subcontractors, remote subcontractors, and vendors, or has not advised of any work that is not approved, then Surety Representative will immediately advise Completion Contractor as to whether it has approved the Work that is the subject of the Completion Pay Application. Surety will then remit payment to Completion Contractor for any Work that is approved by Surety Representative no later than forty five (45) days of receipt by Surety of the Completion Pay Application. In lieu of remitting the entire progress payment to Completion Contractor, at Surety's discretion, Surety may make payments owed to subcontractors by joint check, after five (5) days written notice to Completion Contractor of such election. In addition, if a subcontractor has not delivered any bond required pursuant to Section 2, then Surety, in its discretion, may choose to make any payments owed to remote subcontractors and lower tier suppliers by joint check, after five (5) days written notice to Completion Contractor of such election. Completion Contractor agrees that Surety and Surety Representative may communicate directly with subcontractors, suppliers, and other vendors to confirm payment status. Any amounts withheld by Surety for remediation of such Work not in conformance with the Bonded Contract will be determined by Surety Representative and Completion Contractor, and no other sums otherwise due Completion Contractor under its Completion Pay Application will be withheld. In the event of any payment dispute that dispute will not delay performance of the Work on the Project by Completion Contractor provided that Surety will make payment of all amounts not in dispute.

Notwithstanding the above paragraph regarding the remittance of progress payments and the paragraph below regarding final payment, at Surety's discretion, progress and other payments to be made to Completion Contractor may be required to be disbursed through a funds control account at the cost of Completion Contractor (.5% of funds deposited into the account). In furtherance of the foregoing, Surety, Completion Contractor, and Surety Representative will enter into a Funds Control Agreement.

Completion Contractor represents and warrants to Surety that it will use any payments received from Surety under this Agreement to pay its obligations owing to its laborers, subcontractors and suppliers of equipment and materials on or to the Project. Completion Contractor covenants with Surety that all payments received hereunder will be treated as trust moneys, except for the portion of the payment paid to Completion Contractor for its fee, and will be used to pay all persons or companies who have furnished labor and/or materials at Completion Contractor's request on the Project. The trust moneys, unless otherwise restricted or regulated by state or local laws, can be commingled with other funds, but the trust fund nature and purpose as stated in this paragraph will not be modified nor waived by this commingling provision. If

14

requested by Surety, Surety Representative, or Obligee it will become a further condition precedent to payment that Completion Contractor furnish to Surety Representative proper waivers of liens, releases, affidavits, sworn statements listing all contracts let and to be let and obligations due or to become due for equipment (and rentals thereof), materials, labor, and services under subcontracts entered into by Completion Contractor, and other evidence establishing that all accounts for services, labor, materials, equipment (and rentals thereof) furnished by or for Completion Contractor in the performance of this Agreement and the prosecution of the Work have been fully paid.  All costs reasonably incurred by Surety because of failure of Completion Contractor to deliver such waiver and release of all claims within thirty (30) days of notice of demand, or arising from any breach of these covenants made in the paragraph, including any reasonable attorney's fees will be paid by Completion Contractor.

Final payment will be made to Completion Contractor as provided under the Bonded Contract, provided that Obligee has accepted the Project as complete and Completion Contractor has furnished evidence reasonably satisfactory to Surety that there are no claims, obligations, or liens outstanding or unsatisfied for reasonable labor, services, equipment, taxes, or other items performed, furnished, or incurred for or in connection with the Work, and Completion Contractor will have fully performed its obligations under this Agreement.  Any remaining Contingency Amount that has not been paid with the submission of Change Orders as contemplated by Section 4, any remaining unbilled overhead and profit that is included in the Lump Sum Amount, and any remaining unbilled line item amounts shown on Exhibit F that fall within the Lump Sum Amount, will be paid by Surety to Completion Agreement as a part of the final payment.

Notwithstanding anything to the contrary herein, Surety may withhold payment, whether progress or final, to Completion Contractor due to Completion Contractor's failure to comply with the Contract Documents after written notice is received by Completion Contractor and a reasonable opportunity to cure has been given.  Surety may not hold more funds than it deems reasonably necessary to cure.  Surety may, at its sole option, issue joint checks to Completion Contractor and to any of its subcontractors, suppliers or vendors.

7.     <u>Time for Completion</u>.  Completion Contractor hereby assumes full responsibility for the completion of Work that is required to be performed by it under this Agreement in a timely manner to ensure completion within the time period provided in Section 3.  This time period may be extended by time extensions granted by Obligee to Surety, which will be negotiated directly between Surety Representative on behalf of Surety and Obligee.

Following thirty (30) days' written notice to cure, Completion Contractor will pay to Surety liquidated damages at the rate of Seven Thousand Dollars ($7,000) per day as set out in the Bonded Contract for any failure to meet any milestone completion dates and failure to complete the Work by the Substantial Completion Date provided in Section 3 (and associated Schedule) of this Agreement in accordance with the Contract Documents.  Completion Contractor is only liable for liquidated damages, if any, due to its own performance and the Substantial Completion Date of its schedule to be provided as part of this Agreement, and not the performance of Katerra and Katerra's schedule related to the original Bonded Contract.  Completion Contractor is only liable to Surety for liquidated damages if and to the extent Surety is required to pay Obligee for such liquidated damages.  Nothing herein is intended to preclude Surety from recovering re-procurement costs or other such damages (including damages for the failure to pay Completion Contractor's

15

subcontractors and suppliers) arising directly from the termination for default of Completion Contractor by Surety or Obligee, such damages not being considered delay damages within the meaning of this paragraph.  The time period for completion set out in Section 3 will be extended by time extension granted by Obligee in accordance with the Bonded Contract to Surety and/or Completion Contractor for delays caused by events that may occur after the date of execution of this Agreement.  Claims for extensions of time will be jointly negotiated by Completion Contractor and Surety Representative with Obligee.

8.     <u>Completion Bonds</u>.  Contemporaneous with the execution of this Agreement, Completion Contractor will provide to Surety its 2020 year-end financial statement and internal prepared 2021 year-end financial statements, or third quarter end financial statements.  Completion Contractor further agrees that as part of this Agreement, it will use its best good faith efforts to provide to Surety performance and payment bonds from a U.S. Treasury listed corporate surety licensed to do business in California and acceptable to Surety, in its sole and absolute discretion, in the same form as the Bonds, each in the penal sum equal to Sixty Three Million Three Hundred Twenty Two Thousand Seven Hundred Forty 96/100 Dollars ($63,322,740.96) and naming Surety as the obligee.  At the request of Completion Contractor, Surety will consider accepting payment and performance bonds from Completion Contractor in a reduced penal amount taking into consideration the status of the Completion of the Project and the bonds that have been provided by subcontractors, with any decision whether to accept any such reduction to be made in the sole reasonable discretion of Surety.  Any such surety must be approved by the U.S. Treasury to issue a bond to the Federal Government in an amount at least equal to the foregoing penal sum amount and must possess an A.M. Best Financial Strength rating of A- or better and a financial size category of VI or larger.  Said completion bonds will cover all of the Work performed by Completion Contractor.  Obligee will be named as a dual obligee on any such completion bonds, or as the sole named obligee in the event of tender.

9.     <u>Insurance Coverage and Licensure</u>.   Completion Contractor represents and warrants that it maintains all necessary licenses, permits, and qualifications to perform the Work.  Completion Contractor shall be a Named Insured on the existing CCIP Policy provided for the Project and this shall fully satisfy Completion Contractor's Commercial General Liability and Excess Liability insurance obligations to Surety and Obligee.  Completion Contractor will obtain all necessary other policies of insurance, such as  workers' compensation, and other insurance coverages, in the amounts as required by the Bonded Contract, which coverages to the extent permitted by law, will name Obligee, Obligee's lender (if required in writing by Obligee), Surety Representative, and Surety as additional insureds.  All such policies will provide that the insurers will notify Surety and Obligee not less than thirty (30) days before any material change, reduction in coverage, cancellation, including cancellation for nonpayment of premium, or other termination thereof or change therein and will include a clause or endorsement denying the insurer any rights of subrogation against Surety and Obligee.  Within five (5) calendar days of the execution of this Agreement, Completion Contractor's agent will deliver directly to Obligee and Surety copies of certificates of insurance evidencing such coverages.

10.    <u>Examination of Work</u>.  Completion Contractor has:  (i) examined the Bonded Contract together with all amendments or addenda; (ii) fully investigated the status of and the conditions affecting the Work (including, but not limited to, the locality and Project site); and (iii) fully informed itself with respect to those items required to complete the Work and perform all of

the obligations required hereunder independent of any representations or warranties, either expressed or implied, of Surety, Obligee, or any of their respective employees, agents, consultants, or representatives.

11.    <u>Representations and Warranties of Completion Contractor</u>.  To induce Surety to enter into this Agreement, Completion Contractor represents and warrants to Surety that: (i) it  has all required licenses, if any, and is in good standing under the laws of the State of California; (ii) it has all required licenses, if any, and is in good standing under the laws of any state, commonwealth, or territory where all or a portion of the Work is to be performed; (iii) it is solvent and does not intend to file any proceeding in bankruptcy, or for reorganization; and (iv) it has paid all taxes and filed all tax returns and other corporate filings required in its state of incorporation and in any state where all or a portion of the Work is to be performed.

12.    <u>Indemnification by Completion Contractor</u>.  Completion Contractor assumes all responsibility for any and all liabilities, claims, damages, losses, suites, and demands against Surety, with respect to the Work and the Completion of the Project arising out of Completion Contractor's breach of this Agreement or its failure to perform as required under this Agreement or that of its subcontractors, employees, materialmen, or any other party performing work for Completion Contractor, all occurring after Completion Contractor commences work on the Project.  Completion Contractor hereby assumes liability and responsibility for all performance bond claims on the Project that are the subject of the Bonded Contract and/or the Bonds, with respect to the work performed by Completion Contractor or completion costs incurred in the Completion of the Project.  Completion Contractor hereby assumes liability and responsibility for all warranty obligations in the Bonded Contract, including, but not limited to, any warranty obligations arising from or relating to work previously performed by Katerra or its subcontractors. Completion Contractor will indemnify and hold Surety, its officers, directors, and employees free and harmless from any against any and all actions, causes of action, suites, for limitation, counsel fees and disbursements incurred by Surety as a result of, or arising out of, or relating to Completion Contractor's completion of its work scope or payment obligations with respect to the Bonded Contract, the Project, and/or the breach of this Agreement by Completion Contractor, including, but not limited to, all payment claims for labor and material costs incurred by the Completion Contractor.

13.    <u>Legal Fees; Litigation</u>.  Surety agrees to indemnify, defend, and hold Completion Contractor harmless from any and all third party claims that arise directly from any Defective Work  (each a "Defective Work  Related Third Party Claim"), including all liabilities, professional fees, expenses, costs, and arising therefrom, except to the extent such Defective Work  Related Third Party Claim is caused by the negligent acts or omissions of Completion Contractor from and after the date thereof, including, but not limited to, (i) any direction of Completion Contractor regarding performance of any work to address any Defective Work  that is contrary to the requirements of the Bonded Contract or commonly accepted industry good practice and standards, (ii) a failure to provide notice to Surety's Representative of any Defective Work  known to Completion Contractor, (iii) the failure of Completion Contractor to address any Defective Work in a timely manner after it has knowledge of any such Defective Work , (iv) the failure of Completion Contractor to take safety or other measures to protect against or prevent the Defective Work  Related Third Party Claim after it has knowledge of the Defective Work , or (v) any breach of Completion Contractor's express obligations pursuant to this Agreement.  Notwithstanding

17

anything to the contrary in this letter, in no event will Surety be obligated to indemnify Completion Contractor for any claims, liabilities, expenses, costs, demands, and obligations to the extent caused by Completion Contractor's breach of its express obligations pursuant to this Agreement or its negligent acts or omissions.  In no event will the amounts paid by Surety under this paragraph be in excess of the lesser of (i) Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate ("the Indemnity Cap"); and (ii) the remaining available penal limit of Liberty's Performance Bond.

If a Defective Work Related Third Party Claim is asserted against Completion Contractor that may give rise to a claim by Completion Contractor for indemnification from Surety, then Completion Contractor will give written notice of such Defective Work Related Third Party Claim to Surety promptly upon obtaining knowledge thereof.  Completion Contractor may elect to contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Defective Work  Related Third Party Claim in any manner that Completion Contractor reasonably deems appropriate and Surety will reimburse Completion Contractor promptly and periodically for all costs and expenses (including attorneys' fees and expenses) of such contest, defense, or settlement and will remain responsible for any losses, subject to the Indemnity Cap and the limitations in the above paragraph, that Completion Contractor suffers resulting from or relating to the Defective Work  Related Third Party Claim; provided, however, that Completion Contractor shall have the independent right to demand that Surety provide Completion Contractor's defense and indemnity, subject to the Indemnity Cap and the limitations in the above paragraph, for the Defective Work  Related Thirty Party Claim which Surety shall thereafter perform pursuant to this paragraph, or Surety may voluntarily assume such defense and indemnity and thereafter contest, defend against, consent to the entry of any judgment on (but only with SBI's prior written consent), or enter into any settlement with respect to the Defective Work Related Third Party Claim at Surety's sole cost and expense and with legal counsel of its choice (and reasonably satisfactory to Completion Contractor), if (i) Surety notifies Completion Contractor, in writing within ten (10) days after receiving notice of the Third Party Claim, that Surety will contest and defend against the Defective Work  Related Third party Claim, and (ii) Surety conducts the defense of the Defective Work  Related Third Party Claim actively and diligently.  If any such condition ceases to be satisfied, then Completion Contractor may again elect to contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Defective Work Related Third Party Claim, and Surety will reimburse Completion Contractor and be responsible as above provided.  If Surety so elects to contest or defend against a Defective Work  Related Third Party Claim in accordance with this paragraph, then Completion Contractor may, at its sole cost and expense, retain separate co-counsel of its choice and otherwise participate in such contest or defense of the Defective Work  Related Third Party Claim, and Surety will not consent to the entry of any judgment on or enter into any settlement with respect to the Defective Work  Related Third Party Claim without Completion Contractor's prior written consent (not to be unreasonably withheld or delayed).

Surety will have the right to assume and control the prosecution or defense of any claim, proceeding, or litigation:  (i)  instituted by or against Obligee;  (ii) instituted by or against any municipality or other governmental authority with respect any taxes;  and (iii) with respect to which Completion Contractor seeks to pass on any cost or award to Surety  ("any Third Party Claim") with counsel of its choosing if Surety provides written notice of its election to assume such defense within twenty (20) days after Completion Contractor has received a Claims Notice, if applicable,  with respect to such Third Party Claim; provided, however, Surety must conduct the

defense or prosecution of any Third Party Claim reasonably, actively, and diligently in order to preserve Completion Contractor's rights. Completion Contractor may participate, at Completion Contractor's own expense, in the defense or prosecution of any Claim assumed by Surety.

Completion Contractor will give Surety prompt notice should it become aware of any Third Party Claim. If, within twenty (20) days of Surety's receipt of such notice, Surety does not elect to defend or prosecute the Third Party Claim, or if Surety fails to adequately defend or prosecute the Third Party Claim, Completion Contractor will have the right to assume control of the defense, prosecution, and/or compromise of such Third Party Claim.

The party assuming the defense or prosecution of any Third Party Claim will keep the other party reasonably informed at all times of the progress and development of its or their defense or prosecution of and compromise and settlement efforts with respect to such Third Party Claim and will furnish the other party with copies of all relevant pleadings, correspondence, and other papers. In addition, the parties to this Agreement will cooperate with each other and make available to each other and their representatives all available relevant records or other materials required by them for their use in prosecuting, compromising, or contesting any Third Party Claim.

Neither party will consent to the entry of any judgment or enter into any settlement with respect to any Third Party Claim without the prior consent of the other party (which consent will not be unreasonably withheld or delayed) unless the judgment or proposed settlement (i) includes an unconditional release of all liability of each of Surety and Completion Contractor that is a party with respect to such Third Party Claim, and (ii) involves only the payment of money damages by the party consenting to the entry of the judgment and does not impose an injunction or other equitable relief upon Surety or Completion Contractor without its consent or impose any restrictions on the operation of the business of Surety or Completion Contractor without its consent.

In the event both Surety and Completion Contractor are named as defendants in an action or proceeding initiated by a third party with respect to a Third Party Claim, they will both be represented by the same counsel (as chosen by Surety but subject to Completion Contractor's reasonable objection), unless such counsel, Surety, or Completion Contractor determines that such counsel has a conflict of interest in representing both Surety and Completion Contractor in the same action or proceeding and Surety and Completion Contractor do not waive such conflict to the satisfaction of such counsel.

In the event of any claim or litigation that does not fall within the definition of a Third Party Claim then Surety and Completion Contractor will reasonably negotiate how the claim or litigation will be handled and an equitable allocation of any associated legal fees and expenses. Completion Contractor will give Surety an estimate of any such cost, expenses, and attorneys fees that it anticipates it will incur prior to incurring them and allow Surety to assume the prosecution or defense of any such claim, demand, litigation, or dispute in each case with counsel chosen by Surety, but subject to Completion Contractor's reasonable objection, so long as Surety gives written notice to Completion Contractor within ten (10) days after receipt of the estimate that Surety will assume such prosecution or defense. Completion Contractor may retain separate co-counsel at its sole cost and expense and participate in any such prosecution or defense.

In any dispute between Completion Contractor, Obligee, and /or Surety, the prevailing party will recover from the non-prevailing party its reasonable and necessary attorney's fees and costs, including, but not limited to, expert witness fees.

14.    <u>Reservation of Surety Rights and Remedies</u>.  Notwithstanding anything contained herein to the contrary, nothing herein will waive, impair, or limit any right, power, or remedy of Surety against Katerra (or any guarantor or indemnitor of Katerra's obligations to Surety) under any agreement for indemnity or other agreement, or at law or in equity, including without limitation, Surety's right of equitable subrogation.  Notwithstanding anything contained herein to the contrary, nothing herein will waive, impair, or limit any right, power, claim, remedy, or defense of Obligee, Completion Contractor, or Surety against Katerra (and its subcontractors, agents, employees, and assigns) under any contract or agreement between or among Katerra and any of Obligee, Completion Contractor, or Surety, or at law or in equity.

15.    <u>Events of Default</u>.  The occurrence of any one or more of the following events may constitute an "Event of Default" hereunder:

(a)    If Completion Contractor fails to perform any material obligation under this Agreement, the Contract Documents, or otherwise owed to Obligee or Surety;

(b)    if Completion Contractor fails to pay amounts due pursuant to the terms of an agreement with any subcontractor, laborer, materialman, or supplier for work or materials supplied to Completion Contractor or its subcontractors;

(c)    if proceedings in bankruptcy, or for reorganization of Completion Contractor, or for the readjustment of the debts of Completion Contractor, under Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute, or any part thereof, or under any other laws, whether state or federal, for the relief of debtors, now or hereafter existing, are commenced by or against Completion Contractor and such proceedings are not dismissed within thirty (30) days of filing;

(d)    if a receiver or trustee is appointed for Completion Contractor or for any substantial part of Completion Contractor's assets, or any proceedings are instituted for the dissolution or the full or partial liquidation of Completion Contractor and such proceedings are not dismissed within thirty (30) days of filing, or if Completion Contractor discontinues its business or materially changes the nature of its business;

(e)    if Completion Contractor fails, refuses, or neglects to supply a sufficient number of skilled workers or other employees (either in quantity or quality) to complete the Work in accordance with this Agreement;

(f)    if Completion Contractor fails to comply with the directions, instructions, and requirements of Surety or Obligee given pursuant to the terms of the Bonded Contract or this Agreement;

(g)    if Completion Contractor fails to comply with any laws, ordinances, rules, regulations, or orders of governmental departments or agencies having jurisdiction over the

performance of the Work and fails to cure related breaches within any cure period, if any, allowed under the Bonded Contract; and

(h)    any material failure of Surety or Obligee to perform as agreed herein, including, but not limited to, the obligation to pay Completion Contractor timely and in full.

Upon the occurrence of any Event of Default, the non-defaulting party will have, in addition to the rights and remedies given in this Agreement, all those allowed by all applicable laws.

16.    <u>Termination for Convenience</u>.  Upon five (5) days written notice to Completion Contractor, Surety will have the right to terminate this Agreement for convenience.  In the event of a termination for convenience, Completion Contractor will be entitled to a payment for Work property performed under the Contract Documents, demobilization costs, and reasonable restocking charges.  Notwithstanding anything to the contrary herein, Completion Contractor will not be entitled to recovery of profit and/or overhead on unperformed work.  Following the effective date of such termination, Completion Contractor shall have no further liability under this Agreement other than with respect to matters which occurred prior to such effective date.

17.    <u>Authority</u>.  Each of the undersigned persons executing this Agreement on behalf of the Surety and Completion Contractor, respectively, represents and warrants that:  (i) he or she is fully empowered and duly authorized by all necessary action of Surety and Completion Contractor, respectively, to execute and deliver this Agreement; (ii) he or she has full capacity, power, and authority to enter into and carry out this Agreement; and (iii) this Agreement is the legal, valid, and binding obligation of Surety and Completion Contractor, respectively.

18.    <u>Notices</u>.  Any notice, request, demand, or other communications required by this Agreement will be in writing and either delivered personally, sent by regularly scheduled overnight air courier service, or postage prepaid certified United States mail, return receipt requested, to the following addresses:

Surety:                    Liberty Mutual Surety
                           1001 4th Ave., Suite 3700
                           Seattle, WA  98155
                           Attn:  Emily Wilson, Surety Claims Counsel Global Risk Claims

                           and

                           HOSCL@libertymutual.com

with a copy to:            Manier & Herod
                           1201 Demonbreun St., Ste. 900
                           Nashville, TN  37203
                           Attn.:  Sam H. Poteet, Jr.
                                   Mary Paty Lynn LeVan
                                   Jeffrey S. Price

21

and

The Vertex Companies, Inc.
16150 Scientific Way
Irvine, CA  92618
Attn:   Nick Deeley

As to Obligee:                  Livermore Multifamily Owner LLC
                                2710 Gateway Oaks Dr., Ste. 150 N
                                Sacramento, CA  95833
                                Attn:  David J. Eichler

with a copy to:                 Baker Botts L.L.P.
                                910 Louisiana Street
                                Houston, TX  77002-4995
                                Attn:  Joseph Colagiovanni

Completion Contractor:          SBI Builders, Inc.
                                710 West Julian Street
                                San Jose, CA  96126
                                Attn:   Paul Nuytten
                                        Renato O'Neal

with a copy to:                 Smith, Currie & Hancock
                                275 Battery Street, Ste. 1300
                                San Francisco, CA  94111
                                Attn:   Craig Wallace

Any such communication will be deemed received at the earliest to occur of: (i) personal receipt; or (ii) the date of promised delivery of a regularly scheduled overnight air courier service. Any of the foregoing addresses may be changed by means of a notice furnished in the manner provided herein.

19.    Entire Agreement.  This is an integrated agreement.  This Agreement and any referenced Exhibit(s) represents the entire agreement between the parties concerning the subject matter hereof, and all oral discussions and prior agreements are merged herein.  This Agreement replaces and supersedes any statements or representations Surety, its consultants, agents, and/or attorneys have made to Completion Contractor or Obligee.

20.    Governing Law, Jurisdiction and Venue.  This Agreement will be deemed to be a contract under the laws of the State of California and for all purposes will be governed by and construed and enforced in accordance with the laws of the California.  The parties to this Agreement consent to the jurisdiction of the State of California.  Venue for any legal proceeding, whether litigation, mediation or arbitration, will be in California.  Unless all parties agree to mediation or arbitration, all disputes will be decided by a court of competent jurisdiction.  The foregoing consent will not be construed as any waiver by the parties of any right under applicable law to remove any lawsuit or proceeding brought in state court to federal court.  In the event any

22

4847-9774-1039

such dispute involves Obligee or it is deemed necessary by either party to make Obligee a party with respect to the dispute and none of the forgoing courts have jurisdiction over Obligee, then any suit under this Agreement may be brought in such alternative court that has jurisdiction over Obligee.

21.     Counterparts.  This Agreement may be executed simultaneously in counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.  This Agreement, to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including .pdf files, digital signatures), will be treated in all manner and respects and for all purposes as an original agreement or instrument and will be considered to have the same binding legal effect as if it were to the original signed version thereof delivered in person.

22.     Nonwaiver of Rights.  No waiver of any right, power, or remedy of any party will be effective unless said waiver is in writing and signed by said party.

23.     Binding Effect, Assignment, and Amendment.  This Agreement will inure to the benefit of, and will be binding upon, the respective successors and permitted assigns of the parties hereto.  Completion Contractor has no right to assign any of its rights or obligations hereunder without the prior written consent of Obligee and Surety.  Completion Contractor expressly agrees that Surety has the right to assign this Agreement and all of its rights, remedies, benefits and obligations to Obligee, or to any designee of Obligees, on the condition that Obligee expressly accepts such assignment in writing.

24.     Severability.  The provisions of this Agreement are intended to be severable.  If any provision of this Agreement is held invalid or unenforceable in whole or in part in any jurisdiction such provision will, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

25.     Section Headings.  The section headings in this Agreement are for convenience only and do not limit, define, or construe the contents of the sections.

26.     Cooperation.  Surety acknowledges that Completion Contractor does not have any contract with Obligee, and Surety does have a contract with Obligee.  This Agreement requires Completion Contractor's performance based on certain actions, conduct, and agreements from Obligee.  Surety will reasonably cooperate with Completion Contractor's interest to undertake to obtain Obligee's actions and agreements in order to facilitate and not delay the performance of the Work or Completion Contractor's timely and diligent performance under this Agreement.

27.     Dispute Resolution.  Any claim between the parties to the Agreement for time or money, controversy, or other disputes arising out of this Agreement or the Work ("Claim") shall be resolved in accordance with this Section 27, and in a prompt, efficient, and cost-effective framework.  Claims shall first be attempted to be resolved through a face-to-face meeting of a principal from each party where, to the extent practicable, such principal was not the primary person involved with such party's work at the Project.  Such meeting shall occur within fifteen (15) calendar days following a written demand to the other party.  Subject to the provisions and

limitations in the next following paragraph, if negotiations fail to resolve the dispute, the parties agree to mediate the matter with an agreed-upon mediator. If the result of mediation is unsatisfactory to either party, subject to the provisions and limitations in the next following paragraph, the dispute shall be subject to litigation or arbitration.

If the parties are unable to resolve the Claim, mediation shall occur and is a condition precedent to arbitration or other legal action, provided, that, in the event any Claim involves Obligee or it is deemed necessary by either Completion Contractor or Surety to make Obligee a party to any proceeding to resolve any Claim and Obligee does not agree to mediate, then any dispute or Claim under this Agreement may be brought in such an alternative dispute resolution or court that has jurisdiction over Obligee without the necessity of mediation. A written request for mediation shall be made within twenty (20) calendar days following inability to resolve the Claim through the principal meeting. The parties shall agree on one mediator. If the parties are unable to agree on a mediator within thirty (30) days of the demand for mediation, the parties shall mediate the dispute using AAA's or JAMS's rules, but not under the purview of the AAA or JAMS. Any claim for the cost of mediation, including the mediator's fee, may be discussed and resolved in the mediation.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

COMPLETION CONTRACTOR:

SBI BUILDERS, INC.

By: _Paul Nuytten_

_Digitally signed by Paul Nuytten DN: C=US, E=paul@sbibuilders.com, O="SBI Builders, Inc.", CN=Paul Nuytten Date: 2022.02.03 16:11:50-08'00'_

Its: _Paul Nuytten_

SURETY:

LIBERTY MUTUAL INSURANCE COMPANY

By: _____
    John A. McDevitt, Regional Vice
    President – Global Risk Claims

24

limitations in the next following paragraph, if negotiations fail to resolve the dispute, the parties agree to mediate the matter with an agreed-upon mediator. If the result of mediation is unsatisfactory to either party, subject to the provisions and limitations in the next following paragraph, the dispute shall be subject to litigation or arbitration.

If the parties are unable to resolve the Claim, mediation shall occur and is a condition precedent to arbitration or other legal action, provided, that, in the event any Claim involves Obligee or it is deemed necessary by either Completion Contractor or Surety to make Obligee a party to any proceeding to resolve any Claim and Obligee does not agree to mediate, then any dispute or Claim under this Agreement may be brought in such an alternative dispute resolution or court that has jurisdiction over Obligee without the necessity of mediation. A written request for mediation shall be made within twenty (20) calendar days following inability to resolve the Claim through the principal meeting. The parties shall agree on one mediator. If the parties are unable to agree on a mediator within thirty (30) days of the demand for mediation, the parties shall mediate the dispute using AAA's or JAMS's rules, but not under the purview of the AAA or JAMS. Any claim for the cost of mediation, including the mediator's fee, may be discussed and resolved in the mediation.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

COMPLETION CONTRACTOR:

SBI BUILDERS, INC.

By: _____

Its: _____

SURETY:

LIBERTY MUTUAL INSURANCE COMPANY

By: _____
      John A. McDevitt, Regional Vice
         President – Global Risk Claims

4847-9774-1039