Robert C. Niesley, Esq. (SBN 131373)
rniesley@watttieder.com
Kyle S. Case, Esq. (SBN 323653)
kcase@watttieder.com
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
4 Park Plaza, Suite 1000
Irvine, CA  92614
Telephone:   949-852-6700
Facsimile:    949-688-2139

Attorneys for Defendants
LIBERTY MUTUAL INSURANCE COMPANY,
THE OHIO CASUALTY INSURANCE
COMPANY, and LIVERMORE MULTIFAMILY
OWNER, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| SBI BUILDERS, INC.,<br><br>            Plaintiff,<br><br>v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY; THE OHIO CASUALTY INSURANCE COMPANY; LIVERMORE MULTIFAMILY OWNER, LLC, a Delaware limited liability company,<br><br>            Defendant.<br><br>LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts corporation,<br><br>            Counterclaimant<br><br>v.<br><br>SBI BUILDERS, INC., a California corporation,<br><br>            Counter-defendant . | CASE NO.  3:24-CV-04216-JCS<br><br>**LIBERTY MUTUAL INSURANCE COMPANY'S COUNTERCLAIM AGAINST SBI BUILDERS, INC. FOR:**<br><br>**(1) Breach of Contract; and**<br><br>**(2) Fraud**<br><br>Removal Filed: July 12, 2024 |

Counterclaimant LIBERTY MUTUAL INSURANCE COMPANY ("Liberty") hereby alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this civil action. This Court has original jurisdiction under 28 U.S.C. § 1332, in that this action is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand ($75,000) dollars.

2. Venue is proper in this judicial district because the underlying contracts were performed in Alameda County. Additionally, Counter-Defendant SBI BUILDERS, INC. ("SBI") is subject to personal jurisdiction in the Northern District of California.

## GENERAL ALLEGATIONS

3. Liberty is, and at all times relevant herein was, a corporation duly organized and existing under the laws of the State of Massachusetts, with a principal place of business in Boston, Massachusetts. "[T]he phrase 'principal place of business refers to the place where the corporation's high level officers direct, control and coordinate activities." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1186 (2010). Typically, the principal place of business or "nerve center" will be the corporation's headquarters. *Id*. Based on the following facts, Liberty's principal place of business, or its "nerve center" is in Boston, Massachusetts:

    a. Liberty's headquarters are located in Boston, Massachusetts.

    b. The Boston, Massachusetts office is the main administrative office for Liberty and contains the substantial predominance of Liberty's corporate operations.

    c. The Boston, Massachusetts office is where the majority of Liberty's executive and administrative functions are performed.

///
///

d. Most decisions regarding Liberty's business strategies, management of corporate assets and finances, and corporate governance are made in Boston, Massachusetts.

4. At all relevant times, Liberty was duly licensed to conduct business in the State of California, and is doing business throughout the State of California, including the County of Alameda. Liberty is an admitted surety insurer in the State of California, among other jurisdictions, and issues contract surety bonds, among other bonds, and lines of insurance in the course of its business.

5. Liberty is informed, believes and thereon alleges that SBI is a California corporation, and is subject to the jurisdiction and laws of this Court.

**Project Background**

6. On or about October 29, 2019, Livermore Multifamily Owner, LLC ("Owner") entered into a written contract with Katerra Construction, LLC ("Katerra") in connection with a construction project known as Legacy at Livermore ("Project"), located at 1934 First Street, Livermore, CA 94550 ("Property").

7. Katerra, as principal, requested that Liberty, as surety, issue performance and payment bonds in connection with the Project.

8. Subsequently, Liberty issued certain performance and payment bonds, each numbered 906223564, naming Katerra as principal and Owner as obligee.

9. During the Project, on or about June 1, 2021, Katerra disclosed its intent to abandon the Project and subsequently filed for bankruptcy protection in the Southern District of Texas.

10. Owner notified Liberty of Katerra's termination and demanded that Liberty take over the Project under the terms of the performance bond issued by Liberty.

11. In connection with the Owner's demand for Liberty to complete the Project, Liberty retained a construction consultant, The Vertex Companies, Inc.

("Vertex"), to assist Liberty in the investigation and managing the completion of the Project.

### Liberty's Request for Proposal

12. On or about June 21, 2021, Vertex, on behalf of Liberty, issued a Request for Proposal seeking contractors to submit bids to perform the work necessary to complete the Project. A true and correct copy of the Request for Proposal is attached hereto as **Exhibit A**.

13. The Request for Proposal required the successful bidder to provide performance and payment bonds naming Liberty and Owner as co-obligee of the bonds. Specifically, Paragraph 13 of Supplementary Requirements of the Request for Proposal required the following:

> 13. PAYMENT & PERFORMANCE BONDS: The Successful Bidder shall provide a performance bond and labor and material payment bond each in the penal sum equal to the amount of the proposal and each naming [Liberty] and [Owner] as co-obligees within five (5) calendar days after execution of the Contract.

14. On or about July 12, 2021, SBI submitted a bid in response to the Request for Proposal ("Bid"). A true and correct copy of SBI's Bid is attached hereto as **Exhibit B**.

15. Liberty received a competing bid in response to the Request for Proposal from Base Constructing, Inc.

16. In its Bid, SBI made numerous representations to Liberty regarding its ability to acquire the required performance and payment bonds for the project, including:

   a. "The above-mentioned is submitting this bid for the completion of work for "Legacy at Livermore" project in strict accordance with all Contract Documents and provisions of this RFP package…"

   b. "Name of Bidder's Bond Company (not agent) is: Argonaut Insurance Company."

///

17. Additionally, SBI included in its Bid a letter from its bonding agent, CBI Constructors Bonding, Inc. ("CBI"), representing that, through Argonaut Insurance Company, SBI had a line of credit available to provide 100% performance and payment bonds for the Project. Specifically, SBI represented:

    a. "SBI Builders secures surety credit through Argonaut Insurance Company."

    b. "The line of credit available to SBI adequate to provide 100% performance and payment bonds for the referenced project."

18. Based on both the quality of SBI's Bid and SBI's representations concerning its ability and promise to acquire the required bonds to complete the Project, Liberty awarded the completion of the Project to SBI.

19. In total, SBI's Bid was $1,763,041.77 higher than Base Constructing, Inc.'s bid.

20. On or about October 18, 2021, Liberty provided to SBI the required forms for the performance and payment bonds to be issued by SBI's bond surety.

## Takeover Agreement

21. On or about October 21, 2021, Liberty executed a Takeover Agreement with Owner to complete the construction of the Project ("Takeover Agreement"). A true and correct copy of the Takeover Agreement is attached hereto as **Exhibit C**.

22. Under the terms of the Takeover Agreement, Liberty was obligated to complete the Project as "expeditiously as practicable" or pay to Owner liquidated damages of $7,000 per day.

## Negotiations of Completion Agreement

23. On December 6, 2021, Renato O'Neal of SBI provided, by email to Nick Deeley, of Vertex, and John McDevitt, of Liberty, among others, SBI's final lump sum number for what SBI believed it would cost to complete the Project. Notably, included with SBI's lump sum number was a line item for SBI's purported

1  performance and payment bond for the total amount of $781,762.00. A true and correct copy of the December 6, 2021 email and final lump sum amount is attached hereto as **Exhibit D**.

24. Additionally, on December 6, 2021, SBI provided to Liberty its General Qualifications to be incorporated into the eventual contract between Liberty and SBI. Included within the General Qualifications, SBI represented to Liberty that, "SBI Builders' insurance, bonds, general conditions and general requirements are a fixed amount each month at $189,419.00. Bond will be billed at 100% on initial draw and paid in full." A true and correct copy of the General Qualifications is attached hereto as **Exhibit E**.

25. Thereafter, a draft contract was circulated amongst SBI and Liberty for SBI to complete the Project.

26. On December 10, 2021, Craig Wallace, counsel for SBI, provided revisions to Liberty's draft contract via email to Liberty's counsel, Mary LeVan. Amongst those revisions, Mr. Wallace again emphasized that, "SBI Builders' insurance, bonds, general conditions and general requirements are a fixed amount each month at $189,419.00. Bond will be billed at 100% on initial draw and paid in full." A true and correct copy of this email correspondence is attached hereto as **Exhibit F**.

27. Based on SBI representations that it, among other things, (1) had the bonding capacity to acquire the requisite performance and payment bonds, and (2) that it would in fact acquire the requisite performance and payment bonds, Liberty allowed SBI to begin performing work to complete the Project without a fully executed completion contract, with the mutual understanding that the terms of the completion agreement were agreed to in principle and that a completion contract would be finalized and fully executed consistent with the terms of SBI's Bid, final lump sum number and General Qualifications.

/ / /

28. From the time SBI was chosen as the completion contractor to the time SBI started work on the Project, the project sat idle without any work being performed for a total of 161 days, thereby incurring to Liberty's detriment, the total of $1,127,000.00 in liquidated damages.

29. Liberty is informed and believes and based thereon alleges that during the continued negotiations of the completion agreement, in or around August/September 2021, Paul Nuytten and Renato O'Neal, both of SBI, verbally informed Nick Deeley, Janet Doherty and Jack Martin, all of Vertex, that its surety who would be issuing the performance and payment bonds did not approve of certain pre-existing subcontractors (who were originally under subcontract with Katerra) to complete the Project under SBI. SBI informed Liberty that it would be required to hire new subcontractors if it were to obtain the required performance and payment bonds.

30. SBI recommended that Liberty close out these subcontractors' contracts and advised Liberty that the work performed by these pre-existing subcontractors was adequate and warranted final payment to those subcontractors.

31. Accordingly, Liberty, believing it had no other option other than to close out these pre-existing subcontractors so that SBI could acquire the required performance and payment bonds, issued final payments to the pre-existing subcontractors based on SBI's representations that the work performed by those subcontractors was adequate.

32. Thereafter, new subcontractors were hired by SBI. These subcontractors were more expensive than the pre-existing subcontractors that SBI allegedly could not use on the Project. In total, the new subcontractors cost Liberty an additional $1,479,675.00.

33. Moreover, the scopes of work between the pre-existing subcontractors and the new subcontractors did not match and contained scope gaps. As a result, Liberty was forced to issue change orders to these new subcontractors to complete

the scopes of work of the pre-existing subcontractors. In total, these change orders cost Liberty $345,270.00.

34. SBI's representations that the pre-existing subcontractors work was adequate was false. After closing out the pre-existing subcontractors, Vertex discovered work performed by the pre-existing subcontractors that was deficient and/or defective. However, because these subcontractors' contracts had been closed, Liberty lack the ability to withhold funds or issue back charges to the pre-existing subcontractors. In total, Liberty discovered $336,810.97 worth of deficient and/or defective work performed by the pre-existing subcontractors that it was forced to rectify at its own expense.

### **Lack of Bonding and Finalizing Completion Agreement**

35. On or about December 29, 2021, during a phone call between SBI and Vertex, SBI informed Vertex that it was unable to obtain the required performance and payment bonds.

36. At the time SBI informed Vertex that it was unable to obtain the required performance and payment bonds, a final completion agreement had not yet been executed as Liberty and SBI were still in the process of negotiating final terms.

37. Given that a significant amount of time had lapsed from the time SBI was selected as completion contractor to the time it informed of its inability to acquire the necessary performance and payment bonds, and given the fact that SBI was already performing work on the Project, Liberty could not undertake spending additional time looking for a new completion contractor given that Liberty would be subject to liquidated damages at the rate of $7,000/day pursuant to the terms of the Takeover Agreement.

38. As a result, Liberty was forced to continue with SBI and revise the terms of the agreed upon (in principle) terms of the completion agreement to

account for SBI's inability and failure to acquire the required performance and payment bonds.

39. On February 3, 2022, Liberty and SBI executed a Completion Agreement for SBI to complete the Project ("Completion Agreement"). A true and correct copy of the Completion Agreement is attached hereto as **Exhibit G**.

40. The Completion Agreement provides that SBI must undertake efforts to obtain surety bonds for its work on the Project. Specifically, the Completion Agreement provides, in relevant part:

> 8. <u>Completion Bonds</u>. Contemporaneous with the execution of this Agreement, Completion Contractor will provide to Surety its 2020 year-end financial statement and internal prepared 2021 year-end financial statements, or third quarter and financial statements. Completion Contractor further agrees that as part of this Agreement, **<u>it will use its best efforts to provide to Surety performance and payment bonds</u>** from a U.S. Treasury listed corporate surety licensed to do business in California and accepted to Surety, in its sole and absolute discretion, in the same form as the Bonds, each in the penal sum equal to Sixty Three Million Three Hundred Twenty Two Thousand Seven Hundred Forty 96/100 Dollars ($63,322,740.96) and naming Surety as the obligee. At the request of Completion Contractor, Surety will consider accepting payment and performance bonds from Completion Contractor in a reduced penal amount taking into consideration the status of the Completion of the Project and the bonds that have been provided by subcontractors, with any decision whether to accept any such reduction to be made in the sole reasonable discretion of Surety. […] Said completion bonds will cover all of the Work performed by Completion Contractor. Obligee will be named as a dual obligee on any such completion bonds, or as the sole named obligee in the event of tender. (Exhibit G, ¶ 8) [bold added]

41. Despite its representations made in its Bid, during negotiations of the Completion Agreement, and in direct contravention of Paragraph 8 of the Completion Agreement, SBI failed to obtain the required performance and payment bonds for the Project.

42. Subsequently, Liberty discovered that SBI's representations about its ability to acquire the necessary performance and payment bonds were false. The reality, as Liberty discovered, was that SBI never had a bonding program with

Argonaut Insurance and never sought to obtain the performance and payment bonds.

### SBI's Performance on the Project

43. During the Project, SBI submitted a number of change requests to Liberty which sought to charge a bond markup for performance and payment bonds, despite never acquiring the required performance and payment bonds.

44. Moreover, SBI's work failed to comply with Project scheduling and caused critical path delays to Project completion causing Liberty to incur liquidated damages.

45. SBI also failed to perform its work in a workmanlike manner which results in deficient and/or defective work on the Project.

46. In fact, SBI has neglected to coordinate, manage and supervise the repair of defective work performed by its subcontractors. As a result, Liberty was forced to hire an additional Vertex consultant to ensure that the defective work was being remedied. This additional consultant cost Liberty $464,153.03 to date, which continues to accrue.

47. SBI also failed to pay its subcontractors. As a result, many subcontractors recorded mechanics liens against the Property which Liberty has been forced to defend and/or resolve.

### FIRST CAUSE OF ACTION

**(Breach of Contract [Completion Agreement] Against SBI)**

48. Liberty incorporates by reference Paragraphs 1 through 47 as though set forth herein in full.

49. Liberty has performed all conditions, covenants and promises required on its part to be performed in accordance with the Completion Agreement, except to the extent it was prevented or excused from performing.

50. Within the last four years, SBI materially breached the Completion Agreement by:

  a. Failing and refusing to adhere to Project scheduling and completing its work in a timely manner causing critical path delays to the Project thereby causing Liberty to incur liquidated damages.

  b. Failing and refusing to perform its work in a workmanlike manner pursuant to the Completion Agreement resulting in deficient or defective work on the Project.

  c. Failing to pay its sub-contractors.

  d. Failing to coordinate, manage and supervise its subcontractors.

51. As a direct and proximate result of SBI's breaches of the Completion Agreement, Liberty has been damaged in the sum of at least $2,942,585.14, plus interest and such additional sums as will be proven at trial.

52. The Completion Agreement contains an attorney fee provision which provides that in the event a dispute arises between SBI and Liberty, the prevailing party shall be entitled to its reasonable and necessary attorney's fees. As a result of SBI's breach of the Completion Agreement, Liberty has been forced to retain the law firm of Watt, Tieder, Hoffar & Fitzgerald, LLP and Liberty is entitled to recover its reasonable and necessary attorney's fees and costs incurred in connection with the instant matter.

## SECOND CAUSE OF ACTION
### (Fraud Against SBI)

53. Liberty incorporates by reference Paragraphs 1 through 47 as though set forth herein in full.

54. As alleged herein, SBI made numerous misrepresentations to Liberty.

55. Specifically, SBI misrepresented in its Bid that:

  a. The above-mentioned is submitting this bid for the completion of work for "Legacy at Livermore" project in strict accordance with all Contract Documents and provisions of this RFP package…"

   b. "Name of Bidder's Bond Company (not agent) is: Argonaut Insurance Company."

   c. "SBI Builders secures surety credit through Argonaut Insurance Company."

   b. "The line of credit available to SBI adequate to provide 100% performance and payment bonds for the referenced project."

56. SBI also misrepresentation that it had or would acquire the performance and payment bonds by including in its final lump sum a line item for the cost of a performance and payment in the amount of $781,762.00.

57. Additionally, SBI misrepresented that it had or would acquire the performance and payment bonds by including in its General Qualifications that, "SBI Builders' […] bonds […] are a fixed amount each month at $189,419.00. Bond will be billed at 100% on initial draw and paid in full." This misrepresentation was further reinforced by SBI's counsel statements during negotiation of the Completion Agreement.

58. Finally, SBI misrepresented that its bonding company would not issue the performance and payment bonds without hiring new subcontractors.

59. Each of the above misrepresentations were false. In reality, SBI never had a bonding program with Argonaut Insurance Company. Moreover, SBI never acquired the requisite performance and payment bond. The truth is that SBI never intended to obtain the required performance and payment bond.

60. Each of the above misrepresentations were made with the intent to deceive Liberty and induce Liberty into selecting SBI as the completion contractor for the Project.

61. For instance, SBI is an experienced contractor as evidenced by its Contractor Qualification information provided in its Bid (See Exhibit B, Bid, pg. 4-28). As an experienced contractor, SBI knew and understood the requirements of the Request for Proposal that, "The Successful Bidder shall provide a performance

WATT, TIEDER,
HOFFAR &
FITZGERALD, L.L.P.
ATTORNEYS AT LAW

12

LIBERTY MUTUAL INSURANCE COMPANY'S COUNTERCLAIM
3:24-CV-04216-JCS

bond and labor and material payment bond each in the penal sum equal to the amount of the proposal and each naming [Liberty] and [Owner] as co-obligees within five (5) calendar days after execution of the Contract." Indeed, in its Bid, SBI represented that its Bid was being submitted in "strict accordance with all Contract Documents and provisions of [the Request for Proposal]" and purported to represent who its alleged bonding surety was.

62. As an experienced contractor who knew that the Project required performance and payment bonds, SBI knew that Liberty would rely on its representations that it (1) had the ability to acquire the bonds and (2) actually acquired the performance and payment bonds. Without the required bonds SBI knew that Liberty would not have selected SBI as the completion contractor.

63. SBI's misrepresentations that it (1) had the bonding capacity and (2) acquired the performance and payment bonds, when in fact it did not, could not have been made for any other reason other than to defraud Liberty and induce Liberty into selecting SBI as the completion contractor on the Project.

64. Liberty justifiable relied on the misrepresentations made by SBI.

65. Liberty was unaware of the falsity of SBI's misrepresentations. Had Liberty known that SBI did not have bonding credit and had not acquired the required performance and payment bonds, Liberty would not have awarded the Project to SBI to complete.

66. As a direct and proximate result of SBI's fraudulent misrepresentations, Liberty has been damaged in the sum of at least $7,589,648.91, plus any additional amounts to be proven at trial, detailed as follows:

| Category | Amount |
|---|---|
| Costs incurred from SBI's subcontractors filing liens on the Property | $6,113.00 |
| Cost incurred for hiring additional Vertex consultant | $464,153.03 |
| Difference between SBI and Base Constructing, Inc.'s bids. | $1,763,041.77 |

| | |
|---|---:|
| Liquidated Damages incurred for period of awarding SBI and SBI beginning work | $1,204,000.00 |
| Loss of ability to back charge pre-existing subcontractors | $336,810.97 |
| New SBI subcontractors | $1,479,675.00 |
| Scope Gaps between new subcontractors and pre-existing subcontractors | $345,270.00 |
| Costs incurred as a result of SBI's defective and/or deficient work that should have been covered by a performance bond surety | $1,990,585.14 |
| **Total:** | **$7,589,648.91** |

67.  Liberty's damages were caused by the actions it took in reliance on SBI's misrepresentations.

68.  Each category of damage described above is related to and stems directly from SBI's fraudulent conduct.

69.  SBI's conduct was oppressive, fraudulent, and malicious, and constitutes despicable conduct in conscious disregard of Liberty's rights. Therefore, Liberty is entitled to an award of exemplary or punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Liberty prays for judgment as follows:

**ON THE FIRST CAUSE OF ACTION:**

1.  For judgment against SBI in the amount to be determined at trial in excess of $2,942,585.14;

2.  For interest thereon at the maximum legal rate;

3.  For an award of reasonable attorneys' fees expended to prosecute this action, according to proof;

4.  For costs of suit herein; and

5.  For such other and further relief deemed necessary and proper by the Court.

///

///

**ON THE SECOND CAUSE OF ACTION:**

1. For all compensatory, incidental, consequential and other damages proximately caused by SBI's fraud in the total amount of $7,589,648.91, plus any additional sums to be proven at trial;

2. For punitive or exemplary damages according to proof;

3. For interest thereon at the maximum legal rate;

4. For costs of suit herein;

5. For such other and further relief as the Court may deem necessary and proper.

Dated: August 2, 2024  Watt, Tieder, Hoffar & Fitzgerald, L.L.P.

By: _____
Robert C. Niesley
Kyle S. Case
Attorneys for Defendants
LIBERTY MUTUAL INSURANCE COMPANY, THE OHIO CASUALTY INSURANCE COMPANY, and LIVERMORE MULTIFAMILY OWNER, LLC

20315152.1 103735.00109